# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

LONDON-SIRE RECORDS, INC., et al., )
    Plaintiffs, )
     )
    v. )    **No. 04cv12434-NG**
     )    **LEAD DOCKET NO.**
DOE 1 et al., )
    Defendants. )

GERTNER, D.J.:

TABLE OF CONTENTS
## ORDER ON MOTIONS TO QUASH
March 31, 2008

I.    BACKGROUND . . . . . . . . . . . . . . . . . . . . . . -3-
    A.    Facts . . . . . . . . . . . . . . . . . . . . -3-
    B.    Procedural History . . . . . . . . . . . . . -9-
II.    LEGAL STANDARDS . . . . . . . . . . . . . . . . . . -12-
III.    THE DEFENDANTS' ANONYMITY IS ENTITLED TO SOME FIRST AMENDMENT
    PROTECTION . . . . . . . . . . . . . . . . . . . . -13-
IV.    APPLICATION OF THE BALANCING TEST . . . . . . . . . -15-
    A.    Factor One: Prima Facie Claim of Actionable Harm . -17-
        1.    Whether the Plaintiffs Have Asserted a Claim Upon
        Which Relief Can Be Granted . . . . . . . -18-
        a.    Whether the Copyright Holder's Right Extends
        Only to Actual Distributions . . . . . . -20-
        b.    Whether the Distribution Right Is Limited to
        Physical, Tangible Objects . . . . . . . -28-
        (1)    Electronic Files Are Material Objects -30-
        (2)    The Transmission of an Electronic File
        Constitutes a "Distribution" Within the
        Meaning of § 106(3) . . . . . . . . -34-
        2.    Whether the Plaintiffs Have Adduced Prima Facie
        Evidence of Infringement . . . . . . . . -41-
        3.    Whether the Plaintiffs Have Tied Their Allegations
        and Evidence to Specific Acts of Infringement -45-
    B.    Factors Two, Three, and Four:Need and Narrow
    Tailoring . . . . . . . . . . . . . . . . . . -46-
        1.    Specificity of the Discovery Request . . . . . -47-
        2.    Absence of Alternative Means to Obtain
        Information . . . . . . . . . . . . . . . -49-
        3.    Central Need to Litigation . . . . . . . . . -50-
    C.    Factor Five: The Defendants' Expectations of Privacy
    . . . . . . . . . . . . . . . . . . . . . . . -50-
    D.    Required Modifications to the Subpoenas . . . . . -52-
V.    THE MOTION TO QUASH FOR LACK OF PERSONAL JURISDICTION . -53-
VI.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . -54-

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LONDON-SIRE RECORDS, INC., et al., ) | |
|     Plaintiffs, ) | |
| ) | |
|     v. ) | No. 04cv12434-NG |
| ) | LEAD DOCKET NO. |
| DOE 1 et al., ) | |
|     Defendants. ) | |

GERTNER, D.J.:

### ORDER ON MOTIONS TO QUASH
March 31, 2008

This case consists of numerous actions consolidated under London-Sire Records, Inc. v. Does 1-4, Civil Action No. 04-cv-12434. The plaintiffs include several of the country's largest record companies. The defendants,[1] the plaintiffs claim, are individual computer users -- mainly college students -- who use "peer-to-peer" file-sharing software to download and disseminate music without paying for it, infringing the plaintiffs' copyrights.

In these cases, the plaintiffs have been able to infer some infringing file-sharing activity from their investigations, but have not been able to discover the file-sharer's identity. They have an Internet Protocol number ("IP number" or "IP address") identifying the file-sharer's computer, but no more. Consequently, the plaintiffs -- with the Court's permission -- have served subpoenas on a number of internet service providers ("ISPs"), largely colleges and universities, seeking a name to go with the number. To preserve the rights of those whose identities

---

[1] The defendants in this case have not yet been named; the Court simply refers to them as "the defendants." Those who contest the subpoena are "the movants."

are sought, the Court has required the ISPs to delay responding to
the subpoena until the individual defendants have had an
opportunity to move to quash it before their identities are
disclosed.[2]  Several defendants have done so; those are the motions
presently before the Court.

After briefing, argument, and amicus participation, the Court
concludes that it has insufficient information to allow the
plaintiffs to take expedited discovery under these circumstances.
First, the movants are entitled to some First Amendment protection
of their anonymity -- albeit limited.  Second, the defendants may
have expectations of privacy with regard to their identity, but
that depends on the terms of the internet service agreement they
have with Boston University, which has not been provided to the
Court.  Third, the movants have raised an issue of fact with
respect to the number of identities disclosed to the plaintiffs by
the expedited discovery.  As it currently exists, the plaintiffs'
subpoena may invade the anonymity of many non-infringing internet
users -- anonymity that deserves protection by the Court.  Under
these circumstances, the best solution is in camera review of the
terms of service agreement and the ISP's list of individuals who
match the information supplied by the plaintiffs.

---

[2] Specifically, the Court requires that the plaintiffs attach a "Court-
Directed Notice Regarding Issuance of Subpoena," which the ISPs distribute to
the individuals in question.  The Notice informs the putative defendants that
they have the opportunity to move to quash the subpoena, as these defendants
have done.  See Appendix A (Court-Directed Notice).

The Court will therefore **GRANT** two of the motions to quash (documents ## 104 and 115), at least until the relevant information is obtained.[3]  The plaintiffs may renew their motion for expedited discovery, addressing the Court's concerns by modifying the subpoena they seek to serve on Boston University, as discussed below.

I.    <u>BACKGROUND</u>

A.    <u>Facts</u>

In each of these cases, the facts are substantially identical.  Since the defendants' motions are effectively motions to dismiss -- there is almost no evidence in the case, and the movants argue, among other things, that the plaintiffs have failed to state a claim upon which relief can be granted -- the Court will apply that standard of review to the pleadings.  The plaintiffs' pleadings are taken as true, and the Court will draw all reasonable inferences in their favor.  <u>See, e.g.</u>, <u>Rivera v. Rhode Island</u>, 402 F.3d 27, 33 (1st Cir. 2005) (stating standard for motion to dismiss).  To survive a motion to dismiss, the plaintiffs' pleaded facts must "possess enough heft to sho[w] that [they are] entitled to relief."  <u>Clark v. Boscher</u>, 514 F.3d 107, 112 (1st Cir. 2008) (internal quotation marks omitted) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, __ U.S. __, 127 S.Ct. 1955, 1959 (2007)) (first alteration in <u>Twombly</u>).

---

[3] Document # 115 is styled "Reply Memorandum of Law of Defendant 'Doe,'" but the Court has no other related documents.  The Court takes the filing as a pro se Motion to Quash, and for clarity's sake, refers to it as such.

The plaintiffs allege that the defendants used peer-to-peer software to "download and/or distribute to the public certain of the [plaintiffs'] Copyrighted Recordings. . . . Through his or her continuous and ongoing acts of downloading and/or distributing to the public the Copyrighted Recordings, each Defendant has violated Plaintiffs' exclusive rights of reproduction and distribution." E.g., Compl. at 5 (docket no. 07-cv-10834, document # 1).  To clarify the issues on which this case turns, the Court will briefly explain the nature of peer-to-peer software and its use.

Peer-to-peer software primarily exists to create decentralized networks of individual computer users.  The software allows the users to communicate directly with one another, rather than routing their transmissions through a central server -- thus the term "peer-to-peer" architecture, as opposed to "client-server."  See, e.g., Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 545 U.S. 913, 919-920 & n.1 (2005).  Each type of architecture has distinct advantages and disadvantages, most of which are not relevant to this case.

What is relevant is that users in a peer-to-peer network can remain relatively anonymous or pseudonymous.  Because communications between two computers on a peer-to-peer network can take place directly, without passing through a central network server,[4] such transactions are not easily observable by a third

---

[4] This is a small oversimplification.  Many popular peer-to-peer networks use a "supernode" architecture.  A supernode is a semi-centralized computer that operates only to relay search queries and responses within the peer-to-peer network.  Once the desired file is located, however, it may be

party.  By the nature of the network and software, then, peer-to-
peer users can control what information they display to the world.
See Linares Decl. at 4, Ex. A to Pl. Mot. Leave to Take Immediate
Discovery (docket no. 07-cv-10834, document # 5).  Moreover,
generally speaking, anyone who has the requisite software and
internet connection can participate in open peer-to-peer networks,
such as the ones the defendants are alleged to have used in this
case.

     Peer-to-peer users can also transfer files over the network.
Many such files are entirely legitimate.  See Grokster, 545 U.S.
at 920.  However, other files transferred are electronic versions
of copyrighted music or video files.  Notably, because the files
on each user's computer are digital, another computer can make a
precise copy of them with no attendant loss in quality.  See
Linares Decl. at 3-4, Ex. A to Pl. Mot. Leave to Take Immediate
Discovery (docket no. 07-cv-10834, document # 5).

     In this case, the plaintiffs allege that each of the
defendants has taken part in just such a file transfer.  To

_____

transferred directly from one computer to another.  See, e.g., Peter S. Menell
& David Nimmer, Legal Realism in Action: Indirect Copyright Liability's
Continuing Tort Framework and Sony's De Facto Demise, 55 UCLA L. Rev. 143,
183-84 (2007).

     The history of peer-to-peer networks has been one of increasing
decentralization, and thus, increasing anonymity.  See id. at 179-85 (tracing
history of peer-to-peer network technologies through lawsuits asserting
contributory copyright liability).  Some newer peer-to-peer technologies even
dispense with supernodes.  See, e.g., Grokster, 545 U.S. at 922; Matthew
Helton, Secondary Liability for Copyright Infringement: BitTorrent as a
Vehicle for Establishing a New Copyright Definition for Staple Articles of
Commerce, 40 Colum. J. L. & Soc. Probs. 1, 20-21 (2006) (discussing new
version of software that permits direct peer-to-peer connection without the
need for a proxy computer).

discover potentially infringing transfers, the plaintiffs (acting
through their trade association, the Recording Industry
Association of America, or "RIAA") have retained a third-party
investigator, MediaSentry, Inc. ("MediaSentry").  Id. at 4-5.
MediaSentry essentially functions as an undercover user of the
peer-to-peer networks.  It connects to the network and searches
for the plaintiff record companies' copyrighted files.  Upon
finding the files, it downloads them.  See id. at 5-6.
MediaSentry gathers what information it can about the computer
from which the files were downloaded (the "sending computer.")
Most crucially, that information includes the date and time at
which the files were downloaded and the IP number of the sending
computer.  It can also include the user's name, but if given, the
names are usually pseudonymous.  See id.  After the files are
downloaded, the RIAA verifies that they can form the basis for a
suit.  It

> reviews a listing of the music files that the
> user has offered for download in order to
> determine whether they appear to be
> copyrighted sound recordings.  The RIAA also
> listens to the downloaded music files from
> these users in order to confirm that they are,
> indeed, illegal copies of sound recordings
> whose copyrights are owned by RIAA members.

Id. at 6.[5]

---

[5] At the hearing, the defendants protested that it is impossible to
determine whether a sound recording is "illegal" merely by listening to it.
See Bestavros Decl. at 2-3 (document # 110).  True enough.  Indeed, one of the
key features of digital copyright infringement is that an nth-generation copy
is more or less identical to a non-infringing first-generation copy, so there
is no drop in sound quality over time.  But listening to the files is still
important.  The defendants must ascertain that what is labeled as a sound

At this point, assuming the plaintiffs wish to sue, they cannot do so; they have only the IP number of the sending computer.  An IP number is sometimes called an IP address because it is just that: an address.  It serves as a locator declaring the place of a particular piece of electronic equipment so that electronic data may be sent to it, and is usually represented as a series of four numbers between 0 and 255.  See, e.g., America Online v. Huang, 106 F.Supp.2d 848, 851 (E.D. Va. 2000).  (For example, 168.122.128.38 is one of the IP addresses allegedly used by a defendant in this case.  See Doe List, Ex. A to Compl. (docket no. 07-cv-10834, document # 1).)

But relatively few personal computer users have a specific, set IP address, called a "static" address.  Instead, many use their computers to connect to a network provided by their ISP, which uses a certain range of IP addresses -- say, all of the numbers between 168.122.1.x to 168.122.100.x.  The ISP assigns an address within its range to the user's computer for the user's session, allocating the numbers within its range on an as-needed basis.  This process is known as "dynamic" addressing.  See, e.g., H. Brian Holland, Tempest in a Teapot or Tidal Wave? Cybersquatting Rights & Remedies Run Amok, 10 J. Tech. L. & Pol'y 301, 305 & nn. 13-18 (2005).  This makes the plaintiffs' task of discovering the identity of a particular infringer more difficult.

---

recording to which they hold the copyright actually is such a recording (and not, say, a misnamed file or fair use that would not infringe the copyright.)

The IP address that they have noted as belonging to a particular user's computer may be assigned to a different user's computer in short order.  See id.

However, the plaintiffs are not without leads.  The range in which the IP address is assigned may reveal the user's ISP.  See Linares Decl. at 7, Ex. A to Pl. Mot. Leave to Take Immediate Discovery (docket no. 07-cv-10834, document # 5); see also, e.g., Network-Tools.com, http://network-tools.com/default.asp (last visited Mar. 31, 2008) (providing such a service).  And ISPs generally keep logs of which IP address is assigned to which user -- although it may purge those logs after a certain period of time, which was one of the key facts relied upon by the Court in granting expedited discovery.  See Linares Decl. at 9, Ex. A to Pl. Mot. Leave to Take Immediate Discovery (docket no. 07-cv-10834, document # 5).  Thus, the plaintiffs seek, though their subpoena, the opportunity to place their list of IP addresses side-by-side with the ISP's user logs to determine who was using the IP address at the moment of the alleged infringement.  The ISPs, particularly colleges and universities, appropriately decline to reveal the identities of their users without a court order.  Therefore, the plaintiffs bring "John Doe" lawsuits and seek discovery in order to determine the real identities of the defendants.

B.    **Procedural History**

The plaintiff record companies have brought approximately forty "John Doe" cases in this Court, many -- perhaps most -- designating more than one defendant, grouped by ISP.[6]  In each case, the Court has granted expedited discovery and leave to subpoena the ISP, recognizing that the plaintiffs' rights may be irreparably and unfairly prejudiced unless they are allowed to seek the defendants' identities.  See, e.g., Order re: Expedited Discovery (Dec. 9, 2004) (document # 7).  Simultaneously, however, the Court has recognized that the defendants should have the opportunity to combat the subpoena if they desire to do so.  Therefore, the Court has ordered that the ISP provide the individual users with notice of the lawsuit and a short statement of some of their rights before revealing their identities to the plaintiffs.  Furthermore, the ISP may not respond to the subpoena for 14 days after each defendant has received notice.  See id.; see also Appendix A (Court-Directed Notice).

Simultaneous with the grant of expedited discovery, the Court has consolidated each "John Doe" case with the first, London-Sire, No. 04-cv-12434.  The cases involve similar, even virtually identical, issues of law and fact: the alleged use of peer-to-peer software to share copyrighted sound recordings and the discovery of defendants' identities through the use of a Rule 45 subpoena to their internet service provider.  Consolidating the cases ensures

---

[6] According to the amicus brief of the Electronic Frontier Foundation, more than 20,000 individuals have been sued nationwide.  Amicus Curiae Br. of the Electronic Frontier Foundation ("EFF Br.") at 5-9 (document # 152).

administrative efficiency for the Court, the plaintiffs, and the ISP, and allows the defendants to see the defenses, if any, that other John Does have raised.[7]

In view of the $750 statutory minimum damages per song, 17 U.S.C. § 504(c)(2), most defendants choose to settle. The approximate settlement range appears to be $3,000 to $6,000 per defendant, a considerable amount of money, particularly to the college students who have been caught in the plaintiffs' nets.

Only three of the defendants have elected to fight the subpoena. Two are Doe defendants from the case originally titled Arista Records LLC v. Does 1-21, No. 07-cv-10834 (consolidated on May 8, 2007). In that case, the plaintiffs sought discovery from Boston University as the defendants' ISP, and the two Does[8] separately moved to quash the subpoena. Each primarily asserts that the plaintiffs have failed to state a sufficient claim for copyright infringement. See Mem. Supp. Mot. Quash (document # 104); Mot. Quash (document # 115). Because the two motions are substantively similar, the Court will address them together.

---

[7] For these reasons, insofar as one of the movant Does requests severance, see Mot. Quash at 1-3 (document # 115), the motion is **DENIED without prejudice.** The case against each Doe will be individually considered for purposes of any rulings on the merits, and the movant may renew the severance request before trial if the case proceeds to that stage.

[8] It is not clear which Does are the two movants. The Doe filing one Motion to Quash (document # 115) identifies him or herself as Doe no. 21; the Doe filing the other Motion to Quash (document # 103) called himself Doe no. 1. Doe no. 1 has been dismissed, however. See Notice of Dismissal (document # 122) (dismissing Doe no. 1 from the civil action originally docketed with number 07-cv-10834); Notice of Dismissal (document # 136) (same).

The third defendant to move to quash the subpoena is Doe no. 12 from <u>Warner Brothers Records, Inc. v. Does 1-17</u>, No. 07-cv-10924 (consolidated on May 18, 2007). The Internet Service Provider at issue is the University of Massachusetts. Doe no. 12 argues that she is not subject to personal jurisdiction in Massachusetts. <u>See</u> Mot. Quash (document # 113).

The Court held a hearing on the Motions to Quash on January 28, 2008. Shortly thereafter, the Court granted the Electronic Frontier Foundation ("EFF") leave to file an amicus brief supporting the Motion to Quash. <u>See</u> Electronic Order (Feb. 6, 2008). Its brief principally treats the First Amendment implications of the subpoena[9] and the proper sweep of the copyright laws. The Court thanks the amicus for its participation.

The Court will examine first the motions of the two Does in the Boston University case, which argue that the subpoena ought to be denied on substantive grounds. It will then turn to the University of Massachusetts Doe's argument that the subpoena should be quashed for lack of personal jurisdiction.

## II. <u>LEGAL STANDARDS</u>

This case is still at a preliminary stage: The plaintiffs seek to learn the identities of the defendants so that the issue may be properly joined on the merits. Under Federal Rule 45, the

---

[9] The EFF's First Amendment arguments are taken on their merits, contrary to the plaintiffs' contention that no party has raised them. <u>See</u> Pls.' Resp. Opp. Amicus Curiae Br. at 2-3 (document # 157). At least one of the motions to quash raises the same issues, albeit in less detail. <u>See</u> Mem. L. Supp. Mot. Quash at 7-8 (document # 104).

Court "shall quash or modify the subpoena if it . . . requires disclosure of privileged or other protected matter and no exception or waiver applies."  Fed. R. Civ. P. 45(c)(3)(A)(iii). The substantive inquiry is similar to the one necessary for issuing a protective order.  See Micro Motion, Inc. v. Kane Steel Co., 894 F.2d 1318, 1322-23 (Fed. Cir. 1990).  The party requesting that the subpoena be quashed must show good cause for protection by specifically demonstrating that disclosure will cause a clearly defined and serious harm.  See Anderson v. Cryovac, Inc., 805 F.2d 1, 7-8 (1st Cir. 1986); Glenmede Trust Co. v. Thompson, 56 F.3d 476, 483 (3d Cir. 1995).  The Court balances the harm of disclosure against the harm to the other party of restricting discovery.

    The Court must therefore first consider whether the defendants' anonymity is entitled to privilege or other protection.  If so, it will turn to the balancing test necessary under Rule 45(c)(3).

### III. THE DEFENDANTS' ANONYMITY IS ENTITLED TO SOME FIRST AMENDMENT PROTECTION

    The motion to quash raises two First Amendment issues -- the right to anonymous speech and the right to whatever creative activity is involved in the defendants' acts.  While the Court recognizes some limited First Amendment protection here, that protection only goes so far as to subject the plaintiffs' subpoenas to somewhat heightened scrutiny.  Other courts have

reached the same conclusion.  See, e.g., Sony Music Entm't v. Does 1-40, 326 F.Supp.2d 556, 564 (S.D.N.Y. 2004).

As the Supreme Court has repeatedly held, the First Amendment protects anonymous speech.  The right to anonymity is an important foundation of the right to speak freely.  Indeed, "[a]nonymity is a shield from the tyranny of the majority.  It . . . exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation -- and their ideas from suppression -- at the hand of an intolerant society."  McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 357 (1995).  See also NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460-62 (1958) (discussing generally the importance of anonymity).  Still, the anonymous activity that is being protected must be "speech."

Copyright infringement, per se, is clearly not speech entitled to First Amendment protection.  See Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 555-57, 560 (1985) (discussing the First Amendment and copyright, and examining whether fair use doctrine applied to alleged act of copyright infringement).  But there are some creative aspects of downloading music or making it available to others to copy: the value judgment of what is worthy of being copied; the association of one recording with another by placing them together in the same library; the self-expressive act of identification with a particular recording; the affirmation of joining others listening

to the same recording or expressing the same idea.  See Rebecca Tushnet, Copy This Essay: How Fair Use Doctrine Harms Free Speech and How Copying Serves It, 114 Yale L.J. 535, 545-47, 562-81 (2004); Jack M. Balkin, Digital Speech and Democratic Culture: A Theory of Freedom of Expression for the Information Society, 79 N.Y.U. L. Rev. 1, 45-46 (2004); cf. Harper & Row, 471 U.S. at 547 (noting that compilation of pure fact "entails originality" in selection and ordering of the facts).  Thus, while the aspect of a file-sharer's act that is infringing is not entitled to First Amendment protection, other aspects of it are.  Cf., e.g., Schad v. Mount Ephraim, 452 U.S. 61, 66 (1981) ("[N]ude dancing is not without its First Amendment protections from official regulation."); Eugene Volokh, Crime-Facilitating Speech, 57 Stan. L. Rev. 1095 (2005) (arguing that crime-facilitating speech has "some First Amendment value").

Nevertheless, the fact that there is First Amendment value associated with sharing music over a peer-to-peer network does not insulate the defendants from liability.  Rather, the minimal First Amendment protection their activity garners[10] entitles them to some

---

[10] See Sony Music, 326 F.Supp.2d at 564 (finding file-sharers' activity "qualifies as speech, but only to a degree," because the "real purpose is to obtain music for free"); In re Verizon Internet Svcs., Inc., 257 F.Supp.2d 244, 260 (D.D.C. 2003), rev'd on other grounds, Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Svcs., Inc., 351 F.3d 1229 (D.C. Cir. 2003) (holding that file-sharers were entitled to some anonymity on First Amendment grounds, "even though the degree of protection is minimal where alleged copyright infringement is the expression at issue").

scrutiny of a discovery request that uses the power of the Court to threaten the privilege.[11]

## IV.    <u>APPLICATION OF THE BALANCING TEST</u>

As to how to balance the harms, the Court finds persuasive the approach of the Southern District of New York in <u>Sony Music</u>, 326 F.Supp.2d 556.  In that case, the court reviewed the leading cases on subpoenas seeking disclosure of defendants' identities from their ISP.  It isolated five important factors:[12]

> (1) a concrete showing of a prima facie claim of actionable harm, (2) specificity of the discovery request, (3) the absence of alternative means to obtain the subpoenaed information, (4) a central need for the subpoenaed information to advance the claim, and (5) the party's expectation of privacy.

---

[11] Other forms of speech also receive such intermediate valuation.  <u>See</u> <u>Florida Bar v. Went For It, Inc.</u>, 515 U.S. 618, 623 (noting that commercial speech is entitled to "a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values" (internal quotation omitted)).  The Court need not, and does not, express a view as to the proper place of file-sharing in the speech hierarchy; it is enough for present purposes to determine that it has some First Amendment value.

[12] In doing so, the court subsumed the analysis a number of other leading cases, including, for example, <u>Dendrite International, Inc. v. Doe</u>, 342 N.J.Super. 134, 775 A.2d 756, 760, 772 (2001), a case relied upon by the EFF.  <u>See</u> <u>Sony Music</u>, 326 F.Supp.2d at 563-64.  <u>Dendrite</u>, like many other cases involving internet speech, is not directly applicable to these facts. In that case, the plaintiff asserted that the anonymous defendant had defamed it on an internet bulletin board -- an act much more clearly in the wheelhouse of the First Amendment's protections.  <u>See</u> 342 N.J. Super. at 140-41, 775 A.2d at 760.  The court in that case therefore sensibly elected to apply a more stringent standard than the one appropriate here.  <u>See id.</u>, 342 N.J. Super. at 149-59, 775 A.2d at 765-72.

Id. at 564-65 (citations omitted).[13]  The first factor ensures that the defendants cannot pierce the defendants' anonymity based on an unsupported or legally insufficient pleading.  The second, third, and fourth factors ensure that the subpoena is narrowly tailored to reveal no more information about the defendants than necessary, and to ensure that third parties who are not accused of infringement remain anonymous.  The fifth factor considers the defendants' expectations of privacy, including whatever service arrangement they might have with their ISP.

The Court considers each factor in turn.


### A.    Factor One: Prima Facie Claim of Actionable Harm

This factor has three parts.  First, the plaintiffs must assert an "actionable harm," a claim upon which relief can be granted.  Second, the claim must be supported by prima facie evidence.  That standard does not require the plaintiffs to prove their claim.  They need only proffer sufficient evidence that, if credited, would support findings in their favor on all facts

---

[13] A number of other courts have also found the Sony Music approach persuasive, some on substantially different facts.  See Best Western Int'l, No. CV-06-1537-DGC, 2006 WL 2091695, at *3-*5 (D.Ariz. July 25, 2006) (posting to internet bulletin boards); Gen. Bd. of Global Ministries of the United Methodist Church v. Cablevision Lightpath, Inc., No. CV-06-3669-ETB, 2006 WL 3479332, at *4-*5 (E.D.N.Y. Nov. 30, 2006) (unauthorized access to email); Elektra Entm't Group v. Does 1-9, No. 04CV2289-RWS, 2004 WL 2095581, at *2-*5 (S.D.N.Y. Sept. 8, 2004) (file-sharing and copyright infringement).  But see Mobilisa, Inc. v. Doe, 217 Ariz. 103, 170 P.3d 712, 720 (Ariz. App. 2007) (declining to apply Sony Music standard in case involving alleged unlawful access to plaintiffs' computer server by anonymous user, and applying a more stringent standard).

essential to their claim.  See <u>Adelson v. Hananel</u>, 510 F.3d 43, 48
(1st Cir. 2007) (discussing prima facie standard for personal
jurisdiction).  Finally, both the claim and the prima facie
evidence supporting it must be "concrete."  That is, they must be
reasonably grounded in allegations of a specific act of
infringement.

The movants and the EFF argue that the plaintiffs have failed
to meet their burden under each part of the test.  <u>See</u> Mot. Quash
at 3-7 (document # 104); Mot. Quash at 4-10 (document # 115); EFF
Br. at 9-24 (document # 152).  Their arguments involve important
and difficult questions of copyright law.  Ultimately, however,
the Court finds that the plaintiffs have satisfied this factor.
Considering as true the facts they have pleaded, and drawing all
reasonable inferences in their favor, the plaintiffs have made a
concrete showing of a prima facie case of an actionable harm.


    1.   **<u>Whether the Plaintiffs Have Asserted a Claim Upon</u>**
          **<u>Which Relief Can Be Granted</u>**

A claim for copyright infringement has two elements.  First,
the plaintiffs must demonstrate that they hold a valid copyright
(an issue the defendants do not contest.)  Second, the plaintiff
must show that the defendant violated of one of the exclusive
rights held by a copyright owner.  <u>See</u> <u>T-Peg, Inc. v. Vermont</u>
<u>Timber Works, Inc.</u>, 459 F.3d 97, 108 (1st Cir. 2006); <u>see also</u>
<u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 360-61
(1991); 17 U.S.C. § 501(a).  The plaintiffs claim that "each

[d]efendant, without the permission or consent of [p]laintiffs, has . . . download[ed] or distribut[ed] to the public" music files to which the plaintiff holds the copyright.  Compl. at 5 (docket no. 07-cv-10834, document # 1).  Two rights reserved to the copyright holder are at issue in this case: the right "to reproduce the copyrighted work in copies or phonorecords," 17 U.S.C. § 106(1), and the right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending," id. § 106(3).

The movants and the amicus present two broad arguments, each of which requires the Court to consider the scope of a copyright holder's exclusive rights under the statutes quoted above.  First, they contend that the copyright laws require an actual dissemination of copyrighted material; merely making copyrighted material available for another person to copy, they argue, is only an attempt at infringement -- which is not actionable.  Mem. Supp. Mot. Quash at 4-6 (document # 104); Mot. Quash at 7 (document # 115); EFF Br. at 10-15 (document # 152).  Second, they contend that the scope of the rights given to copyright owners by § 106 is limited by the definition of "phonorecords" as "material objects" in 17 U.S.C. § 101.[14]  In their view, the copyright owner's rights

_____

[14] The parties refer to "copies."  The statute makes clear that where sound recordings are at issue, "phonorecords" is a more precise term.  See 17 U.S.C. § 101.  The two terms appear to be functionally interchangeable, however, differing only in the nature of the copyrighted work.  See H.R. Rep. 94-1476 at 53 (1976), reprinted in 1976 U.S.C.C.A.N. at 5666 (noting that under the copyright statutes, "'copies' and 'phonorecords' together will

are limited to tangible, physical objects, and purely electronic transmissions over the internet fall outside those rights.[15] Suppl. Mem. L. Supp. Mot. Quash at 4-6 (document # 149); Mot. Quash at 7 (document # 115); EFF Br. at 15-24 (document # 152). Both of these broad arguments question whether the plaintiffs have alleged a legally cognizable harm under the copyright statutes. If they have not, then the subpoena must be quashed.

###   a.   Whether the Copyright Holder's Right Extends Only to Actual Distributions

The first question the Court must address is whether the distribution right under 17 U.S.C. § 106(3) requires an actual dissemination to constitute an infringement.[16]  It is an important issue, determining in part how to evaluate the proffered evidence

---

comprise all of the material objects in which copyrightable works are capable of being fixed").

[15] Strictly speaking, much of the parties' briefing on this issue is directed toward the scope of the distribution right under § 106(3), not the reproduction right under § 106(1).  But both refer to "copies or phonorecords," so the arguments implicate both rights, though to different degrees.

[16] The plaintiffs have also alleged a violation of their reproduction rights under § 106(1).  Under that statute, a copyright owner's rights are infringed whenever an unauthorized person "reproduce[s] the copyrighted work in copies or phonorecords."  The plaintiffs have alleged that the defendants downloaded music, as well as distributed it, and that they did not have authorization to do so.  See Compl. at 5 (docket no. 07-cv-10834, document # 1).  At least subject to arguments over the definition of "phonorecords," discussed below, the plaintiffs thus appear to have alleged a legally sufficient harm under § 106(1).  It is still appropriate to address briefly the distribution right under § 106(3), however; it was the focus of the parties' briefing and arguably constitutes the crux of the alleged infringement in this case.  The Court's analysis may also inform later arguments, such as summary judgment or request for further data from the ISP not authorized by the current scope of the subpoena.

in this case.  MediaSentry, posing as just another peer-to-peer
user, can easily verify that copyrighted material has been made
available for download from a certain IP address.  Arguably,
though, MediaSentry's own downloads are not themselves copyright
infringements because it is acting as an agent of the copyright
holder, and copyright holders cannot infringe their own rights.[17]
If that argument is accepted, MediaSentry's evidence cannot alone
demonstrate an infringement.

The plaintiffs suggest two reasons why an actual distribution
might not be required.  First, the statute reserves to the
copyright owner the right "to do <u>and to authorize</u> . . . [the
distribution of] copies or phonorecords of the copyrighted work to
the public."  § 106(3) (emphasis added).  The language appears to
grant two distinct rights: "doing" and "authorizing" a
distribution.  Making the copyrighted material available over the
internet might constitute an actionable "authorization" of a
distribution.  Second, if mere authorization is not enough, the
plaintiffs argue that in appropriate circumstances -- including
these -- "making available" copyrighted material is sufficient to
constitute an act of actual distribution.  Neither argument has
merit.

The First Circuit has squarely considered and rejected the
proposition that copyright liability arises where the defendant

_____

[17] <u>See</u> Mem. Supp. Mot. Quash at 4-6 (document # 149); EFF Br. at 12 n.8
(document # 152).  The Court need not reach this issue now.

authorized an infringement, but no actual infringement occurred. See Venegas-Hernandez v. Ass'n de Compositores & Editores de Música Latinoamericana, 424 F.3d 50, 57-58 (1st Cir. 2005).  It noted that Congress' intent in adding "authorize" to the statute was to "avoid any questions as to the liability of contributory infringers."  Id. at 58 (internal quotation marks omitted) (quoting H.R. Rep. 94-1476 ("House Report") at 52 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5674).  Authorization is sufficient to give rise to liability, but only if an infringing act occurs after the authorization.  See id. at 59; see also Latin Am. Music Co. v. The Archdiocese of San Juan of the Roman Catholic & Apostolic Church, 499 F.3d 32, 46 (1st Cir. 2007) (citing and applying Venegas-Hernandez).

Thus, to constitute a violation of the distribution right under § 106(3), the defendants' actions must do more than "authorize" a distribution; they must actually "do" it.  The Court therefore moves to the plaintiffs' second argument: Merely making copyrighted works available to the public is enough where, as in this case, the alleged distributor does not need to take any more affirmative steps before an unauthorized copy of the work changes hands.  Other courts have split over whether that is a valid reading of the statute.  Compare Hotaling v. Church of Jesus Christ of Latter-Day Saints, 118 F.3d 199 (4th Cir. 1997) (holding that making copyrighted material available is sufficient to constitute a distribution), and Arista Records LLC v. Greubel, 453

F.Supp.2d 961, 969-70 (N.D. Tex. 2006) (citing and following <u>Hotaling</u>), <u>and</u> <u>Warner Bros. Records, Inc. v. Payne</u>, No. W-06-CA-051, 2006 WL 2844415, at *3-*4 (W.D. Tex. July 17, 2006) (same), <u>with</u> <u>In re Napster, Inc. Copyright Litig.</u>, 377 F.Supp.2d 796, 802-05 (N.D. Cal. 2005) (criticizing <u>Hotaling</u> as being "contrary to the weight of [other] authorities" and "inconsistent with the text and legislative history of the Copyright Act of 1976"), <u>and</u> <u>Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.</u>, 991 F.2d 426, 434 (8th Cir. 1993) (stating that infringement of the distribution right requires the actual dissemination of copies or phonorecords).

To suggest that "making available" may be enough, the plaintiffs rely primarily on the Fourth Circuit's decision in <u>Hotaling</u>.[18]  In that case, a library had an unauthorized copy of a book, which it "made available" to the public; the defendant argued that without a showing that any member of the public

---

[18] The plaintiffs also cite <u>A & M Records, Inc. v. Napster, Inc.</u>, 239 F.3d 1004 (9th Cir. 2001).  In <u>A & M v. Napster</u>, the the Ninth Circuit considered a suit against a provider of peer-to-peer services.  The court stated that "Napster users who upload file names to the search index for others to copy violate plaintiffs' distribution rights." <u>Id.</u> at 1014.  As the EFF argues, the Ninth Circuit's reasoning is not persuasive here.  First, as the district court noted in that case, "it is pretty much acknowledged" that infringement had occurred.  <u>Id.</u> (internal quotation marks omitted).  Second, because the plaintiffs were suing the peer-to-peer network provider rather than any particular user, they did not need to show that any <u>particular</u> copyright was infringed.  It was enough to show that approximately 70% of the available material infringed the plaintiffs' copyrights.  <u>See id.</u> at 1013. Finally, the court's very statement may betray a slight misunderstanding about the way the technology worked -- it was not the "file names" that were copied, as the court's statement seems to imply, but the actual files themselves. Indeed, merely "upload[ing] file names" does not even constitute making the files themselves available.  <u>But see</u> <u>Motown Record Co., LP v. DePietro</u>, No. 04-CV-2246, 2007 WL 576284, at *3 & n.38 (E.D. Pa. Feb. 16, 2007) (finding <u>A & M v. Napster</u> persuasive on facts similar to those in the case at bar).

actually read the book, it could not be liable for "distribution."
See id. at 201-02, 203.  The district court agreed and granted
summary judgment to the defendant.  The Fourth Circuit reversed:

> When a public library adds a work to its
> collection, lists the work in its index or
> catalog system, and makes the work available
> to the borrowing or browsing public, it has
> completed all the steps necessary for
> distribution to the public.  At that point,
> members of the public can visit the library
> and use the work.  Were this not to be
> considered distribution within the meaning of
> § 106(3), a copyright holder would be
> prejudiced by a library that does not keep
> records of public use, and the library would
> unjustly profit by its own omission.

Id.; see also id. at 204.

The plaintiffs contend that this case is analogous to

Hotaling,[19] and suggest that the Court should reach the same

conclusion as the Fourth Circuit.  But the EFF correctly points

out a lacuna in the Fourth Circuit's reasoning.  See EFF Br. at 15

(citing William F. Patry, 4 Patry on Copyright §§ 13:9, 13:11

(2007)).  Merely because the defendant has "completed all the

steps necessary for distribution" does not necessarily mean that a

---

[19] Indeed, this case is closer to the facts of Hotaling than were the
facts in the Napster litigation.  In In re Napster, the court considered an
"indexing" system in which central computer servers kept a record of which
peer-to-peer users had which files, somewhat analogous to the supernodes used
by the peer-to-peer system at issue here.  See supra note 4.  In rejecting the
plaintiffs' theory, the court noted that the index was only an index -- not
the actual file containing the sound recording.  See In re Napster, 377
F.Supp.2d at 803.  In this case, the individual peer-to-peer users are alleged
to have had the electronic files on their hard disks, not merely a reference.
See also Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1162-63 (9th
Cir. 2007) (distinguishing Google's process of indexing images and providing
thumbnails to users on similar grounds).

distribution has actually occurred.[20]  It is a "distribution" that the statute plainly requires.  See 17 U.S.C. § 106(3).

The plaintiffs encourage the Court to adopt a much more capacious definition of "distribution."  They argue that the Supreme Court has held that the "terms 'distribution' and 'publication' . . . [are] synonymous in the Copyright Act."  Pls.' Resp. Opp. Amicus Curiae Br. at 2-3 (document # 157) (citing Harper & Row, 471 U.S. at 552).[21]  They further note, correctly, that the statutory definition of publication can include offers to distribute.  See 17 U.S.C. § 101.  And sharing music files on a peer-to-peer network does, at least arguably, constitute an offer to distribute them.

While some lower courts have accepted the equation of publication and distribution, see Greubel, 453 F.Supp.2d at 969; In re Napster, 377 F.Supp.2d at 803, the plaintiffs' argument mischaracterizes the Supreme Court's decision in Harper & Row. The Supreme Court stated only that § 106(3) "recognized for the first time a distinct statutory right of first publication," and quoted the legislative history as establishing that § 106(3) gives

_____

[20] The First Circuit's decisions in Venegas-Hernandez, 424 F.3d at 57-59, and Latin American Music Co., 499 F.3d at 46, appear to support this distinction.

[21] Before the Copyright Act was passed in 1976, "publication" determined the date on which statutory protection of the copyright began.  See 17 U.S.C. § 24 (1970), repealed by Copyrights Act of 1976, ch. 3, § 302, 90 Stat. 2541. It occurred when "'the original or tangible copies of a work [were] . . . made available to the general public.'"  Bartok v. Boosey & Hawkes, Inc., 523 F.2d 941, 945 (2d Cir. 1975) (quoting Melville B. Nimmer, Nimmer on Copyright § 49 at 194-95 (1974)).  It did not include the mere public performance of a work. See Ferris v. Frohman, 223 U.S. 424, 435-36 (1912).

a copyright holder "the right to control the first public distribution of an authorized copy . . . of his work." Harper & Row, 471 U.S. at 552 (internal quotation marks omitted) (quoting House Report at 62, reprinted in 1976 U.S.C.C.A.N. at 5675) (alteration in Harper & Row).  That is a far cry from squarely holding that publication and distribution are congruent.

To the contrary, even a cursory examination of the statute suggests that the terms are not synonymous.  "Distribution" is undefined in the copyright statutes.  "Publication," however, is defined, and incorporates "distribution" as part of its definition:

> 'Publication' is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending.  The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication.  A public performance or display of a work does not of itself constitute publication.

17 U.S.C. § 101.  By the plain meaning of the statute, all "distributions . . . to the public" are publications.  But not all publications are distributions to the public -- the statute explicitly creates an additional category of publications that are not themselves distributions.  For example, suppose an author has a copy of her (as yet unpublished) novel.  If she sells that copy to a member of the public, it constitutes both distribution and publication.  If she merely offers to sell it to the same member of the public, that is neither a distribution nor a publication.

And if the author offers to sell the manuscript to a publishing house "for purposes of further distribution," but does not actually do so, that is a publication but not a distribution.

Plainly, "publication" and "distribution" are not identical. And Congress' decision to use the latter term when defining the copyright holder's rights in 17 U.S.C. § 106(3) must be given consequence.  In this context, that means that the defendants cannot be liable for violating the plaintiffs' distribution right unless a "distribution" actually occurred.

But that does not mean that the plaintiffs' pleadings and evidence are insufficient.  The Court can draw from the Complaint and the current record a reasonable inference in the plaintiffs' favor -- that where the defendant has completed all the necessary steps for a public distribution, a reasonable fact-finder may infer that the distribution <u>actually took place</u>.  As in <u>Hotaling</u>, the defendants have completed the necessary steps for distribution, albeit electronic: Per the plaintiffs' pleadings, each individual Doe defendant connected to the peer-to-peer network in such a way as to allow the public to make copies of the plaintiffs' copyrighted recordings.  <u>See</u> Compl. at 5 (docket no. 07-cv-10834, document # 1).  Through their investigator, the plaintiffs have produced evidence that the files were, in fact, available for download.  They have also alleged that sound recordings are illegally copied on a large scale, supporting the inference that the defendants participated in the peer-to-peer

network with the intent that other users could download from the
defendants copies of the plaintiffs' copyrighted material.
See Linares Decl. at 3-4, Ex. A to Pl. Mot. Leave to Take
Immediate Discovery (docket no. 07-cv-10834, document # 5).  At
least at this stage of the proceedings, that is enough.  The
plaintiffs have pled an actual distribution and provided some
concrete evidence to support their allegation.

> **b.    Whether the Distribution Right Is Limited to
> Physical, Tangible Objects**

Next, the movants and the EFF contend that the distribution
right under 17 U.S.C. § 106(3) is limited to physical, tangible
objects.  By its terms, the distribution right only extends to
distributions of "phonorecords of the copyrighted work to the
public by sale or other transfer of ownership, or by rental, lease
or lending."  In turn, 17 U.S.C. § 101 defined "phonorecords" as
"material objects in which sounds . . . are fixed."  The movants
and the EFF focus on the phrase "material object," as well as the
meaning of "sale or other transfer," and conclude that purely
electronic file sharing does not fall within the scope of the
right.  If their argument is accepted, it would mean that the
plaintiffs' Complaint is legally insufficient to allege a
violation of the distribution right protected by § 106(3).

The movants' argument is sweeping, carrying substantial
implications for a great deal of internet commerce -- any
involving computer-to-computer electronic transfers of
information.  Indeed, this case is an exemplar.  The plaintiffs

have not alleged a physical distribution.  To the contrary, it is clear that their harm comes from the purely electronic copying of music files.  See Linares Decl. at 3-4, Ex. A to Pl. Mot. Leave to Take Immediate Discovery (docket no. 07-cv-10834, document # 5). After carefully considering the parties' and the EFF's arguments, the Court concludes that § 106(3) confers on copyright owners the right to control purely electronic distributions of their work.

As noted above, 17 U.S.C. § 106(3) applies to the distribution of "phonorecords."  And "phonorecords" are defined in full as follows:

> 'Phonorecords' are material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.  The term 'phonorecords' includes the material object in which the sounds are first fixed.

17 U.S.C. § 101.  The movants and the EFF contend that the electronic distribution, if it occurred, did not involve the "distribution" of a material object "by sale or other transfer of ownership, or by rental, lease or lending," as §§ 106(3) and 101 require.  The argument has two closely related prongs -- first, that no material object actually changed hands, and second, that even if it did, it was not through one of the methods of transfer enumerated in the statute.

Each of those arguments relies on an overly literal definition of "material object," and one that ignores the phrase's

purpose in the copyright statutes.  Congress intended for the
copyright owner to be able to control the public distribution of
items that can reproduce the artist's sound recording.  It makes
no difference that the distribution occurs electronically, or that
the items are electronic sequences of data rather than physical
objects.

Before squarely addressing the parties' arguments, however,
the Court briefly revisits an important foundational issue --
whether the electronic files at issue here can constitute
"material objects" within the meaning of the copyright statutes.
Doing so will help the Court explain the scope of the distribution
right and frame the application of the Copyright Act to an
electronic world.

### (1)  **Electronic Files Are Material Objects**

Understanding Congress' use of "material object" requires
returning to a fundamental principle of the Copyright Act of 1976,
Pub. L. No. 94-553, 90 Stat. 2541 (codified as amended in 17
U.S.C.).  Congress drew "a fundamental distinction between the
'original work' which is the product of 'authorship' and the
multitude of material objects in which it can be embodied.  Thus,
in the sense of the [Copyright Act], a 'book' is not a work of
authorship, but is a particular kind of 'copy.'"  House Report at
53, <u>reprinted in</u> 1976 U.S.C.C.A.N. at 5666.[22]

---

[22] The term "material object" also distinguishes a tangible copy of a
work from its performance.  <u>Compare</u> 17 U.S.C. § 101 (defining "copies"), <u>with</u>
<u>id.</u> (defining "perform").  Clearly, different copyrights are implicated by the
ownership of a phonorecord and by a public performance of the sound recording

The Copyright Act thus does not use materiality in its most obvious sense -- to mean a tangible object with a certain heft, like a book or compact disc.  Rather, it refers to materiality as a medium in which a copyrighted work can be "fixed."  <u>See</u> 17 U.S.C. § 101 ("A work is 'fixed' in a tangible medium of expression when its embodiment in a copy or phonorecord, . . . is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration.").  As the Second Circuit cogently explained, "[t]he sole purpose of § 101's definitions of the words 'copies' and 'fixed' is to . . . define the material objects in which copyrightable and infringing works may be embedded and to describe the requisite fixed nature of that work within the material object."  <u>Matthew Bender & Co., Inc. v. West Pub. Co.</u>, 158 F.3d 693, 702 (2d Cir. 1998).  The opposite is true as well.  The sole purpose of the term "material object" is to provide a reference point for the terms "phonorecords" and "fixed."[23]

---

physically embodied in that phonorecord.  <u>Compare</u> 17 U.S.C. § 106(1), <u>with</u> <u>id.</u> § 106(3), <u>and with</u> <u>id.</u> §§ 106(4), 106(6).  While this seems an elementary distinction, it is important to the scope of the distribution right, discussed more extensively below.

[23] This point of view is supported by Congress' abrogation of one judicial doctrine concerning the nature of a "copy."  In <u>White-Smith Publishing Co. v. Apollo Co.</u>, 209 U.S. 1 (1908), the Supreme Court rejected the argument that the copyright for a piece of music applied to the perforated sheets used to instruct a player piano, holding that it was limited to sheet music from which a person could read and reproduce the music.  Because the perforated sheets were not intelligible to a person, the Court held, they were not "copies."  <u>Id.</u> at 17.  Congress rightly rejected this "artificial and largely unjustifiable distinction[]," House Report at 52, <u>reprinted in</u> 1976 U.S.C.C.A.N. at 5665, by expanding the definition of "fixed" to include methods that required machines.  Concurrently, Congress sought to broaden the definition of the medium in which copyrighted material <u>could</u> be fixed.  <u>See</u> <u>id.</u> at 52-53, <u>reprinted in</u> 1976 U.S.C.C.A.N. at 5665-66.  A "material object"

This analysis is borne out in other aspects of the Copyright Act -- for example, the Act's abrogation of a common-law presumption regarding the sale of copyrights.  At common-law, if an author sold her manuscript, the sale included the author's copyrights in the original work unless the sale agreement specifically excepted them.  <u>See, e.g.</u>, <u>Yardley v. Houghton Mifflin Co.</u>, 108 F.2d 28, 30-31 (2d Cir. 1939); <u>Pushman v. New York Graphic Soc'y, Inc.</u>, 287 N.Y. 302, 306-07 (1942).  Congress specifically abolished that presumption by distinguishing between the abstract, original work on the one hand, which is the source of the copyrights, and its material incarnation on the other, which is protected by the copyrights.  <u>See</u> 17 U.S.C. § 202; House Report at 53, 123, <u>reprinted in</u> 1976 U.S.C.C.A.N. at 5666, 5739-40.  Because the two are different, the author can freely sell a copy without disturbing the copyrights.

Thus, any object in which a sound recording can be fixed is a "material object."  That includes the electronic files at issue here.  When a user on a peer-to-peer network downloads a song from another user, he receives into his computer a digital sequence representing the sound recording.  That sequence is magnetically encoded on a segment of his hard disk (or likewise written on other media.)  With the right hardware and software, the downloader can use the magnetic sequence to reproduce the sound recording.  The electronic file (or, perhaps more accurately, the

_____

is thus largely, if not entirely, a vehicle for the fixation requirement.

appropriate segment of the hard disk) is therefore a "phonorecord" within the meaning of the statute.  See § 101 (defining "fixed" and "phonorecords"); Matthew Bender & Co., 158 F.3d at 703-04. See also New York Times Co. v. Tasini, 533 U.S. 483, 490-91 (2001) (appearing to assume that electronic-only distributions constitute material objects); Stenograph LLC v. Bossard Assocs., Inc., 144 F.3d 96, 100 (D.C. Cir. 1998) (holding that installation of software onto a computer results in "copying"); Working Group on Intellectual Property Rights, Intellectual Property and the National Information Infrastructure 213 (1995), available at http://www.uspto.gov/go/com/doc/ipnii/ ipnii.pdf (noting that electronic transmissions implicate copyright holders' rights and strongly implying that electronic files constitute "material objects").

    With that background, the Court turns to the movants' and the EFF's arguments.

### (2)  The Transmission of an Electronic File Constitutes a "Distribution" Within the Meaning of § 106(3)

    The movants and the EFF present two reasons why the Court should decline to find that purely electronic transmissions are a violation of the distribution right.  First, they note that the distribution right is limited to "phonorecords of the copyrighted work," 17 U.S.C. § 106(3), and that part of the definition of "phonorecords" is that they are "material objects," id. § 101. They focus on the phrase "material objects" to suggest that a

copyright owner's distribution right only extends to "tangible" objects.  <u>See</u> EFF Br. at 15-16.  Because there was no exchange of tangible objects in this case -- no "hand-to-hand" exchange of physical things -- they argue that the plaintiffs' distribution right was not infringed by the defendants' actions.

The movants' second argument focuses on a different phrase in § 106(3): "distribution" is limited to exchanges "by sale or other transfer of ownership, or by rental, lease, or lending."  They note, correctly, that an electronic download does not divest the sending computer of its file, and therefore does not implicate any ownership rights over the sound file held by the transferor. Therefore, they conclude, an electronic file does not fit within the defined limits of the distribution right.

The movants' two arguments appear to be analytically distinct, but in fact each is the obverse of the other: Any time the transfer of copyrighted material takes place electronically, both contentions at least potentially come into play.  Electronic transfers generally involve the reading of data at point A and the replication of that data at point B.  Whenever that is true, one person might be stationed at point A and another at point B, obviating the need for a "hand-to-hand" transfer.  Similarly, because the data at point A is not necessarily destroyed by the process of reading it, the person at point A might retain ownership over the original, forestalling the need for a "sale or other transfer of ownership," as stated in § 106(3).

Clearly, that description accurately characterizes electronic file transfers.  The internet makes it possible for a sending computer in Boston and a downloader in California to communicate quickly and easily; the physical distance between the two, as well as the purely electronic nature of the transfer, makes the movants' argument attractive.  But the "point A-to-point B" characterization is no less apt for an older technology, such as a fax transfer over a phone line.  And it also applies to cases in which point A and point B are very close together -- even in the same room.[24]  The movants' argument thus pivots on the <u>nature</u> of the transfer, in which the copyrighted work is read by a machine, translated into data, transmitted (in data form), and re-translated elsewhere.

After carefully considering the parties' and the EFF's arguments, the Court concludes that 17 U.S.C. § 106(3) does reach this kind of transaction.  First, while the statute requires that distribution be of "material objects," there is no reason to limit "distribution" to processes in which a material object exists throughout the entire transaction -- as opposed to a transaction in which a material object is created elsewhere at its finish.  Second, while the statute addresses ownership, it is the newly

---

[24] Suppose someone has a copy of a copyrighted poem on a single sheet of paper.  He announces, "I'm going to be at the copy machine with the poem pressing the 'Copy' button, but I'm not going to touch the new copies that come out in the tray."  If another person takes one of the new copies, no hand-to-hand transfer of a tangible object has occurred, and the person who presses the copy button has not been divested of ownership in his original.

minted ownership rights held by the transferee that concern it, not whether the transferor gives up his own.

The first point requires that the Court closely examine the scope of the distribution right under § 106(3). The statute provides copyright owners with the exclusive right "to distribute . . . phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3). In turn, phonorecords are defined in part as "material objects in which sounds . . . are fixed by any method." Id. § 101. And as discussed above, in the sense of the Copyright Act, "material objects" should not be understood as separating tangible copies from non-tangible copies. Rather, it separates a copy from the abstract original work and from a performance of the work. See supra Section IV.A.1.b.(1).

Read contextually, it is clear that this right was intended to allow the author to control the rate and terms at which copies or phonorecords of the work become available to the public. In that sense, it is closely related to the reproduction right under § 106(1), but it is not the same. As Congress noted, "a printer [who] reproduces copies without selling them [and] a retailer [who] sells copies without having anything to do with their reproduction" invade different rights. House Report at 61, reprinted in 1976 U.S.C.C.A.N. at 5675. Under § 106(3),

> [T]he copyright owner [has] the right to
> control the first public distribution of an
> authorized copy or phonorecord of his work,
> whether by sale, gift, loan, or some rental or

> lease arrangement.  Likewise, any unauthorized
> public distribution of copies or phonorecords
> that were unlawfully made [is] an
> infringement.  As section 109 makes clear,
> however, the copyright owner's rights under
> section 106(3) cease with respect to a
> particular copy or phonorecord once he has
> parted with ownership of it.

House Report at 62, reprinted in 1976 U.S.C.C.A.N. at 5675-76.

Clearly, § 106(3) addresses concerns for the market for copies or

phonorecords of the copyrighted work, and does so more explicitly

and directly than the other provisions of § 106.[25]

An electronic file transfer is plainly within the sort of

transaction that § 106(3) was intended to reach.  Indeed,

electronic transfers comprise a growing part of the legitimate

market for copyrighted sound recordings.  See, e.g., Verne

Kopytoff & Ellen Lee, Tech Chronicles, S.F. Chron., Feb. 27, 2008,

at C1 (reporting that through its iTunes Store, which operates

exclusively via electronic file transfer, Apple has sold more than

4 billion songs to 50 million customers).[26]  What matters in the

---

[25] The House Report does not specifically address the distribution right as a protection of the copyright owner's right to control the market, but it is an inescapable inference from the nature of the right.  See, e.g., Harper & Row, 471 U.S. at 558 ("By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas."); cf. House Report at 62-63, reprinted in 1976 U.S.C.C.A.N. at 5676 (noting that too broad an exception to performance rights for non-profit users could allow free displays and performances to "supplant markets for printed copies"); id. at 80, reprinted in 1976 U.S.C.C.A.N. at 5694 (expressing concern that illegitimate fair use could affect the copyright owner's market for distribution of copies).  The Court does not express a view as to the extent to which peer-to-peer file sharing actually does cause economic damage to copyright owners.

[26] It is perhaps in recognition of this fact of internet-era life -- and in recognition of the fact that copyrighted material can be "distributed" electronically -- that Congress has made available compulsory licenses "to distribute [phonorecords] to the public for private use, including by means of a digital phonorecord delivery."  17 U.S.C. § 115.

marketplace is not whether a material object "changes hands," but whether, when the transaction is completed, the distributee has a material object.  The Court therefore concludes that electronic file transfers fit within the definition of "distribution" of a phonorecord.[27]

For similar reasons, the Court concludes that an electronic file transfer can constitute a "transfer of ownership" as that term is used in § 106(3).  As noted above, Congress wrote § 106(3) to reach the "unauthorized public distribution of copies or phonorecords that were unlawfully made."  House Report at 62, reprinted in 1976 U.S.C.C.A.N. at 5676.  That certainly includes situations where, as here, an "original copy" is read at point A and duplicated elsewhere at point B.[28]  Since the focus of § 106(3) is the ability of the author to control the market, it is concerned with the ability of a transferor to create ownership in someone else -- not the transferor's ability simultaneously to retain his own ownership.

This conclusion is supported by a comparison to the "first sale" doctrine, codified at 17 U.S.C. § 109.  The "first sale" doctrine provides that once an author has released an authorized

_____

[27] The reading is not a stretch.  The dictionary definition of "to distribute" includes, inter alia, "to disperse through a space . . . ; spread; scatter[;] to promote, sell, and ship or deliver . . . to individual customers . . . [;] to pass out or deliver . . . to intended recipients."  Random House Unabridged Dictionary 572 (2d ed. 1993).  An electronic file transfer fits comfortably within each.

[28] It is irrelevant that such an action may also infringe the reproduction right secured to the copyright holder under 17 U.S.C. § 106(1). A single action can infringe more than one right held under § 106.

copy or phonorecord of her work, she has relinquished all control over that particular copy or phonorecord. See id. § 109(a); House Report at 79-80, reprinted in 1976 U.S.C.C.A.N. at 5693-94. The person who bought the copy -- the "secondary" purchaser -- may sell it to whomever she pleases, and at the terms she directs. The market implications are clear. The author controls the volume of copies entering the market, but once there, he has no right to control their secondary and successive redistribution. To be sure, the author retains a certain degree of control over the secondary sale, at least to the extent that he can control that redistributions through the terms in the original sales contract. But he must bring a contract suit, not an infringement action. See id. at 79, reprinted in 1976 U.S.C.C.A.N. at 5693. See also, e.g., Am. Int'l Pictures, Inc. v. Foreman, 576 F.2d 661, 664 (5th Cir. 1978) (holding that where copyrighted material is resold subject to restrictions, and the secondary buyer violates those restrictions, no copyright infringement action lies). More often and more practically, however, the author will simply price the new copies or phonorecords to reflect the work's value in a secondary market. See, e.g., Vincent v. City Colleges of Chicago, 485 F.3d 919 (7th Cir. 2007) (citing Stanley M. Besen & Sheila N. Kirby, Private Copying, Appropriability & Optimal Copyright Royalties, 32 J.L. & Econ. 255 (1989)).

Conversely, where ownership is created through an illegal copy, the first sale doctrine does not provide a defense to a

distribution suit.  <u>See</u> <u>Quality King Distrib., Inc. v. L'anza</u>
<u>Research Int'l, Inc.</u>, 523 U.S. 135, 148 (1998).  The distinction
makes sense: where ownership is created through an illegal copy,
the copyright holder has never had the chance to exercise his
market rights over the copy.  That is precisely the situation
here.[29]

### 2.  <u>Whether the Plaintiffs Have Adduced Prima Facie Evidence of Infringement</u>

The second sub-element of the <u>Sony Music</u> test's first factor
asks whether the plaintiffs have presented prima facie evidence of
infringement.  <u>See</u> 326 F.Supp.2d at 564.  Just as police cannot
invade the privacy of a home without some concrete evidence of
wrongdoing inside, plaintiffs should not be able to use the Court
to invade others' anonymity on mere allegation.  By requiring
plaintiffs to make out a prima facie case of infringement, the

---

[29] The EFF's reliance on <u>Agee v. Paramount Communications</u>, 59 F.3d 317,
325 (2d Cir. 1995), is misplaced.  The plaintiff in <u>Agee</u> claimed the violation
of several different rights after Paramount used his music as a soundtrack to
a video without authorization; most relevantly, the plaintiff claimed
violation of the distribution right protected by § 106(3).  The video traveled
from Paramount to local affiliate television stations, and from there to the
public.  The court concluded that the broadcast, as it traveled from the
affiliate stations to the public, was a public performance, not the
distribution of a copy.  The affiliates were only the intermediaries through
which Paramount's right to perform was exercised.  <u>See</u> <u>Agee</u>, 59 F.3d at 325;
<u>see also</u> 17 U.S.C. § 112(e)(1) (permitting retention of "ephemeral recordings"
for retransmission).  A key fact was that the transmission was designed to be
transitory.  Electronic files, such as those transferred here, are not.

The Court recognizes that electronic copies can be of varying
permanence, <u>see</u> <u>MAI Sys. Corp. v. Peak Computer, Inc.</u>, 991 F.2d 511, 518-19
(9th Cir. 1993) (discussing whether loading copyrighted software into
temporary random access memory constitutes a "copy" under the Copyright Act),
and it is not clear that all of them should be treated equally under the
copyright statutes.  But this is a clear case, at one end of the spectrum.
The files at issue here were downloaded precisely to be copies, indefinitely
replayable and transferable.  The Court has no need to consider modes of
electronic transmission beyond transfers over peer-to-peer networks.

standard requires plaintiffs to adduce evidence showing that their complaint and subpoena are more than a mere fishing expedition. The plaintiffs need not actually prove their case at this stage; they need only present evidence adequate to allow a reasonable fact-finder to find that each element of their claim is supported. See Adelson, 510 F.3d at 48.  They have done so.

The first element of a copyright infringement suit is a valid copyright.  See T-Peg, 459 F.3d at 108.  The plaintiffs have asserted, and the defendants have not challenged, that they hold the copyright to each of the sound recordings incorporated into the complaint.  See Compl. at 4-5 (docket no. 07-cv-10834, document # 1).

The second element is violation of one of the copyright holder's exclusive rights.  See T-Peg, 459 F.3d at 108.  The movants and the EFF argue that because the plaintiffs have not demonstrated an actual infringement, they have not asserted an actual violation.[30]  They reason that the investigator downloading

---

[30] Counsel for one movant also represents that none of the movant's music files were unlicensed.  See Suppl. Mem. Supp. Mot. Quash at 9-10 (document # 149).  While that may be the case, it is not clear why it is relevant to allegations of unlicensed distribution under 17 U.S.C. § 106(3). And insofar as it is relevant to allegations of unlicensed copying under 17 U.S.C. § 106(1), it is a matter better left for after discovery, when counsel's representation can be supported by evidence.

The same movant further contends that the Linares affidavit, which forms the basis of some of the plaintiffs' prima facie case, should be stricken. The movant claims that MediaSentry, the private investigator who downloaded the files from the Does and recorded their IP addresses, see Linares Decl. at 4-6, Ex. A to Pl. Mot. Leave to Take Immediate Discovery (docket no. 07-cv-10834, document # 5), does not have the license to undertake private investigations required by Massachusetts General Laws ch. 147, §§ 23-25.  The Court has no evidence properly before it as to whether or not MediaSentry has a license, how MediaSentry gathers its information, or whether that information is publicly available.  It therefore declines to reach the issue

the files from the defendants' computers was an agent of the plaintiffs, and plaintiffs cannot infringe their own copyrights. See Mem. Supp. Mot. Quash at 4-6 (document # 149); EFF Br. at 12 n.8 (document # 152).

The Court need not now decide the precise nature of the evidence MediaSentry gathered.  While the parties dispute whether an investigator's download can be a perfected infringement, the downloads are also relevant, as described above, for another purpose: demonstrating that such infringement was technically feasible, thereby demonstrating that distributions could occur.

The plaintiffs have alleged that each defendant shared many, many music files -- at least 100, and sometimes almost 700.  See Ex. A to Compl. (docket no. 07-cv-10834, document # 1) (providing information for each Doe, including number of copyrighted music files shared); Linares Decl. at 4, Ex. A to Pl. Mot. Leave to Take Immediate Discovery (docket no. 07-cv-10834, document # 5) (attesting to the veracity of the information contained in Exhibit A to the Complaint).[31]  As noted above, that evidence supports an inference that the defendants participated in the peer-to-peer network precisely to share copyrighted files.  The evidence and

_____

on this record; the movant may re-file a motion to strike.

    [31] From the Linares Declaration, it is easily inferred how this information is gained.  MediaSentry, on finding an alleged infringer, requests through the peer-to-peer software a list of all the files available to be shared on the sending computer.  It then culls through the resulting list of files to isolate (and count) the plaintiffs' copyrighted sound recordings. See Linares Decl. at 5-6, Ex. A to Pl. Mot. Leave to Take Immediate Discovery (docket no. 07-cv-10834, document # 5).

allegations, taken together, are sufficient to allow a statistically reasonable inference that at least one copyrighted work was downloaded at least once. That is sufficient to make out a prima facie case for present purposes.[32] Discovery may well reveal other factors relevant to the statistical inference, such as the length of time the defendant used peer-to-peer networks.

The plaintiffs have satisfied their burden for a prima facie case. As noted above, merely exposing music files to the internet is not copyright infringement. The defendants may still argue that they did not know that logging onto the peer-to-peer network would allow others to access these particular files, or contest the nature of the files, or present affirmative evidence rebutting the statistical inference that downloads occurred. But these are substantive defenses for a later stage. Plaintiffs need not prove knowledge or intent in order to make out a prima facie case of infringement. See Feist, 499 U.S. at 361; Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1160 n.19 (1st Cir. 1994). As noted above, they are not required to win their case in order to serve the defendants with process.

---

[32] This general inference of infringement is not inconsistent with the "concrete" criterion discussed below. It bears re-emphasis that this is a preliminary stage of the litigation; the plaintiffs need only show that some infringement was likely and that they have specifically identified at least some of the copyrighted material at issue. This protects the defendants from a fishing expedition in which plaintiffs only wish to investigate specific behavior -- for example, the large use of bandwidth by a single user continuously over a long period of time or the mere use of a peer-to-peer network.

**3.    Whether the Plaintiffs Have Tied Their Allegations
and Evidence to Specific Acts of Infringement**

The third sub-element of the first <u>Sony Music</u> factor is that
the allegations be "concrete" -- that they be tied to specific
acts of infringement.  <u>See</u> 326 F.Supp.2d at 564.  The movants
argue that the plaintiffs have failed to do so.  Mot. Quash at 7-
10 (document # 115).  In considering this question, the Court must
keep in mind that transfers on a peer-to-peer network are not
observable by outside users.  To show infringement,[33] the
plaintiffs are obliged to build a chain of inferences.  The Court
finds that, on this record, the chain is adequately anchored to
specific allegations to satisfy this sub-element.

The plaintiffs have alleged that each of the defendants used
the peer-to-peer network to distribute copies of specific sound
recordings, detailed in Exhibit A to the Complaint.  For instance,
Doe no. 21, one of the movants here, is alleged to have
distributed the song "Clocks," by the artist Coldplay.  Capitol
Records holds the copyright to that song.  <u>See</u> Ex. A to Compl.
(docket no. 07-cv-10834, document # 1).  The plaintiffs allege
that the downloading creates a precise copy of the song.  And Doe
no. 21 is alleged to have "continuously used, and [to] continue[]
to use," a peer-to-peer network.  Compl. at 5 (docket no. 07-cv-
10834, document # 1).  Finally, the fact of MediaSentry's download

---

[33] At least, absent MediaSentry's downloads -- again, the Court does not
decide whether those downloads can constitute direct evidence of actual
infringements.

shows that it was, in fact, possible to download "Clocks" from Doe no. 21's computer as of 6:56 a.m. on January 25, 2007.  Thus, the plaintiffs have alleged the specific content at issue; the essential nature of the infringement of that content; a rough time period in which the infringement took place; and that at a certain time, the defendant had taken every step necessary for an infringement of Capitol Records's rights in "Clocks" to occur.

While the plaintiffs must eventually prove that an actual infringement of those rights occurred, they may certainly do so through circumstantial proof and inference.  And drawing a reasonable inference in the plaintiffs' favor, one did occur.  The plaintiffs' current showing is adequate to satisfy both Federal Rule of Civil Procedure 8 and the more exacting standard of <u>Sony Music</u> -- even if they could not directly observe, and thus allege, an infringing act.  <u>See, e.g.</u>, 5 Patry, <u>Patry on Copyright</u>, §§ 19:3 (listing necessary elements to plead a copyright claim), 19:10 (discussing pleading acts of infringement with specificity).

### B.   <u>Factors Two, Three, and Four: Need and Narrow Tailoring</u>

The second, third, and fourth factors in the <u>Sony Music</u> test are designed to ensure that the subpoena is appropriate to the plaintiffs' needs, their allegations, and the preliminary evidence they have presented.  The Court weighs "(2) specificity of the discovery request, (3) the absence of alternative means to obtain the subpoenaed information, [and] (4) a central need for the subpoenaed information to advance the claim."  <u>Sony Music</u>, 326

F.Supp.2d at 565.  Thus, the second factor prevents the subpoena
from being so overbroad that it unreasonably invades the anonymity
of users who are not alleged to have infringed copyright.  The
third cuts against the subpoena if there is another reasonable and
less-intrusive means to gather the same information.  And the
fourth tests whether the plaintiffs must have the information to
proceed.  On the circumstances of this case, the third and fourth
factors support the disclosure of the defendants' identities.
However, the Court is unable to determine on this record whether
the plaintiffs' request is adequately specific to satisfy the
second factor.

### 1.   **Specificity of the Discovery Request**

The second Sony Music factor examines the breadth of the
information sought by the plaintiffs.  It has two aspects: first,
the breadth of the information the plaintiffs seek, and second,
whether the subpoena requires the ISP to reveal identifying
information for numerous non-infringing parties, piercing the
First Amendment anonymity to which they are entitled.

Under the Court's Order permitting expedited discovery, the
plaintiffs are limited to identifying information: "name, address,
telephone number, e-mail address, and Media Access Control
addresses for each defendant."  Amended Order re: Expedited
Discovery at 1 (May 9, 2007) (docket no. 07-cv-10834, document #

8).[34]  The Court further ordered that "[n]o further information
about the Doe defendants shall be revealed."  Id.  These limits
are appropriate because they allow the plaintiffs to discover whom
they are suing -- the purpose of the expedited discovery -- but no
more.  It does not, for example, permit disclosure of any
information regarding the defendant's internet use.

Second, the Court must consider whether the information
sought can be reasonably traced to a particular defendant.
Generally speaking, according to the plaintiffs, the combination
of IP address and date and time of access is sufficient to allow
identification of the defendant.  See Mem. Supp. Ex Parte
Application for Leave To Take Immediate Discovery at 2 (docket no.
07-cv-10834, document # 5).

That claim may not always be true.  More than one computer
may be placed under a single IP number.  Thus, it is possible that
the ISP may not be able to identify with any specificity which of
numerous users is the one in question.  See Stengel Decl. at 3
(document # 118).  If that is the case, giving the plaintiffs a

_____

[34] The Media Access Control ("MAC") number is a unique identifier
embedded in most network adaptors -- the physical piece of hardware that
permits a user to connect to a network, and thus to the internet.  The MAC
address is used by the ISP in routing information through the network and is
specific to the user's computer; it is therefore uniquely relevant in allowing
a fact-finder to determine whether the defendant was, in fact, infringing the
plaintiff's copyright.  Although sophisticated users can use software to make
MAC addresses appear otherwise than they actually are -- a process called
"spoofing" -- the addresses are still highly probative evidence in this
litigation.  See, e.g., Daniel Kamitaki, Note, Beyond E-Mail: Threats to
Network Security and Privileged Information for the Modern Law Firm, 15 S.
Cal. Interdisc. L.J. 307, 312 & nn. 30-34 (2006) (discussing MAC addresses
generally); United States v. Carter, No. 07-CR-00184-RLH, 2008 WL 623600, at
*12 (D.Nev. Mar. 6, 2008) (noting possibility of spoofing).

long list of possible infringers would permit precisely the sort
of fishing expedition the Sony Music test is designed to avoid.
On the other hand, the ISP may frequently be able to narrow the
list to a handful of possible users.  In that situation, the
plaintiffs should be entitled to use discovery to determine the
identity of the alleged infringer.  While it still might be
possible that an unauthorized user was the actual infringer, see
id., that is a matter better left for further discovery and
presentation of the plaintiffs' claims on their merits.

The problem calls for a pragmatic solution that carefully
respects the anonymity of potentially innocent parties.
Therefore, the Court will undertake to review particular cases as
they come up, based on the number of users at issue and the degree
of particularity with which the plaintiffs would be able to pick
out the alleged infringer from a list.  The subpoena to be served
on Boston University shall be modified as discussed below in
Section IV.D.

**2.    Absence of Alternative Means to Obtain Information**

The third Sony Music factor requires that the plaintiffs have
no other, less-intrusive way of obtaining the information they
seek.  This factor appears to be met in this case.  Only the ISP
has any record of which IP addresses were assigned to which users.
To other entities online, those users would appear only as their
IP addresses.  The movants have not suggested any other method of

obtaining the defendants' information; nor is the Court aware of any.

### 3.    Central Need to Litigation

Finally, it is evident that the plaintiffs need the information in order to further the litigation.  Without names and addresses, the plaintiffs cannot serve process, and the litigation can never progress.  Therefore, the plaintiffs do have a central need for this information.

### C.    Factor Five: The Defendants' Expectations of Privacy

The final Sony Music factor regards the expectation of privacy held by the Doe defendants, as well as other innocent users who may be dragged into the case (for example, because they shared an IP address with an alleged infringer.)  See 326 F.Supp.2d at 565.

As discussed above, see Section III, the alleged infringers have only a thin First Amendment protection.  See Harper & Row, 471 U.S. at 559-60.[35]  Moreover, many internet service providers require their users to acknowledge as a condition of service that they are forbidden from infringing copyright owners' rights, and that the ISP may be required to disclose their identity in litigation.  See, e.g., Sony Music, 326 F.Supp.2d at 559.

The record is unfortunately silent as to Boston University's terms of service agreement, if one exists.  That agreement could

---

[35] Insofar as the defendants wish to assert a more substantial First Amendment value -- fair use, for example -- that is a matter better left for later in the litigation.

conceivably make a substantial difference to the expectation of privacy a student has in his or her internet use. The process through which the plaintiffs determine whether a particular user actually used a peer-to-peer network to distribute music files may be much more intrusive than merely obtaining identities. In one case before the Court,[36] the plaintiffs have sought to obtain an image of a defendant's hard disk,[37] allowing a forensic computer expert to inspect it to determine whether the defendant possessed an electronic copy of the plaintiffs' copyrighted material. See Pls.' Mot. Compel Discovery (docket no. 03-cv-11661, document # 527).[38]

The Court finds that the terms of service arrangement, if one exists, would be extremely helpful in analyzing the privacy interests at issue. As this is an important factor for the Sony Music test, the Court will require that the subpoena served on

---

[36] The Court may take judicial notice of related proceedings. See, e.g., Anderson v. Rochester-Genesee Reg'l Transp. Auth., 337 F.3d 201, 205 n.4 (2d Cir. 2003).

[37] That is, a precise copy of the hard drive, exactly as it is in the defendant's computer. This allows the plaintiffs not only to see what is obviously present on the user's computer, but also deleted or concealed files. "'Deleting' a file does not actually erase that data from the computer's storage devices. Rather, it simply finds the data's entry in the disk directory and changes it to a 'not used' status -- thus permitting the computer to write over the 'deleted' data. Until the computer writes over the 'deleted' data, however, it may be recovered by searching the disk itself rather than the disk's directory. Accordingly, many files are recoverable long after they have been deleted -- even if neither the computer user nor the computer itself is aware of their existence." Shira A. Scheindlin & Jeffrey Rabkin, Electronic Discovery in Federal Civil Litigation: Is Rule 34 Up to the Task?, 41 B.C. L. Rev. 327, 337 (2000) (footnotes omitted).

[38] Of course, even an infringer's non-infringing information is entitled to some protection. But the situation is more serious where the defendant asked to permit an image of her computer may not be an infringer at all.

Boston University be modified to require that it submit to the Court its terms of service arrangement.

**D.    Required Modifications to the Subpoenas**

For the reasons explained above in Sections IV.B.1 and IV.C, the Court lacks the information to adjudicate whether the plaintiffs have carried their burden in demonstrating a need for expedited discovery under the Sony Music test.  Therefore, the Motions to Quash that assert privacy interests (documents ## 104 and 115) are **GRANTED**.  The plaintiffs may renew their motion for expedited discovery, but must attach to such motion a copy of the Rule 45 subpoena to be served on Boston University.  **The subpoena must include the following language or language substantially similar**:

> The ISP shall submit to the Court, under seal, the information requested by the plaintiffs for its consideration in camera.  For any IP address provided by the plaintiffs for which the ISP is unable to determine, to a reasonable degree of technical certainty, the identity of the user, it shall submit a list of all such users and a brief statement explaining the difficulty in selecting among them the alleged infringer.
>
> The ISP shall simultaneously submit to the Court its terms of service agreement with its users, or, if it does not have a terms of service agreement, a statement to that effect.
>
> The submissions by the ISP shall be made no later than 14 days after service of the subpoena.
>
> The ISP shall not disclose to the plaintiffs any information regarding the identities of the defendants unless ordered to do so by this Court.

The Court, with the <u>Sony Music</u> framework thus in place, will consider the plaintiffs' request for expedited discovery as made in their renewed motion.

**V.    THE MOTION TO QUASH FOR LACK OF PERSONAL JURISDICTION**

In addition to the Motions to Quash filed by the Boston University Does, one other Doe has filed a Motion to Quash.  She claims that the Court lacks personal jurisdiction over her.  She asserts, among other things, that she has never lived in Massachusetts and that "none of [her] visits to the State of Massachusetts had any relationship to the matter for which [she is] being sued, namely [her] alleged use of filesharing systems from [her] home in Maryland."  Doe Aff. at 1, Ex. A to Mot. Quash Due to Lack of Personal Jurisdiction (document # 113).  The Court has the discretion to permit jurisdictional discovery.  <u>See, e.g.</u>, <u>United States v. Swiss Am. Bank, Ltd.</u>, 274 F.3d 610, 626 (1st Cir. 2001).  It is appropriate to do so in this case.

The only information the Court has before it is Jane Doe's affidavit -- signed as Jane Doe -- attesting that she is not a Massachusetts resident.  On the facts of this case, that is an insufficient basis to disallow jurisdictional discovery.  Even taking all of the facts in her affidavit as true, it is possible that the Court properly has personal jurisdiction.  The Massachusetts long-arm statute permits jurisdiction to the extent allowed by constitutional limits.  <u>Daynard v. Ness, Motley,</u> <u>Loadholt, Richardson & Poole, P.A.</u>, 290 F.3d 42, 52 (1st Cir.

2002) (quoting 'Automatic' Sprinkler Corp. of Am. v. Seneca Foods Corp., 361 Mass. 441 (1972)).  It is a broad license.  For example, Jane Doe might well be subject to jurisdiction if she infringed the plaintiffs' copyrights on a trip into Massachusetts.  See Mass. Gen. Laws ch. 223A, § 3(c)-(d).  It would be premature to adjudicate personal jurisdiction on this record.

The Motion to Quash Due to Lack of Personal Jurisdiction (document # 113) is **DENIED without prejudice**.

**VI.  CONCLUSION**

For the foregoing reasons, the Motions to Quash (document ## 103 and 115) are **GRANTED.  The plaintiffs' Motion for Expedited Discovery may be renewed subject to the requirements on the subpoena set forth above in Section IV.D.**  Boston University is **ORDERED** not to destroy the information sought by plaintiffs unless the subpoena is not renewed by April 16, 2008.  Furthermore, the Motion to Quash Due to Lack of Personal Jurisdiction (document # 113) is **DENIED without prejudice**.

**SO ORDERED.**

Date: March 31, 2008              /s/ Nancy Gertner
                                  **NANCY GERTNER, U.S.D.C.**

-52-

## APPENDIX A

**COURT-DIRECTED NOTICE**
**REGARDING ISSUANCE OF SUBPOENA**

A subpoena has been issued directing Boston University, your Internet Service Provider ("ISP"), to disclose your name.  The subpoena has been issued because you have been sued in the United States District Court for the District of Massachusetts in Boston, Massachusetts, as a "John Doe" by several major record companies.  You have been sued for infringing copyrights on the Internet by uploading and/or downloading music.  The record companies have identified you only as a "John Doe" and have served a subpoena on your ISP to learn your identity.  This notice is intended to inform you of some of your rights and options.

**YOUR NAME HAS NOT YET BEEN DISCLOSED.**
**YOUR NAME WILL BE DISCLOSED IN 14 DAYS IF YOU DO NOT**
**CHALLENGE THE SUBPOENA.**

Your name has not yet been disclosed.  The record companies have given the Court enough information about your alleged infringement to obtain a subpoena to identify you, but the Court has not yet decided whether you are liable for infringement.  You can challenge the subpoena in Court.  You have 14 days from the date that you receive this notice to file a motion to quash or vacate the subpoena.  If you file a motion to quash the subpoena, your identity will not be disclosed until the motion is resolved (and the companies cannot proceed against you until you are identified).  The second page of this notice can assist you in locating an attorney, and lists other resources to help you determine how to respond to the subpoena.  If you do not file a motion to quash, at the end of the 14 day period, your ISP will send the record company plaintiffs your identification information.

**OTHER ISSUES REGARDING THE LAWSUIT AGAINST YOU**

To maintain a lawsuit against you in the District Court of Massachusetts, the record companies must establish jurisdiction over you in Massachusetts.  If you do not live or work in Massachusetts, or visit the state regularly, you may be able to challenge the Massachusetts court's jurisdiction over you.  If your challenge is successful, the case in Massachusetts will be dismissed, but the record companies may be able to file against you in another state where there is jurisdiction.

The record companies may be willing to discuss the possible settlement of their claims against you.  The parties may be able to reach a settlement agreement without your name appearing on the public record.  You may be asked to disclose your identity to the record companies if you seek to pursue settlement.  If a settlement is reached, the case against you will be dismissed.  It is possible that defendants who seek to settle at the beginning of a case will be

offered more favorable settlement terms by the record companies.  You may contact the record companies' representatives by phone at (206) 973-4145, by fax at (206) 242-0905, or by email at info@settlementsupportcenter.com.

You may also wish to find your own lawyer (see resource list below) to help you evaluate whether it is in your interest to try to reach a settlement or to defend against the lawsuit.

**RESOURCE LIST**

The organizations listed below provide guidance on how to find an attorney.  If you live in or near Massachusetts or Boston, the second and third listings below provide referrals for local attorneys.

American Bar Association
http://www.abanet/org/legalservices/findlegalhelp/home.htm

Massachusetts Bar Association
http://www.massbar.org
Lawyer referral service - (617) 338-0610

Boston Bar Association
http://www.bostonbar.org
Lawyer referral service - (617) 742-0625

The organizations listed below have appeared before other courts around the country in similar lawsuits as "friends of the court" to attempt to protect what they believe to be the due process and First Amendment rights of Doe defendants.

Electronic Frontier Foundation
454 Shotwell Street
San Francisco, California 94110-1914
email: RIAAcases@eff.org

Public Citizen
1600 20th Street, NW
Washington, DC 20009
phone: (202) 588-7721
email: litigation@citizen.org