UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARISTA RECORDS LLC, a Delaware limited liability company; WARNER BROS. RECORDS INC., a Delaware corporation; ATLANTIC RECORDING CORPORATION, a Delaware corporation; VIRGIN RECORDS AMERICA, INC., a California corporation; UMG RECORDINGS, INC., a Delaware corporation; BMG MUSIC, a New York general partnership; CAPITOL RECORDS, INC., a Delaware corporation; SONY BMG MUSIC ENTERTAINMENT, a Delaware general partnership; MOTOWN RECORD COMPANY, L.P., a California limited partnership; MAVERICK RECORDING COMPANY, a California joint venture; ELEKTRA ENTERTAINMENT GROUP INC., a Delaware corporation; LAFACE RECORDS LLC, a Delaware limited liability company; and INTERSCOPE RECORDS, a California general partnership,<br><br>                    Plaintiffs,<br><br>v.<br><br>DOES 1 - 21,<br><br>                    Defendants. | CIVIL ACTION No. 04-cv-12434-NG<br>(CONSOLIDATED DOCKET NO.)<br><br><br>CIVIL ACTION No. 07-cv-10834<br>(ORIGINAL DOCKET NO.) |

**PLAINTIFFS' MOTION TO RECONSIDER THE COURT'S ORDER ON
MOTIONS TO QUASH**

#1325944 v1

# TABLE OF CONTENTS

I.     INTRODUCTION AND SUMMARY OF ARGUMENT .................................................. 1

II.    THE PROCESS ADOPTED BY THE COURT IS NOT PROPERLY TAILORED TO
       PROTECT THE LIMITED PRIVACY INTERESTS THAT THE COURT FOUND ...... 4

III.   THE COURT'S PRIVACY ANALYSIS WAS ERRONEOUS BECAUSE IT
       CONSIDERED ONLY DEFENDANTS' POTENTIAL HARM AND FAILED TO
       CONSIDER PLAINTIFFS' ACTUAL HARM ................................................................ 6

IV.    THE COURT ERRED IN REACHING THE "MAKING AVAILABLE" ISSUE, AND,
       IN ANY EVENT, ITS DETERMINATIONS WERE CONTRARY TO THE
       LANGUAGE OF THE COPYRIGHT ACT, LEGISLATIVE INTENT, AND THE
       PRONOUNCEMENTS OF NUMEROUS CIRCUIT AND DISTRICT COURTS, AS
       WELL AS THOSE OF THE UNITED STATES COPYRIGHT OFFICE ...................... 9

       A.     Where, As Here, The Court Correctly Found That Plaintiffs Have Properly Pled
              Distribution, The Court Erred In Opining On The "Making Available" Issue,
              Which Was Unnecessary To The Court's Determination...................................... 9

       B.     The Terms "Distribution" And "Publication" Are Synonymous In The Copyright
              Act...................................................................................................................... 10

       C.     Making Digital Files Available On A P2P Network Constitutes Distribution
              Under The Copyright Act ................................................................................... 13

V.     CONCLUSION............................................................................................................. 19

#1325944 v1

# TABLE OF AUTHORITIES

## CASES

*A&M Records, Inc. v. Napster,*
239 F.3d 1004 (9th Cir. 2001) ......................................................................14

*Agree v. Paramount Communications, Inc.,*
59 F.3d 317 (2d Cir. 1995)...........................................................................12

*In re Aimster Copyright Litigation,*
334 F.3d 643 (7th Cir. 2003) ..........................................................................8

*Arista Records LLC. v. Does 1-30,*
Civil Action No. 07-4647 (D.N.J. Jan. 28, 2008) ...........................................7

*Arista Records, LLC v. Greubel,*
453 F. Supp. 2d 961 (N.D. Tex. 2006) .........................................................15

*Atlantic Recording Corp. v. Anderson,*
No. 06-CV-3578, slip op. at 12 (S.D. Tex. Mar. 12, 2008) ..........................12

*BMG Music v. Gonzalez,*
430 F.3d 888 (7th Cir. 2005) ..........................................................................8

*Batjac Productions Inc. v. GoodTimes Home Video Corp.,*
160 F.3d 1223 (9th Cir. 1998) ......................................................................17

*Computer Assocs. Int'l., Inc. v. Altai, Inc.,*
982 F.2d 693 (2nd Cir. 1992)........................................................................11

*Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.,*
843 F.2d 600 (1st Cir. 1988)...........................................................................8

*Elektra Entertainment Group, Inc. v. Barker,*
Case No. 05-CV-7340 (KMK) (S.D.N.Y. Mar. 31, 2008) ...........................10

*Ford Motor Co. v. Summit Motor Prod., Inc.,*
930 F.2d 277 (3d Cir. 1991)..........................................................................12

*Getaped.com, Inc. v. Cangemi,*
188 F. Supp. 2d 398 (S.D.N.Y. 2002)...........................................................12

*Harper & Row Publishers, Inc. v. Nation Enterprises,*
471 U.S. 539 (1985)..................................................................................9, 12

ii

*Hotaling v. Church of Jesus Christ of Latter-Day Saints*,
118 F.3d 199 (4th Cir. 1997) ...................................................................13

*Interscope Records v. Does 1-14*,
No. 5:07-cv-04107-RDR-KGS (D. Kan. Apr. 11, 2008)..................................7, 12

*Lamoureux v. Genesis Pharmacy Servs., Inc.*,
226 F.R.D. 154 (D. Conn. 2004)................................................................6

*Latin American Music Co. v. Archdiocese of San  Juan*,
499 F.3d 32 (1st Cir. 2007)...............................................................15, 16

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster Ltd.*,
545 U.S. 913 (2005)................................................................................8

*Motown Record Co. v. DePietro*,
2007 U.S. Dist. LEXIS 11626 (E.D. Pa. Feb. 16, 2007) .........................................15

*In re Napster, Inc. Copyright Litig.*,
377 F. Supp. 2d 796 (N.D. Cal. 2005) ............................................................12

*Norvell v. Sangre de Cristo Dev. Co., Inc.*,
519 F.2d 370 (10th Cir. 1975) ...................................................................9

*Perfect 10 v. Amazon.com Inc.*,
508 F.3d 1146 (9th Cir. 2007) ..................................................................14

*Port Authority of New York & New Jersey v. Department of Transportation*,
479 F.3d 21 (D.C. cir. 2007)....................................................................19

*Rhode Island v. Narragansett Indian Tribe*,
19 F.3d 685 (1st Cir. 1994)......................................................................9

*Sony Music Entertainment Inc. v. Does 1-40*,
326 F. Supp. 2d 556 (S.D.N.Y. 2004)...........................................................2, 6

*Sony Pictures Home Entm't, Inc. v. Lott*,
471 F. Supp. 2d 716 (N.D. Tex. 2007) ..........................................................15

*Universal City Studios Prods. LLLP v. Bigwood*,
441 F. Supp. 2d 185 (D. Me. 2006) .............................................................15

*Venegas-Hernandez v. Asociacion De Compositores y Editores De Musica
LatinoAmerica*,
424 F.3d 50 (1st Cir. 2005).....................................................................16

*In re Wagar*,
    2006 U.S. Dist. LEXIS 90345 (N.D.N.Y. Dec. 13, 2006) ............................................. 5

*Weist v. E.I. DuPont De Nemours & Co.*,
    2008 U.S. Dist. LEXIS 25605 (W.D.N.Y. March 31, 2008) ...................................... 5

*Whitney v. Robertson*,
    124 U.S. 190 (1888) ................................................................................................. 19

## STATUTES AND RULES

20 U.S.C. § 1232g(b)(2)(B) ........................................................................................... 6

34 C.F.R. § 99.37(a)(1) .................................................................................................. 6

17 U.S.C. § 101 ............................................................................................................. 10

17 U.S.C. § 106(3) ........................................................................................................ 10

17 U.S.C. § 512(i)(1) ...................................................................................................... 4

Fed. R. Civ. P. 26(b)(1) ................................................................................................. 5

S. Rep. No. 94-473 at 57 (1976) ................................................................................... 11

#1325944 v1

Plaintiffs respectfully submit the following Motion for Reconsideration of the Court's Order on Motions to Quash, dated March 31, 2008 (the "Order").  For the reasons set forth below, Plaintiffs request that the Court modify certain portions of the Order.

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

In its Order, the Court recognized Plaintiffs' need and right to expedited discovery in this case.  The Court also found that Plaintiffs stated valid claims for copyright infringement.  Plaintiffs respectfully submit, however, that the Court's Order is erroneous in several respects, principally with respect to the process that the Court adopted and with respect to certain applicable principles of law.

With respect to the process adopted by this Court, Plaintiffs respectfully submit that the process is not tailored to the limited privacy interest that the Court recognized and protects from disclosure information that is not private at all.  For example, Plaintiffs are unaware of any legal or factual basis for requiring Boston University (the "University") to submit its privacy policy *in camera*.  The privacy policy is not confidential, nor should it be used as a shield to protect infringers.  Indeed, the University's computing ethics policy states that the University requires users of its Internet service to comply with applicable federal, state, and local laws.  *See* Declaration of Katheryn Coggon at ¶ 6 ("Coggon Decl.") (attached hereto as *Exhibit A*).  To the extent the University has a more explicit privacy policy, such policy may indeed prohibit users of the University Internet service from engaging in copyright infringement.  Moreover, the Court's assumption that multiple users might be identified is unfounded.  The University uses the NetReg system. Id. at ¶ 4.  NetReg produces an association between the user and any computer that the user registers.  Id.  Moreover, the University expressly advises its students that they may register a guest's computers, but a student must do so in the student's own name, and the student is responsible for the guest's computer usage.  *See* id.  In light of the foregoing, there should only

1

be one user associated with any registered computer.  Indeed, Plaintiffs and record companies like them have dealt with the University in the past, and, to Plaintiffs' knowledge, the University has never indicated that there were multiple infringers identified by virtue of a single IP address. *See* Coggon Decl. at ¶ 3.  Even if there were multiple users associated with a single IP address, however, there is no basis to withhold the names of these individuals from Plaintiffs.  It may be the case that multiple individuals were engaged in the infringing behavior.  That is a situation that Plaintiffs have seen previously in other cases.  *Id*. at ¶ 5.  It also may be the case that the identified individuals would have discoverable information regarding the infringement at issue. Moreover, to the extent that there is any issue as to who the actual infringer was, Plaintiffs have an interest in participating in the identification process, both because Plaintiffs are the injured parties and because Plaintiffs may have additional information (e.g., a user name) and/or expertise that would enable the Court and the parties to identify the actual infringer(s).

With respect to issues of law, Plaintiffs note that, although the Court adopted the analysis of the court in *Sony Music Entertainment Inc. v. Does 1-40*, 326 F. Supp. 2d 556 (S.D.N.Y. 2004), this Court came to an entirely different conclusion on virtually identical facts.  This appears to be based upon a misapplication of the *Sony* test.  Specifically, this Court considered the *potential* harm to Defendants due to their limited privacy interests but failed to balance this against the undisputed *actual* harm to Plaintiffs, including the well-documented fact that piracy on the Internet has resulted in millions of dollars in losses in the record industry and thousands and thousands of lost jobs, not to mention the irreparable harm that is presumed under copyright law.  Moreover, the Court's finding that individuals who are engaged infringing behavior on peer–to–peer networks have a privacy interest in the titles of the works they have infringed, is contrary to established copyright law.  Plaintiffs respectfully submit that, when the *Sony*

2

balancing test is properly applied, the actual harm to Plaintiffs far outweighs any minimal potential harm to Defendants, as the *Sony* court itself found on virtually identical facts.

In addition, Plaintiffs respectfully submit that the Court improperly opined on the issue of "making available." The Court found, properly, that Plaintiffs had pled and presented a *prima facie* case of copyright infringement against Defendants. As such, whether or not Plaintiffs' theory of "making available" should be sustained need not have been reached by the Court. Accordingly, Plaintiffs respectfully submit that the Court's commentary on "making available" was unnecessary to the decision and dicta and that it should be stricken from the Court's Order. When the actual infringers are identified, should the case proceed to litigation against any of such infringers, then the "making available" issue may or may not be properly joined before the Court for its consideration.

Finally, had the Court properly reached the "making available" issue, Plaintiffs respectfully submit that the Court's determinations were contrary to the statutory language, to the legislature's intent, and to the pronouncements of numerous circuit and district courts and of the United States Copyright Office. Specifically, Plaintiffs respectfully submit that the Court erred in finding that "publication" and "distribution" are not synonymous. Every court that has spoken to this issue before, including the United States Supreme Court, has held that the terms are synonymous. Moreover, the legislative history of the Copyright Act, which this Court did not consider, strongly supports this conclusion. In addition, the Court's determination on the "making available" issue is contrary to the holdings of numerous circuit and district courts and the determination of the United States Copyright Office that making a work available in circumstances like those present here violates the exclusive right of distribution. Indeed, the

3

effect of this Court's ruling is to render the United States in violation of its obligations under the WIPO Digital Treaties.

For all of these reasons, and as more fully set forth below, Plaintiffs respectfully request that this Court reconsider the foregoing portions of its Order.

## II.    THE PROCESS ADOPTED BY THE COURT IS NOT PROPERLY TAILORED TO PROTECT THE LIMITED PRIVACY INTERESTS THAT THE COURT FOUND

In its Order, after determining that Defendants had a minimal First Amendment privacy interest, the Court proceeded to establish an *in camera* review process, providing that both the University's privacy policy and information that would identify the infringers should be provided solely to the Court. Even if Defendants have some sort of privacy interest at stake here, the process adopted by the Court, which is without precedent in thousands of cases like this one, has no basis in law or fact, is not properly tailored to protect Defendants' interest, and is highly prejudicial to Plaintiffs.

First, neither the Court nor anyone else has articulated a basis for finding the University's privacy policy to be confidential, such that it should be submitted *in camera* only. Nor should the University's privacy policy be used as a shield to protect copyright infringers. Indeed, Plaintiffs have every reason to believe that the University's policy, like that of other universities and ISPs, expressly prohibits the use of the University's service to infringe copyrights. Indeed, in the absence of a policy with respect to copyright infringement, the ISP would likely not qualify for the safe-harbor provisions of the Digital Millennium Copyright Act. *See* 17 U.S.C. § 512(i)(1). Moreover, the University discloses on its website its full Computing Ethics Policy, which appears to includes policies typically found in university privacy policies concerning use of a school's internet service. *See* Coggon Decl. at ¶ 6.

4

Second, to the extent that the Court based its process on the assumption that multiple users would be identified, there simply is no evidence in the record to support such a conclusion. As noted above, the University uses the NetReg System. NetReg produces an association between the user and any computer that the user registers. In addition, the University advises students that they may register a guest's computer, but a student must do so in the student's own name, and the student is responsible for the guest's computer usage. In light of the foregoing, there should be only one user associated with any registered computer, and the likelihood of the University's identifying multiple infringers for a single IP address is remote, at best. Indeed, Plaintiffs and record companies like them have dealt with the University in the past, and, to Plaintiffs' knowledge, the University has never indicated that there were multiple infringers identified by virtue of a single IP address among the 121 University defendants. *See* Coggon Decl. at ¶ 3. For that matter, Plaintiffs are not aware of a single instance among the 435 Doe defendants in this District where an ISP indicated that the IP address provided was affiliated with more than one individual. Id.

Even if multiple users were identified, however, such information should be provided to Plaintiffs. First, Plaintiffs' request for such information is reasonably calculated to lead to the discovery of admissible evidence, because any persons connected to the computer at issue are likely to have relevant information. As such, under Fed. R. Civ. P. 26(b)(1), Plaintiffs are entitled to such information. *See Weist v. E.I. DuPont De Nemours & Co.*, 2008 U.S. Dist. LEXIS 25605, *7 (W.D.N.Y. March 31, 2008) (The phrase, "relevant to the subject matter in the pending action," has been construed broadly to encompass any matter that bears on, or could reasonably lead to other matter that could bear on, any issue in the case). *See also In re Wagar*, 2006 U.S. Dist. LEXIS 90345, *15–*16 (N.D.N.Y. Dec. 13, 2006) (same); *Lamoureux v.*

5

*Genesis Pharmacy Servs., Inc.*, 226 F.R.D. 154, 158 (D. Conn. 2004) (same). Second, Plaintiffs should be permitted to participate in the process because they are, of course, the victims here. Moreover, they may have additional information (e.g., a user name) that would allow the Court and the parties to identify the actual infringer. For example, where other ISPs have had multiple names disclosed, this has sometimes reflected the fact that multiple individuals were, in fact, infringing. *See* Coggon Decl. at ¶ 5. On other occasions, where ISPs have disclosed multiple names, the individuals named have worked with the record companies to determine who the proper defendant should be. *See id.* Finally, Defendants could not claim any rational privacy interest in the limited information requested here because the information sought is "directory information" under the Family Educational and Privacy Rights Act ("FERPA"), and it is not privileged at all. *See* 20 U.S.C. § 1232g(b)(2)(B); 34 C.F.R. § 99.37(a)(1)-(3).[1]

For all of these reasons, Plaintiffs respectfully submit that the type of *in camera* discovery process that this Court adopted to address Defendants' minimal privacy interests is unwarranted in this case.

## III.    THE COURT'S PRIVACY ANALYSIS WAS ERRONEOUS BECAUSE IT CONSIDERED ONLY DEFENDANTS' POTENTIAL HARM AND FAILED TO CONSIDER PLAINTIFFS' ACTUAL HARM

In its Order, the Court determined that Defendants were entitled to some First Amendment protection and appears to have adopted the analysis of the court in *Sony Music Entertainment Inc. v. Does 1-40*, 326 F. Supp. 2d at 564-67. This Court, however, came to an entirely different conclusion from *Sony*, albeit on virtually identical facts. *See* Order, at 14. The

---

[1] For example, FERPA prohibits unauthorized disclosure of confidential student information, it expressly excludes from its confidentiality provisions the very type of identifying information that Plaintiffs are seeking here.

6

Court appears to have reached the opposite conclusion from *Sony* based on a misapplication of the balancing test set forth in that case.

In *Sony*, the court began by noting the very limited First Amendment interests of the defendants:

> In contrast to many cases involving First Amendment rights on the Internet, a person who engages in P2P file sharing is not engaging in true expression. Such an individual is not seeking to communicate a thought or convey an idea. Instead, the individual's real purpose is to obtain music for free.

*Id.* at 564.

Against this backdrop, the *Sony* court applied a multifactor balancing test that compared the defendants' limited privacy interests with the massive harm to the plaintiff record companies that would have resulted if expedited discovery were not allowed. The *Sony* court concluded that "defendants' First Amendment right to remain anonymous must give way to plaintiffs' right to use the judicial process to pursue what appear to be meritorious copyright infringement claims." *Id.* at 567; *accord Interscope Records v. Does 1-14,* No. 5:07-cv-04107-RDR-KGS, slip op. at 4-6 (D. Kan. Apr. 11, 2008) (applying *Sony* test and denying motion to quash on the grounds that the record company plaintiffs' interests overrode the defendants' limited privacy interests) (attached as *Exhibit B*); *Arista Records LLC. v. Does 1-30,* Civil Action No. 07-4647, at 4 (D.N.J. Jan. 28, 2008) (concluding that a "[d]efendant, who allegedly used one or more P2P networks to unlawfully download and disseminate Plaintiffs' copyrighted works, has at best a minimal expectation of privacy in remaining anonymous and this expectation is clearly outweighed by Plaintiffs' interests . . . .") (attached as *Exhibit C*).

Here, although the Court indicated that it was adopting the *Sony* balancing test, the Court did not actually balance the parties' competing interests. Specifically, the Court focused exclusively on the *potential* harm to Defendants as a result of their limited First Amendment

7

rights, while apparently not considering the *actual* harm to Plaintiffs, including the well-documented fact that piracy on the Internet has resulted in millions of dollars of losses in the record industry and thousands and thousands of lost jobs, not to mention the irreparable harm that is presumed under copyright law.  *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster Ltd.*, 545 U.S. 913, 918-923 (2005) (noting that users of P2P networks share copyrighted music and video files on an enormous scale); *BMG Music v. Gonzalez*, 430 F.3d 888, 890 (7th Cir. 2005); *In re Aimster Copyright Litigation*, 334 F.3d 643 (7th Cir. 2003); *Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 611-612 (1st Cir. 1988); Lev Grossman, *It's All Free*, Time, May 5, 2003.  Plaintiffs respectfully submit that proper application of the *Sony* balancing test demonstrates that the actual harm to Plaintiffs substantially outweighs any harm to Defendants and, thus, that Plaintiffs should have been allowed the discovery requested, without qualification or condition, as the *Sony* court itself held.

Plaintiffs further respectfully submit that the Court erred in finding a privacy interest in the types of music that Defendants were caught stealing.  Indeed, the advent of such a privacy interest would lead to absurd results.  For example, if a masked person walks into Walmart, shoplifts 100 CDs, gets stopped by store security, is asked to remove the mask, and refuses based upon an alleged privacy interest in the collection that he stole, few if anyone would find such an argument persuasive.  Nor would a jewel thief have a privacy right created by virtue of the creativity of what rings he or she decided to steal and from whom.  Plaintiffs respectfully submit that the same results should obtain here.  Defendants have been caught with sound recordings that do not belong to them and that they did not legally purchase.  The owners of those recordings are entitled to know the identity of the people who got caught with the goods, and Defendants should not be able to hide their identifies based on an alleged right to keep private

8

their taste in the music that they obtained illegally.  Simply stated, when a person engages in

copyright infringement (and Plaintiffs have alleged a *prima facie* case here), that individual has

no privacy interest in the works infringed.  *See Harper & Row Publishers, Inc. v. Nation*

*Enterprises*, 471 U.S. 539, 555-56 (1985) (First Amendment does not shield copyright

infringement).

　　　　For all of these reasons, Plaintiffs respectfully request that this Court reconsider its

analysis as to the *Sony* balancing test.

**IV.  THE COURT ERRED IN REACHING THE "MAKING AVAILABLE" ISSUE,
AND, IN ANY EVENT, ITS DETERMINATIONS WERE CONTRARY TO THE
LANGUAGE OF THE COPYRIGHT ACT, LEGISLATIVE INTENT, AND THE
PRONOUNCEMENTS OF NUMEROUS CIRCUIT AND DISTRICT COURTS,
AS WELL AS THOSE OF THE UNITED STATES COPYRIGHT OFFICE**

　　　　**A.　　Where, As Here, The Court Correctly Found That Plaintiffs Have Properly
Pled Distribution, The Court Erred In Opining On The "Making Available"
Issue, Which Was Unnecessary To The Court's Determination**

　　　　It is axiomatic that a court should not render advisory opinions or determine questions

that are unnecessary to the court's determination.  *See Rhode Island v. Narragansett Indian*

*Tribe*, 19 F.3d 685, 705 (1st Cir. 1994) (courts should not engage in unnecessary inquiries or

issue advisory opinions);  *Norvell v. Sangre de Cristo Dev. Co., Inc.*, 519 F.2d 370, 375 (10th Cir.

1975) ("It is fundamental that federal courts do not render advisory opinions and that they are

limited to deciding issues in actual cases and controversies.")..  In its Order, at 26-27, this Court

expressly – and correctly – found that Plaintiffs had properly pled and made a *prima facie*

showing of violations of their exclusive distribution rights.  The Court went on, however, to

discuss and reject Plaintiffs' argument as to the so-called "making available" right.  *See* Order,

at 22-26.  Having determined that Plaintiffs had established a proper distribution claim, it was

unnecessary for the Court to have reached the "making available" (or "deemed distribution")

issue.  As such, in accordance with the settled principles noted above, Plaintiffs respectfully

submit that it was error for the Court to reach the "making available" issue and that the Court's analysis was dicta and should be stricken from the Court's Order.

### B.     The Terms "Distribution" And "Publication" Are Synonymous In The Copyright Act

Without waiver of their position that this Court erred in reaching the "making available" issue, Plaintiffs note that, as part of its "making available" analysis, the Court held that "publication" and "distribution" are not synonymous. *See* Order, at 26. Every court that has spoken to this issue, including the United States Supreme Court, however, has held to the contrary. Moreover, the legislative history of the Copyright Act, which this Court did not address, demonstrates that Congress intended the terms to be synonymous.

17 U.S.C. § 106(3) provides, in pertinent part, that the owner of a copyright has the exclusive right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership." The term "distribute" is not defined in the Copyright Act. The Copyright Act does, however, define "publication," using language similar to that of § 106(3). Specifically, "publication" is defined as:

> [T]he distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication.

17 U.S.C. § 101.

In *Elektra Entertainment Group, Inc. v. Barker*, Case No. 05-CV-7340 (KMK) (S.D.N.Y. Mar. 31, 2008) (attached as *Exhibit D*), the court provided a detailed analysis of the legislative history of the Copyright Act and concluded that Congress, indeed, intended the terms

10

"distribution" and "publication" to be synonymous.  Among other things, the *Barker* court

stated:

> This Court concurs with the conclusion that the House and Senate
> of the Ninety-Fourth Congress considered the terms "distribute"
> and "publication" to be synonymous.  In particular, the Court finds
> persuasive the words that Congress used to characterize the five
> exclusive rights given under Section 106.  As noted by the Second
> Circuit, the text of Section 106 conveys to a copyright owner the
> right to:  "(1) reproduce the copyrighted work; (2) prepare
> derivative works; (3) distribute copies of the work by sale or
> otherwise; and, with respect to certain artistic works, (4) perform
> the work publicly; and (5) display the work publicly."  *See e.g.,*
> *Computer Assocs. Int'l., Inc. v. Altai, Inc.*, 982 F.2d 693, 716
> (2nd Cir. 1992).  Yet, the House and Senate Committees that
> evaluated the Copyright Act described this bundle of five rights as
> "the exclusive rights of reproduction, adaptation, *publication*,
> performance, and display."  House Report at 61 (emphasis added);
> S. Rep. No. 94-473 at 57 (1976) (emphasis added) (hereinafter
> Senate Report).  Thus, both the House and Senate clearly equated
> the right of distribution with the right of publication.  This choice
> of language was not a mere slip of the pen:  throughout both the
> House and Senate Committee Reports, the right contained under
> 106(3) is described as the right of publication.  For example, the
> Committee Reports identify the "Rights of Reproduction,
> Adaptation, and Publication" as "[t]he first three clauses of
> section 106."  House Report at 61; Senate Report at 57.

*Id.* at 12-13.

The *Barker* court also noted that:

> [T]he passage of the House Committee Report quoted by the
> Supreme Court in *Harper & Row Publishers* notes that
> Section 106(3) establishes "the exclusive right of publication" and
> governs "unauthorized public distribution" – using the words
> "distribution" and "publication" interchangeably within a single
> paragraph.  House Report at 62; see also Senate Report at 58.  In
> sum, the House and Senate Judiciary Committees of the Ninety-
> Fourth Congress consistently described Section 106(3) as
> protecting both the right of "distribution" and the right of
> "publication," and thus apparently viewed these concepts as
> synonymous.

*Id.*

11

The *Barker* court proceeded to demonstrate that applicable case authority is in full accord, noting that "[s]everal courts (including the Supreme Court) that have wrestled with the Copyright Act have generally found, relying in part on the statute's legislative history, "distribution" and "publication" to be synonymous." *Id.* at 11.

In *Harper & Row Publishers, Inc., ,* 471 U.S. at, 552, for example, the Supreme Court noted that the Copyright Act of 1976:

> [R]ecognized for the first time a distinct statutory right of first publication, which had previously been an element of the common-law protections afforded unpublished works. The Report of the House Committee on the Judiciary confirms that 'Clause (3) of section 106, establishes the exclusive right of publication . . . . Under this provision the copyright owner would have the right to control the first public distribution of an authorized copy . . . of his work.'" (quoting H. R. No. 94-1476, at 62 (1976).

Other cases have reached the same conclusion. *See, e.g., Ford Motor Co. v. Summit Motor Prod., Inc.*, 930 F.2d 277 (3d Cir. 1991) ("'Publication' and the exclusive right protected by section 106(3) . . . are for all practical purposes, synonymous. Therefore, any clarification of what is meant by 'publication' would also clarify what is meant by section 106(3) . . . ."); *Agree v. Paramount Communications, Inc.*, 59 F.3d 317, 325 (2d Cir. 1995) (citing approvingly the *Ford Motor Co.* court's determination that the terms "distribution" and "publication" are "essentially synonymous," but deciding the case on other grounds); *Atlantic Recording Corp. v. Anderson*, No. 06-CV-3578, slip op. at *12 (S.D. Tex. Mar. 12, 2008) (attached as *Exhibit E*) ("'Distribute' is not defined in the Copyright Act, but the Supreme Court has equated the term with 'publication,' which is defined under the act."); *Interscope Records v. Duty*, No. 05-CV-3744, 2006 WL 988086, at *2 (D. Ariz. Apr. 14, 2006) ("[T]he right of distribution is synonymous with the right of publication . . . ."); *In re Napster, Inc. Copyright Litig.*, 377 F. Supp. 2d 796, 803 (N.D. Cal. 2005) (equating distribution and publication); *Getaped.com,*

12

*Inc. v. Cangemi*, 188 F. Supp. 2d 398, 401 n. 2 (S.D.N.Y. 2002) (holding that Section 106(3) gives copyright holders the exclusive right of publication).

In short, the Copyright Act, its legislative history, and applicable case law all show that the terms "distribution" and "publication" are synonymous.  Indeed, until this Court issued its Order, no court appears to have held otherwise.  As such, Plaintiffs respectfully request that this Court reconsider its holding that "publication" and "distribution" are not synonymous.

### C.    Making Digital Files Available On A P2P Network Constitutes Distribution Under The Copyright Act

Again without waiver of their contention that the Court erred in reaching the "making available" issue, Plaintiffs note that, in rejecting the "making available" right, the Court's determination was contrary to the holdings of numerous other circuit and district courts, as well as the view of the United States Copyright Office.  Moreover, the effect of the Court's ruling is to render the United States in violation of its treaty obligations under the WIPO Digital Treaties. As such, Plaintiffs respectfully submit that, if the Court is to reach these issues, these determinations were erroneous and should be reconsidered.

### 1.    Applicable Case Law Supports The So-Called Making Available Right

Three circuit court cases and numerous district court decisions have held that making a copyrighted work available for distribution to the public without authorization from the copyright holder violates the copyright holder's distribution right under section 106(3).  In *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199 (4th Cir. 1997), the defendant's library obtained unauthorized copies of the plaintiffs' work, added a listing of the copies to its index of available works, and made the copies available for the public to check out of its library, without keeping records of what was checked out.  Based on this evidence, the

13

Fourth Circuit held that, even in the absence of proof that the work had actually been provided to the public, the work had been distributed within the meaning of section 106(3). *Id*. at 203.

The same analysis is applicable here. Defendants posted the list of sound recordings that they had available for anyone to download, Defendants had the recordings in their possession, and, as in *Hotaling*, Defendants did not maintain a "checkout log" indicating who downloaded these sound recordings. For the same reasons as discussed in *Hotaling*, under these circumstances, Defendants should be held to have distributed the works at issue. To hold otherwise would allow would-be infringers in cases like this to infringe with impunity merely by choosing not to maintain records as to who received infringing works from the infringer. It would also allow users of unauthorized P2P networks to escape substantial liability because these services are set up so as to make it exceedingly difficult, if not impossible, to determine who downloaded a particular recording from another. Surely, this cannot be the law.

In light of the foregoing, numerous courts have applied the *Hotaling* analysis to facts that are virtually identical to this case and have found a violation of the distribution right. In *A&M Records, Inc. v. Napster*, 239 F.3d 1004 (9th Cir. 2001), for example, the Ninth Circuit held that "users who upload file names to the search index for others to copy violate plaintiffs' distribution rights." *Id.* at 1014. As this Court correctly found, the facts in this case are closer to *Hotaling* than the facts in *Napster* were. *See* Order, at 23 n. 19.

In *Perfect 10 v. Amazon.com Inc.*, 508 F.3d 1146 (9th Cir. 2007), the Ninth Circuit reaffirmed its holding in *Napster*. In *Perfect 10*, the court reiterated that "the distribution rights of the plaintiff copyright owners [in the *Napster* case] were infringed by Napster users (private individuals with collections of music files stored on their home computers) when they used the Napster software to make their collections available to all other Napster users." *Id.* at 1162-63.

14

This so-called deemed distribution rule did not apply in *Perfect 10*, however, because Google, unlike Defendants in this case, did not have the copyrighted works on its servers and, therefore, could not be making them available to anyone.

Several other courts have reached the identical conclusion. *Sony Pictures Home Entm't, Inc. v. Lott*, 471 F. Supp. 2d 716, 722 (N.D. Tex. 2007) ("[I]t is well-established that unauthorized downloading and uploading of copyrighted media files . . . is a violation of the copyright holders' exclusive rights to reproduce and distribute the files."); *Arista Records, LLC v. Greubel*, 453 F. Supp. 2d 961, 969, 971 (N.D. Tex. 2006) (plaintiffs' allegations that the defendant "made the copyrighted recordings available to others without permission and actively reproduced and/or distributed the copyrighted recordings" stated a claim of copyright infringement); *Universal City Studios Prods. LLLP v. Bigwood*, 441 F. Supp. 2d 185, 190-91 (D. Me. 2006) ("[B]y using KaZaA to make copies of the Motion Pictures available to thousands of people over the internet, Defendant violated Plaintiffs' exclusive [distribution] right."); *Motown Record Co. v. DePietro*, 2007 U.S. Dist. LEXIS 11626, at *12 (E.D. Pa. Feb. 16, 2007) ("A plaintiff claiming infringement of the exclusive-distribution right can establish infringement by proof of actual distribution or by proof of offers to distribute, that is, proof that the defendant 'made available' the copyrighted work."); *Atlantic Recording Corp. v. Anderson*, Civil Action No. H-06-3578 slip op. at 12, ("[M]aking copyrighted works available for download via a peer-to-peer network contemplates 'further distribution,' and thus constitutes a violation of the copyright owner's exclusive 'distribution' right under 17 U.S.C. § 106(3).") (*Exhibit E).* In rejecting the holdings of all of these courts, this Court suggested that the First Circuit rejected the making available argument in *Latin American Music Co. v. Archdiocese of San Juan*, 499 F.3d 32, 46 (1st Cir. 2007) and *Venegas-Hernandez v. Asociacion De Compositores y Editores De*

#1325944 v1

*Musica LatinoAmerica*, 424 F.3d 50, 57-58 (1st Cir. 2005). Neither court did so. In *LAMCO,* the court expressly noted that it might well have been infringing for LAMCO to list a publisher's copyrighted works in its catalogue where certain of the songs at issue also "*were available* on [its affiliate's] website" and where certain songs had been distributed by LAMCO and its affiliate in a compact disc. *LAMCO*, 499 F.3d at 47 (emphasis added). Because the court could not tell which recordings were merely listed in the catalog and which also were made available through LAMCO's affiliate's website or by CD, the court held that summary judgment on the issue of infringement was inappropriate. In other words, the court permitted the case to go to trial where there was a fact question as to whether the alleged infringers had done more than merely list songs on a index. In this respect, *LAMCO* is completely consistent with Plaintiffs' argument here that the distribution right is violated where copyrighted sound recordings are not only listed in an index of recordings but also are available behind the index, i.e., available for download once identified on the index, which was the case here.

Similarly, although *Venegas-Hernandez* addressed the question of whether authorization of an infringing act could support an infringement claim, it did not address the making available issue at all. As to the authorization issue, it is noteworthy that the court conceded that "the better bare-language reading" of the Copyright Act would allow claims for infringement based on the mere authorization of an infringing act. *See Venegas-Hernandez*, 424 F.3d at 57-58. The court went on, however, to determine that the legislative history of the Act should override the "bare-language reading."

In short, the great majority of cases to have addressed the "making available" right have found such a right to be part and parcel of the right of distribution, and neither of the First Circuit

cases cited by this Court held otherwise.  Accordingly, Plaintiffs respectfully request that the

Court reconsider its effort to distinguish all of these cases.

2.        The Order Is Contrary to the Findings of the Copyright Office

In rejecting the so-called "making available" right, the Court's Order directly

contradicted the findings of the United States Copyright Office.  The Register of Copyrights "has

the authority to interpret the copyright laws and its interpretations are entitled to judicial

deference if reasonable."  *Batjac Productions Inc. v. GoodTimes Home Video Corp.*,

160 F.3d 1223, 1230 (9th Cir. 1998).  The opinion of the United States Copyright Office

unequivocally supports Plaintiffs' position that making sound recordings available on a P2P

network constitutes a distribution under section 106(3).  Thus, the Register of Copyrights has

determined the following:

> While Section 106 of the U.S. Copyright Act does not specifically
> include anything called a "making available" right, the activities
> involved in making a work available are covered under the
> exclusive rights of reproduction, distribution, public display and/or
> public performance set out in Section 106.  Which of these rights
> are invoked in any given context will depend on the nature of the
> "making available" activity.
>
> In the case of a peer to peer network user uploading a copyrighted
> work onto his or her computer, making it available for other users
> of the peer to peer network to download, it is simply incorrect to
> suggest that the person performing the download is the only person
> legally responsible for infringement.  Making the work available in
> this context constitutes an infringement of the exclusive
> distribution right, as well of the reproduction right (where the work
> is uploaded without the authorization of the copyright holder).

Letter from Marybeth Peters to Rep. Berman (attached as *Exhibit F*).

As noted above, this determination is entitled to judicial deference.

17

3.     **The Court's Order Renders The United States In Violation Of Its Obligations Under The WIPO Digital Treaties**

Finally, Plaintiffs respectfully request that the Court reconsider its Order because, as it stands, the Order places the United States in violation of its obligations under the so-called WIPO Digital Treaties.

At the outset, Plaintiffs note that the Court appears to have misunderstood Plaintiffs' argument as to the WIPO Digital Treaties. Plaintiffs are *not* asserting that the WIPO Digital Treaties are self-executing. Rather, Plaintiffs are asserting that the actions of the Legislative and Executive Branches demonstrate that *United States* Copyright law subsumes a "making available" right within the distribution right. Specifically, the WIPO Digital Treaties expressly include an exclusive right of making available. For example, Article 6 of the WIPO Copyright Treaty grants to copyright holders the exclusive right "of authorizing the making available to the public of the original and copies of their works through sale or other transfer of ownership." Similarly, Article 8 of the WIPO Copyright Treaty provides an exclusive right of "authorizing any communication to the public of [copyrighted] works, by wire or wireless means, including the making available to the public of [those] works" in such a way that members of the public may access these works from a place and at a time individually chosen by them. Upon ratification of these Treaties, the United States was required to take whatever steps were necessary to bring *United States* law into compliance with the Treaties' terms, including amending United States law as necessary to ensure compliance with the WIPO Digital Treaties.

As more fully set forth in Section III(B)(2) of Plaintiffs' Response in Opposition to Amicus Brief of the Electronic Frontier Foundation, both the House and the Senate agreed that the then-existing Copyright Act already protected the right of making available and, thus, no

18

amendment was needed to bring United States law into compliance with the WIPO Digital

Treaties.  The Executive Branch, including the Register of Copyrights, fully agreed.

In now finding that no making available right exists, this Court has not only rejected the

conclusion reached by both the Executive and Legislative Branches, but also it has rendered the

United States squarely in violation of its obligations under the WIPO Digital Treaties.

Specifically, as noted above, to comply with its treaty obligations, the United States was required

to ensure that, among other things, United States law provided at least the same rights as the

WIPO Digital Treaties, which contain express making available rights.  If no such rights exist

under United States law, then the United States is not providing the same rights as the WIPO

Digital Treaties, and, it is in violation of those treaties.

Because it is well-settled that, where a treaty and a federal statute relate to the same

subject, courts should construe them so as to give effect to both, if that can be done without

violating the language of either, *see Whitney v. Robertson,* 124 U.S. 190, 194 (1888); *Port*

*Authority of New York & New Jersey v. Department of Transportation,* 479 F.3d 21, 31 (D.C. cir.

2007), Plaintiffs respectfully ask this Court to reconsider its determination.

## V.     CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court reconsider

its Order and allow Plaintiffs the expedited discovery that they have sought, without further

involvement of the Court.

19

#1325944 v1

ARISTA RECORDS LLC; WARNER BROS.
RECORDS INC.; ATLANTIC RECORDING
CORPORATION; VIRGIN RECORDS
AMERICA, INC.; UMG RECORDINGS, INC.;
BMG MUSIC; CAPITOL RECORDS, INC.;
SONY BMG MUSIC ENTERTAINMENT;
MOTOWN RECORD COMPANY, L.P.;
MAVERICK RECORDING COMPANY;
ELEKTRA ENTERTAINMENT GROUP INC.;
LAFACE RECORDS LLC; and INTERSCOPE
RECORDS

By their attorneys,

Dated: April 16, 2008          By:     /s/ Katheryn J. Coggon
                                       Richard Gabriel
                                       Katheryn J. Coggon
                                       Holme Roberts & Owen
                                       1700 Lincoln Street
                                       Suite 4100
                                       Denver, CO.  80203-4541
                                       Main Phone:  (303) 861-7000
                                       Main Fax:  (303) 866-0200

20

## <u>NOTICE OF ELECTRONIC FILING</u>

   The undersigned hereby certifies that this document was electronically filed on April 16, 2008, and will be sent electronically to the registered participants identified on the Notice of Electronic Filing.  In addition, a copy was served by first class mail to the following:

Raymond Sayeg, Esq.
Denner Pellegrino
4 Longfellow Place, 35th Floor
Boston, MA 02114


       /s/ Katheryn J. Coggon
       Katheryn J. Coggon

#1325944 v1

EXHIBIT "A"

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ARISTA RECORDS LLC, a Delaware limited liability company; WARNER BROS. RECORDS INC., a Delaware corporation; ATLANTIC RECORDING CORPORATION, a Delaware corporation; VIRGIN RECORDS AMERICA, INC., a California corporation; UMG RECORDINGS, INC., a Delaware corporation; BMG MUSIC, a New York general partnership; CAPITOL RECORDS, INC., a Delaware corporation; SONY BMG MUSIC ENTERTAINMENT, a Delaware general partnership; MOTOWN RECORD COMPANY, L.P., a California limited partnership; MAVERICK RECORDING COMPANY, a California joint venture; ELEKTRA ENTERTAINMENT GROUP INC., a Delaware corporation; LAFACE RECORDS LLC, a Delaware limited liability company; and INTERSCOPE RECORDS, a California general partnership, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION No. 04-cv-12434-NG (CONSOLIDATED DOCKET NO.)  CIVIL ACTION No. 07-cv-10834 (ORIGINAL DOCKET NO.) |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| DOES 1 - 21, | ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF KATHERYN COGGON IN OPPOSITION TO PLAINTIFFS' MOTION TO RECONSIDER THE COURT'S ORDER ON MOTIONS TO QUASH

I, KATHERYN COGGON, ESQ., declare:

1.    I am Special Counsel in the law firm of Holme Roberts & Owen LLP.  We serve as national counsel for plaintiffs in the above-captioned case.  I have personal knowledge of the

facts set forth in this declaration except as where stated on information and belief. As to such facts, I believe them to be true.

2.      On March 31, 2008, this Court issued an Order establishing an in camera review procedure for information regarding defendants. The Court expressed concerns that innocent parties could be identified as infringers. I respectfully submit this Declaration to address the Court's concerns.

3.      To the best of my knowledge, the consolidated Doe action includes copyright infringement claims against 435 Doe defendants for cases filed starting November 18, 2004 and continuing to the present. The majority of those defendants have been affiliated with Boston University (121 defendants), Massachusetts Institute of Technology (67), and University of Massachusetts (152 defendants). For 40 of the defendants, the ISPs could not identify an individual for the requested IP address at the date and time specified, including just 1 case at Boston University, 6 at MIT, and 6 at University of Massachusetts. There are 81 defendants for which subpoena responses are still pending. **I am not aware of a single instance among the 435 Doe defendants in this District where an ISP indicated that the IP address provided was affiliated with more than one individual.**

4.      With respect to Boston University and the University of Massachusetts (and possibly other ISPs within the District), they can provide identifying information for a single person for each IP address (if such information is still available) because they use the Network Registration system for tracking assignment of IP addresses and use of the university network. My understanding of the NetReg system is based on several conversations and one deposition of network administrators at schools which also use the NetReg system as well as a review of the BU computing website. Boston University's website describes the Network Registration system

2

in detail at www.bu.edu/computing. The Frequently Asked Questions section as of April 11, 2008 is attached hereto as Exhibit 1. In particular, the NetReg service produces an association between the network user and any computer that user registers in the BU database. (In the case of University of Massachusetts, the university mails to the student a login id and separately mails a password so that once the student arrives on campus, he/she can register his/her computer with the system.) BU uses that database to assign the user's computer an IP address. Thus, when BU queries the NetReg system and database using a specific IP address including date and time, the database will indicate the registered user associated with that IP address. This is different from an ISP that tracks an IP address through physical wiring connections to a particular dormitory room, for instance. Students who live in campus residence halls at BU have access to the internet through ResNet (a network that specifically serves BU residence halls), which uses NetReg to create that association between the user and the registered computer. If visitors want access to the ResNet, BU policy allows the student to register the visitor's computer using the student's name, but BU policy clarifies that the student will be held accountable for the visitor's use of ResNet. Also of interest, is BU's policy that prohibits use of wireless router technology in the residence halls, which further reduces the likelihood of misidentification of a defendant. In a related case in this District, I deposed a network administrator for the University of Massachusetts at Amherst. He described the NetReg system at UMASS as very similar to the descriptions included on the BU website.

5.    In other Districts, a handful of ISPs have disclosed multiple names for a single IP address. Those ISPs do not use the NetReg tracking system. When multiple potential infringers are identified we take the following steps to minimize the inconvenience to potential innocent parties. First, we contact the identified individuals in advance of naming anyone specifically in a

Complaint or publicly disclosing their names. Second, we indicate to those individuals that the ISP identified multiple people and provide each of them with the information necessary so that they can communicate among themselves to determine whether a particular person is the responsible party. In virtually all of the multiple person responses, it has been the case that those identified were roommates, suite-mates or shared a house. Third, we conduct further investigation which can include discussion with the ISP to determine the nature of the IP address assignment system, a careful review with the ISP as to the details of the particular identification, and further discussion with all identified individuals regarding specific computer settings and information. In some cases, the identified individuals have offered their computers for inspection and voluntarily provided additional information relevant to determining the responsible individual. When we have had multiple names disclosed for a single IP address, it has sometimes been the case that multiple individuals were infringing. In most other cases when we have had multiple names disclosed, the individuals named have worked with us to determine who the proper defendant should be.

6.      Also on the BU website is a section titled Conditions of Use and Policy on Computing Ethics, attached hereto as Exhibit 2. Notably, the notice to users of BU's computing facilities states that "no representation has been made to them as to the privacy of any communication or data stored on or sent through these facilities" and that users of BU's computing facilities agree to comply with applicable federal, state, and local laws.

7.      As a result of similar litigation in other jurisdictions and feedback from various ISPs, we have recently changed the subpoena language that we use in similar cases. Most recently, we have asked the ISP to produce:

> For each of the IP addresses listed in Attachment A to this Subpoena, and at the listed dates and times, provide the corresponding name, current and permanent addresses,

#1325789 v1

telephone numbers, e-mail addresses, and Media Access Control addresses. In the event that [ISP] cannot link the IP address to a specific individual, provide all documents and electronically-stored information relating to the assignment of the IP address at the dates and times provided.

We believe this approach minimizes the burden on the ISPs to identify the infringers in the cases where more than one individual may be responsible and also allows Plaintiffs to further examine the basis for any claim by an ISP that no information is available for a particular IP address.  Plaintiffs do not intend by this revised language to relieve the ISPs from disclosing multiple individuals affiliated with a particular IP address, but it does clarify that the ISP is not affirmatively identifying such individuals as the infringers.  If the Court finds this revised language acceptable, Plaintiffs propose submitting revised subpoenas to BU and UMASS consistent with this language.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 16th day of April, 2007, at Denver, Colorado.

KATHERYN J. COGGON, ESQ.

#1325789 v1

# EXHIBIT "1"

# NETWORK REGISTRATION

## Frequently Asked Questions

**What is NetReg?**

NetReg is a Boston University Campus Network service that produces an association between you and any computer you register in an institutional database. This database is subsequently used to assign your computer an Internet address—also known as an IP address—associating you with the address you're assigned.

**What is the purpose of NetReg?**

ResNet—the network serving Boston University residence halls—provides high speed access to the Campus Network and the Internet to over 11,000 computers. If any one of these computers is improperly configured, malfunctioning, or compromised by a virus, worm, or other malicious intrusion, it can affect the performance of ResNet and the availability of network resources overall. Without NetReg, a malfunctioning computer can only be immediately identified by its Internet address. Using this address to determine who to contact in response to a problem is difficult and time consuming. With NetReg's association of BU login names to network addresses, we can determine who to contact in response to a problem more quickly and efficiently. Furthermore, since NetReg compiles a list of ResNet subscribers, we can send important announcements to the ResNet community regarding network upgrades and maintenance activities.

**Does NetReg reconfigure, install software, or place information on my computer?**

No. NetReg simply creates a record in the NetReg database with your network address and BU login name.

**After I register and reboot my computer, how do I know I'm registered via NetReg?**

Once you register and reboot your computer, you should have unrestricted access to the Campus Network and the Internet. For example, if you can successfully direct your Web browser to a Web service such as Google (http://www.google.com/), you and your computer have been registered via NetReg.

**Does a computer registered with NetReg have access to resources that would otherwise require me to enter my BU login name and Kerberos password?**

Although registering a computer with NetReg enables that computer to communicate via ResNet, registration does not in itself enable a computer to gain access to resources that otherwise require a BU login name and Kerberos password, such as e-mail, ACS, and the Link. A BU login name and Kerberos password are always required each time you connect to these resources from any computer.

**I have visitors who want to connect their notebook computers to ResNet while they're here. Can they register their computers?**

Only someone with a BU login name and Kerberos password can register a computer on ResNet. If you have guests who want to use ResNet while they're here, you may register their computers in your name. However, you will be held accountable for their use of ResNet. Keep in mind that you should only enter personal information such as a BU login name and Kerberos password on a computer you own, or on a computer owned by someone you trust.

**Can I use NetReg to register my wireless access point?**

Personal computers are the only devices authorized to connect to ResNet. Network components such as personal wireless access points that are not installed and managed by the Office of Information Technology are prohibited in the residence halls.

**Why shouldn't I use a personal wireless access point in the residence halls?**

There are several reasons why personal wireless access points are prohibited in the residence halls. These devices often provide a broad range of complex network services that may interfere with ResNet performance and availability. More importantly, unregulated wireless access points pose a serious security risk that can be exploited by malicious individuals to eavesdrop on wireless transmissions. These transmissions often contain sensitive or confidential information, such as passwords and personal records. Would you feel comfortable giving an acquaintance or someone you don't even know access to your letters, telephone calls, or e-mail? Personal wireless access points put something else, and possibly someone else, between you and your ResNet transactions. They may also provide others with access to your transmissions, even if these individuals don't have physical access to, or control over, the device.

**Is it ever safe to use a wireless network?**

Wireless networks that are professionally managed and maintained by a responsible network service provider and that incorporate additional security features such as a VPN are reasonably safe to use. For more information about wireless network access at Boston University, including locations at the University that provide authorized wireless service, visit our Personal Computing Support Center wireless network Web site at www.bu.edu/pcsc/wireless.

**Who should I contact if I have other questions about NetReg?**

If you have questions about NetReg or personal computing at Boston University, please contact the Office of Information Technology Personal Computing Support Center at:

**Personal Computing Support Center**
111 Cummington Street, Room B19
www.bu.edu/pcsc
pcsc@bu.edu
**617-353-7272 (353-PCSC)**



Network Systems | OIT | August 24, 2005

# EXHIBIT "2"

# COMPUTING WEB

FAQs    Contact



ACCOUNTS & E-MAIL    TELECOM & NETWORK    COMPUTERS & SOFTWARE    FACILITIES    WEB    POLICIES    HELP

## CONDITIONS OF USE AND POLICY ON COMPUTING ETHICS

January 1997

### CONDITIONS OF USE

> **Notice to All Users**: Users of the University's computing facilities, including
> University-supported electronic mail, are on notice, and by using these facilities
> agree, that no representation has been made to them as to the privacy of any
> communication or data stored on or sent through these facilities; that the
> University has reserved the rights set forth below and in the Boston University
> Information Security Policy and Policy on Computing Ethics; and that the use of
> these facilities is restricted to University-authorized purposes.

The use of the University's computing facilities in connection with University activities and de
minimis personal use is a privilege extended to various members of the University
community; it is not a right. Users of the University's computing facilities are required to
comply with, and by using such facilities agree that they are on notice of and agree to
comply with, be subject to, and grant the University the right to implement, the Boston
University Information Security Policy, the Policy on Computing Ethics and these Conditions
of Use. Users also agree to comply with applicable federal, state, and local laws and to
refrain from engaging in any activity that is inconsistent with the University's tax-exempt
status or that would subject the University to liability. The University reserves the right to
amend these Conditions and Policies at any time without prior notice and to take such further
actions as may be necessary or appropriate to comply with applicable federal, state, and
local laws.

To protect the integrity of the University's computing facilities and its users against
unauthorized or improper use of those facilities, and to investigate possible use of those
facilities in violation of or in aid of violation of University rules and policies, Boston University
reserves the right, without notice, to limit or restrict any individual's use, and to inspect,
copy, remove or otherwise alter any data, file, or system resource which may undermine the
authorized use of any computing facility or which is used in violation of University rules or
policies. Boston University also reserves the right periodically to examine any system and
any other rights necessary to protect its computing facilities.

The University disclaims responsibility for loss of data or interference with files resulting from
its efforts to maintain the privacy and security of those computing facilities or from system
malfunction or any other cause. As used herein and in the Policy on Computing Ethics below,
the term "computing facility" means, refers to, and includes any and all forms of computer-
related equipment, tools, and intellectual property, including computer systems, personal
computers, computer networks, and all forms of software, firmware, operating software, and
application software, which are owned or leased by the University or are under the
University's possession, custody, or control.

### POLICY ON COMPUTING ETHICS

Thousands of users share the computing facilities at Boston University. These facilities must
be used responsibly by everyone, since misuse by even a few individuals has the potential to

POLICIES

Computing Ethics

Student Web Page Disclaimer

Information Security Policy

Information Security Management

disrupt University business or the work of others. You are therefore required to exercise responsible, ethical behavior when using the University's computing facilities. This includes, but is not limited to, the following:

1. You must use only those computer resources which you have been authorized to use by the University. The unauthorized use of computer resources, as well as the providing of false or misleading information for the purpose of obtaining access to computing facilities, is prohibited and may be regarded as a criminal act and treated accordingly by the University. You must not use University computing facilities to gain unauthorized access to computing facilities of other institutions, organizations, or individuals.

2. You may not authorize anyone to use your computer accounts for any reason. You are responsible for all use of your accounts. You must take all reasonable precautions, including password maintenance and file protection measures, to prevent use of your account by unauthorized persons. You must not, for example, share your password with anyone else, and you should change your password regularly.

3. You must use the University's computer resources only for the University-related purposes for which they were authorized. As with all University equipment, use of the computer facilities, including the Campus Network, for private or commercial purposes is prohibited, except as expressly authorized. You must not use the University's computer resources for any unlawful purpose, such as the installation or distribution of fraudulently or illegally obtained software. Use of external networks connected to the University's networks must comply with the policies of acceptable use promulgated by the organizations responsible for those networks.

4. You must not access, alter, copy, move or remove information, proprietary software or other files (including programs, members of subroutine libraries, data, and electronic mail) without prior authorization from the appropriate University data trustee, security officer, or other responsible party. You must not copy, distribute, display, or disclose third-party proprietary software without prior authorization from the licensor. Proprietary software must not be installed on systems not properly licensed for its use.

5. You must not use any computing facility irresponsibly or in a way that might needlessly interfere with the work of others. This includes transmitting or making accessible offensive, annoying, or harassing material, or materials such as chain letters, unauthorized mass mailings, or unsolicited advertising; intentionally, recklessly, or negligently damaging any system, material, or information not belonging to you; intentionally intercepting electronic communications or otherwise violating the privacy of information not belonging to or intended for you; intentionally misusing system resources or making it possible for others to do so; or loading software or data from untrustworthy sources, such as freeware, onto administrative systems.

6. You are encouraged to report any violation of these guidelines by another individual and any information relating to a flaw in or bypass of computing facility security to Information Technology, University Information Systems, or the Office of Internal Audit.

The unauthorized or improper use of Boston University's computer facilities, including the failure to comply with the above guidelines, constitutes a violation of University policy and will subject the violator to disciplinary and/or legal action by the University, and, in some cases, criminal prosecution. In addition, the University may require restitution for any use of service which is in violation of these guidelines. Any questions about this policy or of the applicability of this policy to a particular situation should be referred to Information Technology, University Information Systems, or the Office of Internal Audit.



&#9673; This Site  &#9675; BU  &#9675; Directory [                    ]  **SEARCH**

February 16, 2005

EXHIBIT "B"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## AT TOPEKA

| | |
|---|---|
| INTERSCOPE RECORDS, a California general partnership; ARISTA RECORDS LLC, a Delaware limited liability company; ATLANTIC RECORDING CORPORATION, a Delaware corporation; BMG MUSIC, a New York general partnership; CAPITAL RECORDS, INC., a Delaware corporation; ELEKTRA ENTERTAINMENT GROUP INC., a Delaware corporation; LAFACE RECORDS LLC, a Delaware limited liability company; MOTOWN RECORD COMPANY, L.P., a California limited partnership; SONY BMG MUSIC ENTERTAINMENT, a Delaware general partnership; UMG RECORDINGS, INC., a Delaware corporation; VIRGIN RECORDS AMERICA, INC., a California corporation; WARNER BROS. RECORDS INC., a Delaware corporation; and ZOMBA RECORDING LLC, a Delaware limited liability company,<br><br>               Plaintiffs,<br><br>v.<br><br>DOES 1 – 14,<br><br>               Defendants. | **CIVIL ACTION**<br>**CASE NO. :07-4107-RDR** |

## ORDER

This matter comes before the court upon defendant Doe no. 11's Motion to Quash (Doc. 9) and defendant Doe no. 6's Motion to Quash (Doc. 11) (hereinafter "Doe Defendants"). Plaintiffs have filed responses to both motions (Docs. 14 and 15). Neither Doe Defendant has filed a reply, and the time to do so has passed.[1] As a result, the matter is fully briefed and ripe for disposition.

---

[1]*See* D. Kan. Rule 6.1(d).

## I.    Background

Plaintiffs filed a Complaint alleging copyright infringement against various Doe Defendants.[2] Plaintiff also sought to ascertain the identity of these Doe Defendants by service of a Rule 45 subpoena on the University of Kansas seeking information that identifies each Doe Defendant, including the name, current (and permanent) addresses and telephone numbers, e-mail addresses, and Media Access Control addresses for each defendant.

In support of their request for ex-parte discovery Plaintiffs attached the Affidavit of Carlos Linares, Vice President for Anti-Piracy Legal Affairs for the Recording Industry Association of America, Inc. ("RIAA"). Mr. Linares explained that immediate ex parte discovery was warranted because (1) prompt identification of infringers is necessary for copyright owners to take quick action (2) infringement of this nature often involves sound recordings that have not yet been distributed publicly (3) without expedited discovery plaintiffs cannot identify defendants' names, address, or e-mail addresses; and (4) Internet Service Providers (ISPs) have different policies pertaining to the length of time they preserve "logs" which identify their users; this time period can range from as short as a few days to a few months before they erase the data.[3]

On October 1, 2007, the court entered an order permitting the ex parte discovery. The court noted that because plaintiffs sought very specific information regarding a certain group of likely readily identifiable people, the scope of the discovery was sufficiently narrow. The court further stated that disclosure of the information pursuant to the subpoena was consistent with the University of Kansas' obligations under 20 U.S.C. § 1232g, the Family and Education Right and Privacy Act of 1974 ("FERPA") but that the University of Kansas could seek to quash the subpoena.[4]

---

[2]*See* Complaint (Doc. 1).

[3]*Id.* at (Exhibit A) p. 8-9.

[4]*See e.g.*, Memorandum in Support (Doc. 4) at (Exhibit B) p. 24, 28 (orders from district courts in the Tenth Circuit specifically providing the third-party the opportunity to quash the subpoena).

On February 6, 2008, James P. Pottorff, Jr., General Counsel for the University of Kansas was personally served with the subpoena.[5]  According to the pending motions, the University of Kansas was to have complied with the subpoena by March 7, 2008.  However, the pending motions were filed on February 27, 2007 and March 5, 2008, and it is unclear from the briefing whether the University of Kansas has complied with the subpoena.  However, subsequent to March 7, 2008, plaintiffs have dismissed their claims against Doe Defendants nos. 3, 9 and 12.[6]

## II.    Parties' contentions

The Defendant Does argue that "[p]laintiff should be required to show that its interests are superior to the privacy interests of John Doe # [6 and] 11"[7] because if this subpoena is not quashed they will suffer "irreparable harm."  Defendant Does also argue that the information plaintiffs seek from the University of Kansas is confidential and protected from disclosure under the Family and Education Right and Privacy Act of 1974 ("FERPA"), 20 U.S.C.§ 1232g, *et seq*.

In turn, plaintiffs argue that they have ascertained significant instances of copyright infringement by these two Doe Defendants and have determined their Internet Protocol ("IP").  However, plaintiffs have not been able to ascertain defendants' names, and since the University of Kansas maintains a log matching IP addresses with the user's computer hardware, the University can match the IP address, date, and time with the computer that was using the IP address when plaintiffs logged the instances of infringement.  Plaintiffs argue that the Doe Defendants' First Amendment privacy protections do not permit copyright infringement and that on balance their need to ascertain the Doe Defendants' identities outweighs any privacy interest.  Similarly, plaintiffs argue that FERPA does not bar and, in fact, expressly permits discovery of the information sought.

---

[5]*See* Return of Service (Doc. 7) at p. 2.

[6]*See* Notice of Dismissal (Docs. 12 and 13).

[7]Motion to Quash (Doc. 9) at p. 2.

3

**III    Discussion**

Federal Rule of Civil Procedure 45 provides that a court may quash or modify a subpoena, in part, if the subpoena "requires disclosure of privileged or other protected matter, if no exception or waiver applies[.]"[8]  Here, the court construes Doe Defendants' arguments as seeking protection under this provision of Rule 45.

**A.    First Amendment**

Plaintiffs treat Doe Defendants' argument that plaintiffs should have to prove that their interest outweighs Doe Defendants' privacy interests as a First Amendment argument. Because the court is without the benefit reply briefs from Doe Defendants in support of their motions to quash, their position on this issue is not clear.  However, plaintiffs argue, and this court agrees, that to the extent plaintiffs are required to prove their interest is greater than Doe Defendants, they have made such a showing.

Courts have routinely held that a person using the Internet to distribute or download copyrighted music without authorization "is engaging in the exercise of speech, but only to a limited extent, and the First Amendment does not protect the person's identity from disclosure."[9]  For example, in *Sony Music Entertainment, Inc. v. Does 1-40*, the court allowed the plaintiffs to serve a subpoena ex parte upon a non-party cable service provider in order to ascertain the identities of Doe defendants accused of illegally distributing and downloading copyrighted music.[10]  After the cable provider notified the alleged infringers, an attorney representing one of the Doe defendants sought to quash the subpoena based, in part, on First Amendment grounds.[11]

---

[8]*See* Fed. R. Civ. P. 45(c)(3)(A).

[9]*UMG Recordings, Inc., v. Does*, No. 06-0652, 2006 U.S. Dist. LEXIS 32821 (N.D. Ca. March 6, 2006)(citing *Sony Music Entertainment, Inc. v. Does 1-40*, 326 F. Supp. 2d 556, 558 (S.D.N.Y. 2004)).

[10]326 F. Supp. 2d at 558-59.

[11]*Id.* at 560-61.

First, the *Sony* court noted that the Supreme Court has held that the First Amendment does not protect copyright infringement.[12] As to the First Amendment challenge, the *Sony* court reasoned that a person who distributes or downloads sound recordings seeks to obtain music for free and is not attempting to convey a thought or an idea.[13] However, the court reasoned that in downloading selected music and distributing music to others, a person could be making a statement of self-expression.[14] As a result, the *Sony* court held that distributing and downloading sound recordings amounted to speech, but only to a limited extent.[15] Then the court considered five factors to determine whether the First Amendment protected the defendants' identities from disclosure, namely:

> (1) a concrete showing of a prima facie claim of actionable harm; (2) the specificity of the discovery request; (3) the absence of alternative means to obtain the subpoenaed information; (4) a central need for the subpoenaed information to advance the claim; and (5) the Doe defendants' expectation of privacy.[16]

In applying these factors, the court reasoned: (1) as to copyright infringement which requires ownership of a valid patent and copying the original work absent permission, plaintiffs had made a prima facie showing; (2) the "sufficiently specific" discovery request demonstrated a reasonable likelihood that it would lead to information identifying defendants making service upon the defendants possible; (3) the plaintiffs had no other means to obtain the subpoenaed information because a search of a publicly available database of IP addresses would yield no additional information; (4) obtaining the identities of the defendants was essential to plaintiffs' ability to pursue the litigation, because without the information plaintiffs could not complete service of process; and

---

[12]*Id.* at 563 (citing *Harper & Row Publishers, Inc. v. Nation Enters*, 471 U.S. 539, 555-56 (1985)).

[13]*Id.* at 564.

[14]*Id.*

[15]*Id.*

[16]*Id.* at 565-66.

(5) defendants had little expectation of privacy because the cable company's service terms stated it had the right to disclose any information necessary "to satisfy any law, regulation, or other governmental request," and because defendants had diminished any expectation of privacy by opening their computers to others through peer-to-peer file sharing.[17]  As a result, the *Sony* court concluded that all five factors weighed in the plaintiffs' favor and that the First Amendment did not protect the disclosure of the defendants' identities.

Through a similar analysis this court also concludes that plaintiffs have overcome the Doe Defendants' limited privacy interests. First, plaintiffs have made a prima facie showing of copyright infringement.[18]  Second, because the discovery request seeks only names, addresses and telephone numbers, e-mail addresses, and Media Access Control addresses for the people associated with certain IP addresses at certain times, it is "sufficiently specific" to demonstrate a reasonable likelihood that the request will lead to information identifying defendants.  Third, plaintiffs lack other means to ascertain the subpoenaed information, as only the University of Kansas can match the instances of alleged infringement with the identifying information.  Fourth, obtaining the identities of the defendants is essential to plaintiffs' ability to pursue the litigation because without the information plaintiffs cannot serve process on the Doe Defendants.  Finally, the Doe Defendants had little expectation of privacy because they opened their computers to others through peer-to-peer file sharing. Although Doe Defendants are, to a limited extent, engaged in First Amendment speech, the five factors weight heavily in favor of compelling disclosure of the identifying information sought.

---

[17]*Id.* at 565-67.

[18]*See* Memorandum in Support of Ex Parte Discovery (Doc. 4) at (Exhibit A)(Linares Affidavit); Complaint (Doc. 1).

**B.   FERPA**

Doe Defendants cite the Family and Education Right and Privacy Act of 1974 ("FERPA"), 20 U.S.C.§ 1232g, generally to argue that the University cannot disclose their identities. However, Doe Defendants did not articulate how the University would be in violation FERPA by disclosing the information sought.

FERPA generally prohibits disclosure by federally-funded educational institutions of certain student records and specifically provides, in pertinent part, that:

> No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein other than directory information . . .) of students without the written consent of the parents to any individual, agency, or organization . . . .[19]

However, FERPA "expressly provides that protected information can be disclosed pursuant to court order."[20] The court in *Laface Records, LLC v. Does 1-5* found on this basis alone that FERPA did not warrant the quashing of subpoenas seeking the identities of alleged student infringers directed at a federally-funded institution of higher education.[21] The court reasoned that "[t]he limited information allowed under the subpoena minimizes the risk that unnecessary private information would become public as a result of the order."[22] So too here, the limited scope of the subpoena makes it unlikely that private information would become public as a result of this order.

Plaintiffs also argue that the sort of information sought by the subpoena involves "directory

---

[19]*See* 20 U.S.C. §§ 1232g(a) and (b)(1).

[20]*Warner Bros. Records Inc. v. Does 1-6*, 527 F. Supp. 2d 1, 3 (D.D.C. 2007)(citing 20 U.S.C. § 1232g(b)(2)(B)).

[21]*See e.g., Laface Records, LLC v. Does 1-5,* No. 07-cv-187, 2008 U.S. Dist. LEXIS 13638, at *11 (W.D. Mich. Feb. 22, 2008)(citing 20 U.S.C. § 1232g(b)(2)(B) as a basis for declining to quash a subpoena seeking identifying information of alleged copyright infringers from a federally-funded institution of higher education).

[22]*Laface Records, LLC v. Does 1-5,* No. 07-cv-187, 2008 U.S. Dist. LEXIS 13638, at *11 (W.D. Mich. Feb. 22, 2008).

information" and thus the privacy limits of FERPA do not come into play.[23] FERPA defines "educational records" as "those records, files, documents, or other materials which (i) contain information directly related to a student; and (ii) are maintained by an educational agency or institution."[24] In turn, FERPA defines "directory information" as "the student's name, address, telephone listing, date and place of birth . . . ."[25]

A recent case from the Eastern District of Tennessee, *Virgin Records America, Inc. v. Does 1-33*, found that Rule 45 did not warrant quashing a subpoena served upon the University of Tennessee at Knoxville which sought an alleged student infringer's "name, address, telephone number, e-mal address, and Media Access Control address ('MAC address')".[26] However, the court made this ruling after thoroughly analyzing the University's FERPA policy. While this court was able to find the University of Kansas' FERPA policy,[27] the court is unwilling to engage in a blind discussion about the University's policy and its intersection with the requirements of FERPA. Since the court has already found that FERPA is not a barrier to the University of Kansas' disclosure of this information, whether the information sought amounts to "directory information" is not material.

Accordingly,

IT IS THEREFORE ORDERED that Defendant Doe no. 11's Motion to Quash (Doc. 9) and Defendant Doe no. 6's Motion to Quash (Doc. 11) are denied.

IT SO ORDERED.

---

[23]Memorandum in Opposition (Doc. 15) at p. 5.

[24]*See* 20 U.S.C. § 1232g(a)(4)(A); *United States v. Miami University*, 294 F.3d 797, 812 (6th Cir. 2002).

[25]20 U.S.C. § 1232g(a)(5)(A).

[26] No. 07-CV-235, 2007 U.S. Dist. LEXIS 79134, at * 2 (E.D. Tenn. Oct. 24, 2007).

[27]University of Kansas' Student Records Policy: Policy and Procedures Guide to the Family Educational Rights and Privacy Act, available at http://www.vpss.ku.edu/records.shtml#dirinfo.

Dated this 11th day of April, 2008 at Topeka, Kansas.

s/ K. Gary Sebelius

K. Gary Sebelius

U.S. Magistrate Judge

EXHIBIT "C"

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ARISTA RECORDS LLC, et al.,** | **Civil Action No. 07-4647 (FLW)** |
| **Plaintiffs,** | |
| **v.** | **ORDER** |
| **DOES 1-30** | |
| **Defendants.** | |

This matter having been opened to the Court upon Motion by Defendant "John Doe" ("Defendant") seeking an Order quashing the subpoena issued to Comcast Cable Communications ("Comcast") [Docket Entry No. 5]; and Defendant arguing that he has both First Amendment and due process rights in the information sought in the subpoena issued to Comcast; and Defendant arguing that the First Amendment provides anonymous speakers, such as him, with the right to remain anonymous; and Defendant further arguing that because the subpoena issued to Comcast seeks to compel Comcast to disclose Defendant's identification, and therefore intrenches on Defendant's First Amendment right to remain anonymous, due process requires proof of a compelling interest, which justifies the incursion on Defendant's fundamental right; and Defendant further arguing that the Court should apply the balancing test articulated in *Dendrite Intern., Inc. v. Doe*, in determining whether such a compelling interest exists (342 N.J. Super. 134 (App. Div. 2001)); and Defendant further arguing that under *Dendrite*, his Motion to Quash pursuant to FED. R. CIV. P. 45 should be granted; and Plaintiffs having opposed Defendant's Motion; and Plaintiffs arguing that the First Amendment does not afford any basis for quashing a subpoena issued to an internet service provider ("ISP"), such as Comcast, where the purpose of the subpoena is to obtain a copyright defendant's identifying information; and

Plaintiffs further arguing that under the circumstances just described, the First Amendment

provides no protection because the right of copyright holders to protect their copyrights

outweighs any minimal privacy expectation that users of peer-to-peer ("P2P") networks, such as

Defendant, may have; and Plaintiffs further arguing that Defendant, who merely used a P2P

network to unlawfully download and distribute Plaintiffs' copyrighted works, did not engage in

protected speech; and Plaintiffs further arguing that because the subpoena issued to Comcast only

seeks Defendant's (and the other copyright defendants') identifying information coupled with the

fact that the First Amendment does not provide a shield for defendants in copyright suits, the

First Amendment provides no basis for quashing Plaintiffs' subpoena; and Plaintiffs further

arguing that even assuming that Defendant's conduct, which consists of nothing more than using

a P2P network to unlawfully download and distribute Plaintiffs' copyrighted works, somehow

constitutes a lesser form of speech and is therefore entitled to some limited constitutional

protection, this limited First Amendment protection would give way to Plaintiffs' right to learn

Defendant's identity under the considerations enunciated in *Sony Music Entmt. v. Does 1-40*, 326

F.Supp. 2d 556 (S.D.N.Y. 2000); and Plaintiffs arguing that under *Sony*, their right would prevail

over Defendant's because Plaintiffs have (1) stated a prima facie case for copyright infringement,

(2) requested specific and narrowly defined information, (3) demonstrated that there are no

alternative means by which they can obtain the requested information, (4) established that they

have a central need for this information in order to proceed with their claim, and (5) shown that

Defendant, as an anonymous user of P2P networks, does not have a reasonable expectation of

privacy in downloading and distributing copyrighted works; and Plaintiffs further arguing that

Defendant's Motion ignores the fact that this Court already found that good cause existed for

2

Plaintiffs' *ex parte* request for expedited discovery in light of (1) the allegations contained in

Plaintiffs' Complaint, (2) the harm to Plaintiffs of having the defendants infringe hundreds or

thousands of their copyrighted works, (3) Plaintiffs' inability to pursue their claims absent the

expedited discovery, (4) the opportunity Defendant (as well as the other copyright defendants)

will have to defend against Plaintiffs' claims at the appropriate time, and (5) the low burden on

the University of complying with the discovery order; and Plaintiffs further arguing that in so

doing, the Court has already considered may of the *Sony* factors and determined that they

weighed in favor of Plaintiffs' need to issue a subpoena on Comcast; and the Court having

reviewed Defendant's moving papers and Plaintiffs' opposition thereto, and having fully

considered the parties' arguments; and the Court finding as an initial matter that generally a

motion to quash a subpoena issued to a non-party, must be brought by the nonparty itself

(*Thomas v. Marina Assocs.*, 202 F.R.D. 433, 434-435 (E.D. Pa. 2001)); and the Court further

finding that where, however, a party to an action claims a privilege or privacy interest in the

information sought from the non-party, then the party will have standing to bring the motion; and

the Court further finding that here, Defendant claims to have a privacy interest in the information

sought from Comcast and, consequently, Defendant has standing to move to quash the subpoena

issued to Comcast pursuant to FED. R. CIV. P. 45; and the Court further finding that pursuant to

Rule 45(c)(3)(A), "[o]n timely motion, the court by which a subpoena was issued shall quash or

modify the subpoena if it . . . (iii) requires disclosure of privileged or other protected matter and

no exception or waiver applies"; and the Court noting that while neither party attached the

subpoena at issue to their Motion papers, upon request of the Court, Plaintiffs furnished a copy of

the subpoena to the Court; and the Court finding that the subpoena in question issued from the

District of New Jersey, and, consequently, this Court is the appropriate forum for Defendant's

Motion to Quash; and the Court further finding that while it has doubts regarding whether

Defendant's conduct constitutes protected speech, assuming arguendo that it does, Defendant's

Motion should still be denied; and the Court further finding that the factors considered by the

Court in *Sony* (namely "(1) a concrete showing of a prima facie claim of actionable harm; (2)

specificity of the discovery request; (3) the absence of alternative means to obtain the

subpoenaed information; (4) a central need for the subpoenaed information to advance the claim;

and (5) the party's expectation of privacy (326 F. Supp. 2d at 564-65 (citations omitted)) are the

factors to be applied in deciding Defendant's Motion to Quash[1]; and the Court further finding

that based upon these considerations, Defendant's Motion should be denied because (1) Plaintiffs

have established a prima facie claim for copyright infringement in their Complaint, (2) the

information requested in the subpoena issued to Comcast is very specific and narrow in nature,

(3) Plaintiffs have no other means of obtaining the information sought in the subpoena, (4) as the

Court has previously found in granting Plaintiffs' *ex parte* application for expedited discovery,

Plaintiffs have demonstrated a central need for the subpoenaed information to advance their

claims, and (5) Defendant, who allegedly used one or more P2P networks to unlawfully

download and disseminate Plaintiffs' copyrighted works, has at best a minimal expectation of

privacy in remaining anonymous and this expectation is clearly outweighed by Plaintiffs'

interests; and the Court having considered this matter pursuant to FED. R. CIV. P. 78, and for

---

[1]The Court finds the *Dendrite* case cited by Defendant to be less applicable because that case involved a defamation claim. The Court further finds that Defendant's notice concerns have been met as he received notice of the subpoena (and, in fact, moved to quash it) and Plaintiffs had no way of providing him with any additional notice of their claims.

4

good cause shown,

IT IS on this 28th day of January, 2008,

ORDERED that Defendant's Motion to Quash the subpoena issued to Comcast is

DENIED; and it is further

ORDERED that the Clerk of the Court terminate this Motion [Docket Entry No. 5]

accordingly.

s/Tonianne J. Bongiovanni
**HONORABLE TONIANNE J. BONGIOVANNI**
**UNITED STATES MAGISTRATE JUDGE**

5

EXHIBIT "D"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELEKTRA ENTERTAINMENT GROUP, INC., a
Delaware corporation; UMG RECORDINGS, INC., a
Delaware corporation; VIRGIN RECORDS
AMERICA, INC., a California corporation; and
SONY BMG MUSIC ENTERTAINMENT, a
Delaware general partnership,

                Plaintiffs,

       -v-

DENISE BARKER,

                Defendant.

Case No. 05-CV-7340 (KMK)

OPINION AND ORDER

<u>Appearances</u>:

Brian E. Moran, Esq.
Robinson & Cole, LLP
New York, New York
*Counsel for Plaintiffs*

Richard L. Gabriel, Esq.
Holme Roberts & Owen LLP
Denver, Colorado
*Counsel for Plaintiffs*

J. Christopher Jensen, Esq.
Maryann Penney, Esq.
Cowan, Liebowitz & Latman, P.C.
New York, New York
*Counsel for Plaintiffs*

Ray Beckerman, Esq.
Morlan Ty Rogers, Esq.
Vandenberg & Feliu, LLP
New York, New York
*Counsel for Defendant*

Michael J. Garcia
United States Attorney for the Southern District of New York
Rebecca C. Martin, Esq.
Assistant United States Attorney
New York, New York
*Counsel for Amicus United States of America*

Andrew P. Bridges, Esq.
Winston & Strawn, LLP
San Francisco, California
*Counsel for Amicus Computer & Communications Industry Association
and U.S. Internet Industry Association*

Eric J. Schwartz, Esq.
Smith & Metalitz LLP
Washington, DC
*Counsel for Amicus Motion Picture Association of America*

Jonathan Zavin, Esq.
Loeb & Loeb LLP
New York, New York
*Counsel for Amicus Motion Picture Association of America*

Fred von Lohmann, Esq.
Electronic Frontier Foundation
San Francisco, California
*Counsel for Amicus Electronic Frontier Foundation*

Wendy Seltzer, Esq.
Brooklyn, New York
*Counsel for Amicus Electronic Frontier Foundation*

KENNETH M. KARAS, District Judge:

Plaintiffs Elektra Entertainment Group, Inc., UMG Recordings, Inc., and Virgin Records

America, Inc. (collectively "Plaintiffs") operate leading recording labels and own many

copyrights in sound recordings.[1]  Plaintiffs have sued Defendant Denise Barker for copyright

---

[1]Sony BMG Music Entertainment was a fourth Plaintiff when this action was filed.  On
January 25, 2006, it filed a stipulation of voluntary dismissal without prejudice.

infringement seeking injunctive relief and damages.[2]  Plaintiffs allege that Defendant infringed

Plaintiffs' exclusive rights of reproduction and distribution by downloading, distributing, and/or

making available copies of protected sound recordings using an online media distribution

system.  Defendant moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure

12(b)(6).  For the following reasons, Defendant's Motion to Dismiss the Complaint is DENIED;

however, the Court grants Plaintiffs thirty days to amend their Complaint consistent with this

Opinion.

## 1. Background

Plaintiffs' Complaint states that Plaintiffs "are, and at all relevant times have been, the

copyright owners or licensees of exclusive rights under United States copyright with respect to

certain copyrighted sound recordings (the 'Copyrighted Recordings')" (Compl. ¶ 10), which they

identify as including the sound recordings attached in list form to the Complaint (*id.*, Ex. A).

The Complaint states that "among the exclusive rights granted to each Plaintiff under the

Copyright Act are the exclusive rights to reproduce the Copyrighted Recordings and to distribute

the Copyrighted Recordings to the public." (*Id.* ¶ 11.)  Plaintiffs further plead, based on

information and belief, "that Defendant, without the permission or consent of Plaintiffs, has

used, and continues to use, an online media distribution system to download the Copyrighted

Recordings, to distribute the Copyrighted Recordings to the public, and/or to make the

Copyrighted Recordings available for distribution to others." (*Id.* ¶ 12.)  The Complaint alleges

---

[2]Defendant's counsel has represented to the Court that Defendant's first name is Tenise, not Denise.  Because the Complaint in this case names Denise Barker, the Court will refer to Defendant as Denise Barker in this Opinion, although the Court is cognizant that Defendant's first name is Tenise.

that "each of the published copies of the sound recordings identified in Exhibit A was accessible

by Defendant." (*Id.* ¶ 13.)

Although the Complaint does not identify the "online media distribution system"

allegedly used by Defendant, two of the Exhibits attached to the Complaint appear to be screen-

shots of the Kazaa peer-to-peer file sharing program. (*Id.*, Exs. B, C.) Plaintiffs brought this

lawsuit after their investigators identified a Kazaa user named "Phoenyxxx@KaZaA" who had

611 music files on her computer that she offered freely for download to other Kazaa users. (Pls.'

Opp'n to Def.'s Mot. to Dismiss ("Pls.' Br.") 6.) Plaintiffs' investigators identified the Internet

Protocol ("IP") address being used by Phoenyxxx@KaZaA and, after filing a "John Doe"

complaint and obtaining a court order, Plaintiffs issued a subpoena to Verizon Internet Services,

Inc. ("Verizon"), the registrant of the relevant IP address block, in order to determine what user

account corresponded to the IP address. (*Id.* at 6-7.) Verizon subsequently identified Defendant

as the owner of the account, and Plaintiffs filed this suit for copyright infringement against

Defendant on August 19, 2005. (*Id.* at 7.)

Defendant raises two arguments in her Motion to Dismiss. First, Defendant contends that

Plaintiffs' Complaint does not plead copyright infringement with adequate specificity. Second,

Defendant argues that Plaintiffs' allegation that Defendant "ma[de] the Copyrighted Recordings

available for distribution to others," (Compl. ¶ 12), fails to state a claim upon which relief can be

granted.[3]

---

[3]Plaintiffs' "making available" allegation, which relies on a construction of copyright
statutes, has drawn the attention of several interested amici. The Court accepted briefs from the
following amici: the United States of America, the Computer & Communication Industry
Association/US Internet Industry Association ("CCIA/USIIA"), the Electronic Frontier
Foundation ("EFF"), and the Motion Picture Association of America ("MPAA").

## II. Discussion

### A. Standard of Review

The Supreme Court has recently held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citations omitted and second alteration in original). In *Twombly, id.* at 1964-69, the Supreme Court also abandoned reliance on the oft-cited line from *Conley v. Gibson* that, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," 355 U.S. 41, 45-46 (1957). As the Supreme Court explained, a literal application of *Conley*'s "no set of facts" rationale is improper because "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery . . . ." *Twombly*, 127 S. Ct. at 1968. Instead, the Court emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* at 1965, and "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 1969. Plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974. If Plaintiffs "have not nudged [their] claims across the line from conceivable to plausible, [their] complaint must be dismissed." *Id.*; *see also Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) ("After careful consideration of the Court's opinion and the conflicting signals from it that we have

5

identified, we believe the Court is not requiring a universal standard of heightened fact pleading,

but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a

claim with some factual allegations in those contexts where such amplification is needed to

render the claim *plausible*." (emphasis in original)).

A motion to dismiss requires the Court to "accept as true the factual allegations made in

the complaint and draw all inferences in favor of the plaintiffs." *Grandon v. Merrill Lynch &

Co., Inc.*, 147 F.3d 184, 188 (2d Cir. 1998); *see also Blimpie Int'l, Inc. v. Blimpie of the Keys*,

371 F. Supp. 2d 469, 470-71 (S.D.N.Y. 2005). "'In adjudicating a Rule 12(b)(6) motion, a

district court must confine its consideration to facts stated on the face of the complaint, in

documents appended to the complaint or incorporated in the complaint by reference, and to

matters of which judicial notice may be taken.'" *Glidepath Holding B.V. v. Spherion Corp.*, No.

04-CV-9758, 2007 WL 2176072, at *9 (S.D.N.Y. July 26, 2007) (quoting *Leonard F. v. Israel

Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted)).

B. Analysis

1. Specificity of the Complaint

Under the Federal Rules of Civil Procedure, a complaint must contain "a short and plain

statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Courts in this district have construed Fed. R. Civ. P. 8(a)(2) "to require a plaintiff to plead with

specificity the acts by which a defendant has committed copyright infringement." *Marvullo v.

Gruner & Jahr*, 105 F. Supp. 2d 225, 230 (S.D.N.Y. 2000). "Broad, sweeping allegations of

infringement do not comply with Rule 8." *Id.* (quoting *Kelly v. L. L. Cool J.*, 145 F.R.D. 32, 36

(S.D.N.Y. 1992), *aff'd*, 23 F.3d 398 (2d Cir. 1994)). Specifically, Rule 8 requires a plaintiff

6

claiming copyright infringement to allege: "(i) which specific original work is the subject of the claim, (ii) that plaintiff owns the copyright in the work, (iii) that the copyright has been registered in accordance with the statute, and (iv) by what acts during what time the defendant infringed the copyright." *Brought to Life Music, Inc. v. MCA Records, Inc.*, No. 02-CV-1164, 2003 WL 296561, at *1 (S.D.N.Y. Feb. 11, 2003).

Defendant argues that under Rule 8 the Complaint must be dismissed because it does not describe specific acts of infringement or the dates and times on which the infringement allegedly occurred. Defendant further argues that the Complaint does not allege that the songs listed in Exhibit A to the Complaint were illegally downloaded or distributed by Defendant. Defendant's arguments are without merit. Rule 8 is "not meant to impose a great burden upon a plaintiff." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Indeed, the purpose of Rule 8(a)(2) "is to give fair notice of a claim and the grounds upon which it rests so that the opposing party may identify the nature of the case, respond to the complaint, and prepare for trial." *Manik v. Avram*, No. 06-CV-477, 2006 WL 2942854, at *3 (S.D.N.Y. Oct. 13, 2006). Here, the Complaint adequately puts Defendant on notice of the alleged infringing acts undertaken by Defendant. In particular, Exhibit B of the Complaint is alleged to be a copy of Defendant's "shared folder" as it appeared on her computer. Plaintiffs submit that Exhibit B provides specific information about Defendant's infringement of Plaintiffs' copyrights, including the network used by Defendant, Defendant's alias, and a comprehensive list of infringed works. (Pls.' Br. 11.) Thus, this Complaint gives Defendant adequate notice of the works subject to Plaintiffs' claim and the grounds upon which Plaintiffs allege Defendant's infringement.

Moreover, the Complaint adequately alleges that Defendant has in the past used, and as

of the filing of the Complaint on August 19, 2005, has continued to use, an online media

distribution system to download, distribute, and/or make available, copyrighted works belonging

to Plaintiffs. The Complaint does not affix a date or time of each instance of alleged

infringement, but it need not do so in order to survive a motion to dismiss. An allegation of past

and continuing infringement "sufficiently puts defendant on notice as to which acts –

downloading and distribution of certain copyrighted recordings via online media – form the basis

of the Plaintiffs' claim." *Elektra Entm't Group, Inc. v. Santangelo*, No. 05-CV-2414, 2005 WL

3199841, at *2 (S.D.N.Y. Nov. 28, 2005); *see also Atl. Recording Corp. v. Does 1-25*, No. 05-

CV-9111, at *2 (S.D.N.Y. Jan. 3, 2006) (Order) (denying motion to dismiss because "an

assertion of continuous and ongoing infringement" satisfies the pleading requirement); *Franklin*

*Elec. Publishers, Inc. v. Unisonic Prod. Corp.*, 763 F. Supp. 1, 4 (S.D.N.Y. 1991) ("[W]hile

plaintiff has not alleged the date defendants allegedly commenced their infringing activities,

plaintiff has alleged that defendant continues to infringe."). Furthermore, Defendant's argument

that Plaintiffs have not properly pled that Defendant actually downloaded or distributed the

copyrighted recordings is unavailing on a motion to dismiss, where the Court must assume the

truth of all well-pleaded allegations of infringement. Here, Plaintiffs, in fact, allege that

Defendant did distribute (and/or made available) Plaintiffs' protected works. This is sufficient

under Rule 8. *See Franklin Elec. Publishers, Inc.*, 763 F. Supp. at 4-5; *see also Phillips v.*

*Girdich*, 408 F.3d 124, 127 (2d Cir. 2005) ("Under the Federal Rules, a 'short and plain'

complaint is sufficient as long as it puts the defendant on notice of the claims against it. The

Rules then rely on extensive discovery to flesh out the claims and issues in dispute." (internal

citation omitted)).[4]

### 2. Plaintiffs' "Make Available" Claim

Plaintiffs' Complaint alleges that Defendant infringed Plaintiffs' copyright by downloading, distributing, and/or making Plaintiffs' copyrighted recordings available to the public, in violation of "Plaintiffs' exclusive rights of reproduction and distribution" under 17 U.S.C. § 106(3). (Compl. ¶ 12.) Defendant does not contest in her Motion to Dismiss that Plaintiffs' allegations of distribution state a valid claim under the Copyright Act of 1976 ("Copyright Act"). Defendant does, however, contest Plaintiffs' claim that she is liable to Plaintiffs merely by making the copyrighted recordings available. In particular, Defendant argues that Plaintiffs cannot establish a violation of their distribution rights without alleging an actual transfer of Plaintiffs' works by Defendant.

### a. The Right of Distribution

"Section 106 of the Copyright Act confers a bundle of exclusive rights to the owner of [a] copyright." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 546 (1985). Among these rights is the right of distribution, which is codified at 17 U.S.C. § 106(3):

Subject to sections 107 through 122,[5] the owner of copyright under

---

[4]Defendant notes that in a recent case, *Interscope Records v. Rodriguez*, No. 06-CV-2485, 2007 WL 2408484 (S.D. Cal. Aug. 17, 2007), a federal district court applied the *Twombly* pleading standard and held that a complaint similar to the one in this case did not sufficiently state a claim upon which relief could be granted. *See id.* at *1. Respectfully, the Court is unpersuaded that *Twombly* demands such a restrictive interpretation of the Rule 8(a) pleading standard.

[5]Section 106 is expressly made subject to Sections 107 through 122 of the Copyright Act, which state limitations on a copyright owner's exclusive rights under 17 U.S.C. § 106(3). *See, e.g.*, 17 U.S.C. § 107 (fair use limitation). The limitations expressed in 17 U.S.C. §§ 107-122 have no bearing on Defendant's Motion to Dismiss.

> this title has the exclusive rights . . . to distribute copies or
> phonorecords[6] of the copyrighted work to the public by sale or
> other transfer of ownership, or by rental, lease, or lending . . . .

Plaintiffs argue that Section 106(3), in addition to granting Plaintiffs the exclusive right to

physically distribute their copyrighted sound recordings to the public, also grants to Plaintiffs an

exclusive right to "make available" the copyrighted sound recordings to the public. This "make

available" right, argues Plaintiffs, was infringed by Defendant's use of the Kazaa peer-to-peer

file sharing program in conjunction with Plaintiffs' copyrighted works. In other words,

according to Plaintiffs, an actual transfer of Plaintiffs' work is not necessary to establish a

copyright violation under Section 106(3).

The Court's analysis of Plaintiffs' argument begins with the text of the statute. *See Cmty.

for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989) (stating that in interpreting the

Copyright Act, "[t]he starting point for our interpretation of a statute is always its language");

*Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 562 (2d Cir. 1995) (same); *see also Knight v.

Comm'r of Internal Revenue*, 128 S. Ct. 782, 787 (2008) ("We start, as always, with the

language of the statute." (internal quotation marks omitted)). The word "distribute," the crucial

term in Section 106(3), is not defined in the Copyright Act. However, while the statute does not

---

[6]"Copies" and "phonorecords" are defined by the Copyright Act as "material objects."
17 U.S.C. § 101. Amici, in particular the Electronic Frontier Foundation, have argued that
digital music files, such as those which reside on Defendant's computer, are not "material
objects" and thus are not included in the Copyright Act. Because Defendant has not raised this
argument in her brief, the Court declines to reach this question. *See United Parcel Serv., Inc. v.
Mitchell*, 451 U.S. 56, 61 n.2 (1981) (declining to consider argument by amicus curiae because
"it was not raised by either of the parties here or below"); *Bell v. Wolfish*, 441 U.S. 520, 531 n.13
(1979) (declining to reach argument raised by amicus curiae because it was not raised by either
party in the litigation); *Bano v. Union Carbide Corp.*, 273 F.3d 120, 127 n.5 (2d Cir. 2001)
(declining to reach an argument raised by amici curiae because the argument was not raised by
any party to the litigation at either the district or appellate court proceedings).

define "distribute" or "distribution," it does define the term "publication," and does so in a

manner which closely mirrors the language of Section 106(3):

> "Publication" is the distribution of copies or phonorecords of a
> work to the public by sale or other transfer of ownership, or by
> rental, lease, or lending. The offering to distribute copies or
> phonorecords to a group of persons for purposes of further
> distribution, public performance, or public display, constitutes
> publication. A public performance or display of a work does not
> of itself constitute publication.

17 U.S.C. § 101. The first sentence of Section 106(3) and the definition of "publication" are

virtually identical. The subsequent sentences in the definition of "publication," however, present

additional language which does not appear in Section 106(3). And it is this additional language

– in particular the sentence which defines publication as "[t]he offering to distribute copies or

phonorecords to a group of persons for purposes of further distribution, public performance, or

public display . . . ." – that Plaintiffs seize upon in arguing for an expansive interpretation of the

right of distribution. The question before the Court, therefore, is whether the Court should look

to the definition of the word "publication" to construe the meaning of the term "distribute" in

Section 106(3) of the Copyright Act.

Several courts (including the Supreme Court) that have wrestled with the Copyright Act

have generally found, relying in part on the statute's legislative history, "distribution" and

"publication" to be synonymous. *See Harper & Row,* 471 U.S. at 552 ("[The Copyright Act of

1976] recognized for the first time a distinct statutory right of first publication, which had

previously been an element of the common-law protections afforded unpublished works. The

Report of the House Committee on the Judiciary confirms that 'Clause (3) of section 106,

establishes the exclusive right of publications . . . . Under this provision the copyright owner

11

would have the right to control the first public distribution of an authorized copy . . . of his

work.'" (quoting H. R. No. 94-1476, at 62 (1976) (hereinafter House Report)); *Ford Motor Co.*

*v. Summit Motor Prod., Inc.* 930 F.2d 277 (3d Cir. 1991) ("'Publication' and the exclusive right

protected by section 106(3) . . . are for all practical purposes, synonymous. Therefore, any

clarification of what is meant by 'publication' would also clarify what is meant by section 106(3)

. . . ."); *see also Agee v. Paramount Commc'ns, Inc.*, 59 F.3d 317, 325 (2d Cir. 1995) (citing

approvingly the *Ford Motor Co.* Court's determination that the terms "distribution" and

"publication" are "essentially synonymous," but deciding the case on other grounds).

     This Court concurs with the conclusion that the House and Senate of the Ninety-Fourth

Congress considered the terms "distribute" and "publication" to be synonymous. In particular,

the Court finds persuasive the words that Congress used to characterize the five exclusive rights

given under Section 106. As noted by the Second Circuit, the text of Section 106 conveys to a

copyright owner the right to: "(1) reproduce the copyrighted work; (2) prepare derivative works;

(3) distribute copies of the work by sale or otherwise; and, with respect to certain artistic works,

(4) perform the work publicly; and (5) display the work publicly." *See e.g., Computer Assocs.*

*Int'l., Inc. v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992). Yet, the House and Senate

Committees that evaluated the Copyright Act described this bundle of five rights as "the

exclusive rights of reproduction, adaptation, *publication*, performance, and display." House

Report at 61 (emphasis added); S. Rep. No. 94-473 at 57 (1976) (emphasis added) (hereinafter

Senate Report). Thus, both the House and Senate clearly equated the right of distribution with

the right of publication. This choice of language was not a mere slip of the pen: throughout both

the House and Senate Committee Reports, the right contained under 106(3) is described as the

right of publication. For example, the Committee Reports identify the "Rights of Reproduction, Adaptation, and Publication" as "[t]he first three clauses of section 106." House Report at 61; Senate Report at 57. In addition, the passage of the House Committee Report quoted by the Supreme Court in *Harper & Row Publishers* notes that Section 106(3) establishes "the exclusive right of publication" and governs "unauthorized public distribution" – using the words "distribution" and "publication" interchangeably within a single paragraph. House Report at 62; *see also* Senate Report at 58. In sum, the House and Senate Judiciary Committees of the Ninety-Fourth Congress consistently described Section 106(3) as protecting both the right of "distribution" and the right of "publication," and thus apparently viewed these concepts as synonymous.

In light of the aforementioned authority, it is unsurprising that courts faced with similar allegations as in this Complaint have looked to the definition of the word "publication" in 17 U.S.C. § 101 to construe the definition of the word "distribute" in Section 106(3). *See, e.g., Atl. Recording Corp. v. Abner Anderson*, No. 06-CV-3578, slip op. at *12 (S.D. Tex Mar. 12, 2008) ("'Distribute' is not defined in the Copyright Act, but the Supreme Court has equated the term with 'publication,' which is defined under the act."); *Interscope Records v. Duty*, No. 05-CV-3744, 2006 WL 988086, at *2 (D. Ariz. Apr. 14, 2006) ("[T]he right of distribution is synonymous with the right of publication . . . ."); *In re Napster, Inc. Copyright Litig.*, 377 F. Supp. 2d 796, 803 (N.D. Cal. 2005) (equating distribution and publication); *Getaped.com, Inc. v. Cangemi*, 188 F. Supp. 2d 398, 401 n.2 (S.D.N.Y. 2002) (holding that Section 106(3) gives copyright holders the exclusive right of publication). As a result, the Court holds that "[t]he offer[] to distribute copies or phonorecords to a group of persons for purposes of further

13

distribution, public performance, or public display," 17 U.S.C. § 101, can violate the distribution

right of Section 106(3).[7]  *But see Obolensky v. G.P. Putnam's Sons*, 628 F. Supp. 1552, 1555-56

––––––––––––––––––––––

[7]Plaintiffs argue that the work of the 105th Congress, in particular its approval and understanding of the World Intellectual Property Organization ("WIPO") treaties, should control the interpretation of Section 106(3), a portion of a statute authored by the 94th Congress. *See* WIPO Copyright Treaty, Apr. 12, 1997, S. Treaty Doc. No. 105-17, *available at* 1997 WL 447232. The Court disagrees. First, the Court notes that because the WIPO treaties are not self-executing, they create no private right of action on their own. *See Medellin v. Texas*, No. 06-984, 2008 WL 762533, at *9 (U.S. Mar. 25, 2008) ("In sum, while treaties 'may comprise international commitments . . . they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms.'" (quoting *Igartúa-De La Rosa v. United States*, 417 F. 3d 145, 150 (1st Cir. 2005) (en banc)) (alteration in original)); *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) ("Unless a treaty is self-executing, however, it does not, in and of itself, create individual rights . . . ."). Second, the Court is hesitant to substitute the claimed legislative intent of the 105th Congress for that of the 94th Congress. As noted by the Second Circuit in *Siben v. Comm'r of Internal Revenue*, 930 F.2d 1034, 1037 (2d Cir. 1991), "the question of how much weight to accord to the views of a subsequent Congress on the meaning of earlier enactments is not an easy one." *Compare Russello v. United States*, 464 U.S. 16, 26 (1983) ("[I]t is well settled that the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." (internal quotation marks omitted)) *with Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 596 (1980) ("[W]hile the views of subsequent Congresses cannot override the unmistakable intent of the enacting one, such views are entitled to significant weight, and particularly so when the precise intent of the enacting Congress is obscure." (internal citations omitted)). Here, however, the Court finds ample support in the contemporaneous legislative history of the Copyright Act for concluding that an "offer[] to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display" falls within the distribution right, and thus need not guess the intentions of a subsequent Congress. *See Doe v. Chao*, 540 U.S. 614, 626-27 (2004) ("'[S]ubsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment,'" (quoting *Solid Waste Agency of N. Cook Cty. v. Army Corps of Eng'rs*, 531 U.S. 159, 170 n.5 (2001)).

In addition, the Court is unpersuaded by Plaintiffs' suggestion that the opinion of Marybeth Peters, the Register of Copyrights, should influence the Court's interpretation of Section 106(3). The Second Circuit has made it clear that "the Copyright Office has no authority to give opinions or define legal terms, and its interpretation on an issue never before decided should not be given controlling weight." *Bartok v. Boosey & Hawkes, Inc.*, 523 F.2d 941, 947 (2d Cir. 1975) (footnotes omitted); *see also Morris v. Bus. Concepts, Inc.*, 283 F.3d 502, 505 (2d Cir. 2002) (quoting *Bartok*).

(S.D.N.Y. 1986) (an unconsummated offer to sell a copyrighted work does not constitute

infringement under the Copyright Act of 1976); Paul Goldstein, Goldstein on Copyright §7.5.1

(3d ed. 2005) ("The crux of the distribution right lies in the transfer . . . of a copy or phonorecord

. . . . [A]n actual transfer must take place; *a mere offer of sale will not infringe the right*.")

(emphasis added); Melville B. Nimmer & David Nimmer, 2 Nimmer on Copyright § 8.11[A] n.2

(2005) ("[N]ote that an offer to distribute copies or phonorecords to the public may in itself

constitute a 'publication,' while the right of distribution apparently is not infringed by the mere

offer to distribute to members of the public." (internal citation omitted)).

Although the Court finds, using Congress's words, that the distribution right of 106(3)

may be infringed by "[t]he offer[] to distribute copies or phonorecords to a group of persons for

purposes of further distribution, public performance, or public display," 17 U.S.C. § 101, the

Court hesitates in equating this avenue of liability with the contourless "make available" right

proposed by Plaintiff. Indeed, the support in the case law for the "make available" theory of

liability is quite limited. The initial judicial authority for this theory comes from the Fourth

Circuit's decision in *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199 (4th

Cir. 1997). In *Hotaling*, the court held that "a library distributes a published work, within the

meaning of the Copyright Act, when it places an unauthorized copy of the work in its collection,

includes the copy in its catalog or index system, and *makes the copy available* to the public." *Id.*

at 201 (internal citation omitted and emphasis added). Respectfully, *Hotaling* did not cite any

precedent in holding that making copyrighted works available to the public constitutes

infringement. Instead, the court – apparently motivated by equitable principles – expressed a

concern that without such a means of establishing infringement, an institution such as a library

could avoid liability so long as it refused to keep records relating to the infringing use. *Id.*

("Were [the act of making copyrighted materials available to the public] not to be considered

distribution within the meaning of § 106(3), a copyright holder would be prejudiced by a library

that does not keep records of public use, and the library would unjustly profit by its own

omission."). This interpretation, even if sound public policy, is not grounded in the statute.

A small number of courts, following *Hotaling*, have found a "make available" right in

Section 106(3). *See, e.g., A&M Records, Inc. v. Napster Inc.*, 239 F.3d 1004, 1014 (9th Cir.

2001) ("Napster users who upload file names to the search index for others to copy violate

plaintiffs' distribution rights."); *Abner Anderson*, slip op. at *12-13 (citing *A&M Records, Inc.*);

*Motown Record Co., LP v. DePietro*, No. 04-CV-2246, 2007 WL 576284, at *3 n.38 (E.D. Pa.

Feb. 16, 2007) ("While neither the United States Supreme Court nor the Third Circuit Court of

Appeals has confirmed a copyright holder's exclusive right to make the work available, the Court

is convinced that 17 U.S.C. § 106 encompasses such a right . . . ."). *But see Arista Records, Inc.*

*v. Mp3Board, Inc.*, No. 00-CV-4660, 2002 WL 1997918, at *4 (S.D.N.Y. Aug. 29, 2002)

(limiting the applicability of *Hotaling* to cases where proof of actual infringement is impossible

to produce because the infringer has not kept records of public use). The great majority of courts

that have considered the question, however, have stopped short of fully endorsing the "make

available" right. Instead, many such courts have expressed interest in the possible viability of

the "make available" right, without expressly reading the right into the statute or otherwise

resolving the issue. *See, e.g., Arista Records LLC v. Gruebel*, 453 F. Supp. 2d 961, 969 (N.D.

Tex. 2006) ("[M]aking copyrighted works available to others *may* constitute infringement by

distribution in *certain circumstances*." (emphasis added)); *Maverick Recording Co. v.*

16

*Goldshteyn*, No. 05-CV-4523, 2006 WL 2166870, at *3 (E.D.N.Y. July 31, 2006) ("[T]he

'making available' argument need not be decided here."); *Fonovisa, Inc. v. Alvarez*, No. 06-CV-

011, slip op. at *5 (N.D. Tex. July 24, 2006) (unpublished) ("This Court is not making a

determination as to whether 'making works available' violates the right of distribution.");

*Warner Bros. Records, Inc. v. Payne*, No. 06-CA-051, 2006 WL 2844415, at *4 (W.D. Tex. July

17, 2006) (declining to "rule out the Plaintiffs' 'making available' theory as a possible ground

for imposing liability"); *Duty*, 2006 WL 988086, at *2 ("[T]he mere presence of copyrighted

sound recordings in [defendant's] share file *may* constitute copyright infringement." (emphasis

added)); *see also Atlantic Recording Corp. v. Howell*, No. 06-CV-2076, 2007 WL 2409549, at

*3-4 (D. Ariz. Aug. 20, 2007) (suggesting the viability of the "make available" argument but

deciding the case based on the defendant's physical distribution of copyrighted material),

*vacated on mot. for recons.*, 2007 WL 3010792 (D. Ariz. Sept. 27, 2007).  *But see Atl. Recording

Corp. v. Brennan*, No. 07-CV-232, 2008 WL 445819, at *3 (D. Conn. Feb 13, 2008) (denying

plaintiffs' entry of default against defendant, in part, by finding that defendant may have a

meritorious defense against plaintiffs' "problematic" make available argument).

      Plaintiffs ask the Court to be faithful to the Copyright Act and find that "distribution" is

synonymous with "publication."  Having accepted that the definition of "distribute" is

synonymous with the definition of "publication," however, liability under Section 106(3)

requires that Plaintiffs – to be faithful to the statute – affirmatively plead that Defendant made an

offer to distribute, and that the offer to distribute was for the purpose of further distribution,

public performance, or public display. *See* 17 U.S.C. § 101; *In re Napster, Inc.,* 377 F. Supp. 2d

at 802-05 (noting that plaintiff's "indexing theory" fell short of demonstrating either "the actual

dissemination of a copyrighted work or an offer to distribute that work for the purpose of its

further distribution or public performance," the two ways to show infringement under Section

106(3)). This is so because the statute itself contains no "make available" language in its

definition of distribution or publication. In the Complaint, Plaintiffs allege that Defendant has

"ma[de] the Copyrighted Recordings available for distribution to others,"[8] (Compl. ¶ 12), not

that Defendant "offer[ed] to distribute copies or phonorecords to a group of persons for purposes

of further distribution," 17 U.S.C. § 101. Thus, because Congress did not expressly equate the

act of "offering to distribute . . . for the purposes of further distribution" to the act of "making

available," Plaintiffs' allegations – insofar as Plaintiffs wish to hold Defendant liable for acts of

infringement other than actual downloading and/or distribution – fail to state a claim.[9]

Although Plaintiffs have not adequately alleged that Defendant "offer[ed] to distribute

[Plaintiffs' copyrighted works] . . . for the purposes of further distribution," Defendant's Motion

still fails because Plaintiffs have adequately alleged that, in addition to making Plaintiffs' works

---

[8] The definition of publication in Section 101 requires both an offer to distribute and that the offer to distribute be for the purpose of further distribution, public performance, or public display. *See* 17 U.S.C. § 101. As Plaintiff alleges that Defendant made the Copyright Recordings available "for distribution to others," (Compl. ¶ 12), Plaintiffs' Complaint appears to satisfy the latter requirement. Whether use of a peer-to-peer file sharing program such as Kazaa necessarily entails "further distribution," however, is still an open question. *See Payne*, 2006 WL 2844415, at *4 ("[L]isting copyrighted works on an online file-sharing system contemplates 'further distribution,' and thus, could constitute a violation of the copyright owner's exclusive distribution right under § 106(3).")

[9] It bears emphasizing that the definition of "distribute" here derives from the Copyright Act itself. Thus, Plaintiffs' reliance on caselaw interpreting that word in other contexts is inapposite, as those cases involve different statutes using the term "distribute." *See, e.g., United States v. Shaffer*, 472 F.3d 1219, 1223-25 (10th Cir. 2007) (employing a broad definition of the undefined term "distribution" within 18 U.S.C. § 2552, a criminal statute relating to child pornography); *United States v. Abraham*, No. 05-CR-344, 2006 WL 3052702, at *7-8 (W. D. Pa. Oct. 24, 2006) (same).

available, Defendant distributed Plaintiffs' copyrighted works. Thus, dismissal is not

appropriate at this stage. *See Technical Tape Corp. v. Minnesota Mining and Mfg. Co.*, 200 F.2d

876, 877 (2d Cir. 1953) (A. Hand, J.) (holding that dismissal should not be granted if the

complaint offers disjunctive allegations and at least one of the allegations is sufficient); *United

Magazine Co. v. Murdoch Magazines Dist., Inc.*, No. 00-CV-3367, 2001 WL 1607039, at *5-6

(S.D.N.Y. Dec. 17, 2001) (same); *Liman v. Midland Bank Ltd.*, 309 F. Supp. 163, 169 (S.D.N.Y.

1970) (same); Charles Alan Wright & Arthur R. Miller, 5 Federal Practice and Procedure: Civil

3d § 1284, at 738 (2004) ("Federal Rule 8(e)(2) provides that if two or more statements are made

in the alternative and one of them, if made independently, would be sufficient, the pleading is not

defective due to the insufficiency of one or more of the alternative allegations."). Of course,

whether Plaintiffs can prove Defendant actually distributed the copyrighted works is not

presently before the Court. It is enough to conclude, which the Court does, that, on its face, the

Complaint sufficiently states a claim based on the distribution allegation alone. However,

should Plaintiffs wish to amend their Complaint to track the language of the Copyright Act that

prohibits an illegal "offer to distribute," the Court grants Plaintiffs thirty days to amend their

Complaint consistent with this Opinion.

### b.  The Right to "Authorize" Under Section 106(3)

In its capacity as amicus, the MPAA proposes an alternate means of establishing the

"make available" right.[10]  MPAA asserts that the "make available" claim is supported by the

---

[10]Although the Court declined to reach EFF's argument that digital music files are not "material objects" within the Copyright Act, *see supra* note 6, the Court will address MPAA's alternate grounds for establishing a "make available" right. The Court takes up this argument because it covers the same ground as Plaintiffs' original "make available" argument, and because it was addressed at length by the Parties at oral argument, *see* Hr'g Tr. at 11-16, 27-39.

introductory clause of Section 106, which gives the owner of a copyright "the exclusive rights to do and to authorize" such enumerated rights as the right of distribution. 17 U.S.C. § 106. The MPAA cites three cases for the proposition that the word "authorize" in Section 106(3) gives a copyright holder an independent right in addition to the enumerated rights which follow the statute's introductory phrase.

The Court begins its analysis with *National Football League v. Primetime 24 Joint Venture*, No. 98-CV-3778, 1999 WL 163181 (S.D.N.Y. Mar. 24, 1999) (hereinafter *NFL*), which the MPAA cites as favorable authority. However, in *NFL*, Judge McKenna, relying on *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1095-98 (9th Cir. 1994) (en banc), clearly rejected the MPAA's argument when he held that, "*Subafilms* is correct insofar as it holds that 17 U.S.C. § 106 *does not* create an infringeable right of authorization independent of infringement of one of the specific enumerated rights set forth in that section." *NFL*, 1999 WL 163181, at *4 (emphasis added); *see also Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, No. 96-CV-1103, 1996 WL 724734, at *6 (S.D.N.Y. Dec. 17, 1996) (following *Subafilm*'s holding). The Court concurs with Judge McKenna's analysis in *NFL*. The only rights granted to the copyright holder by the statute are found in the numbered sub-sections of Section 106, and unless one of those rights is infringed, the copyright holder has no recourse in law under Section 106. *NFL*, 1999 WL 163181, at *4 . Furthermore, as explained in *Subafilms* and *NFL*, Congress added the "authorize" language to Section 106 in order to avoid any confusion with regard to contributory infringers. *See Subafilms*, 24 F.3d at 1093 (quoting House Report at 57 ("Use of the phrase 'to authorize' is intended to avoid any questions as to the liability of contributory infringers.")); *accord NFL*, 1999 WL 163181, at *4. Plaintiffs have alleged direct infringement

20

in their Complaint, not contributory infringement, so MPAA's argument based on the statute's inclusion of the word "authorize" is misplaced.

MPAA also cites *Curb v. MCA Records, Inc.*, 898 F. Supp. 586 (M.D. Tenn. 1995) and *Expediters Int'l v. Direct Line Cargo Mgmt. Servs.*, 995 F. Supp. 468 (D. N.J. 1998). *Curb* is easily distinguished on its facts. *Curb* presented a case of contributory infringement involving a domestic authorization to distribute copyrighted material overseas. *Curb*, 898 F. Supp. at 592, 595-96. The *Curb* court's holding was limited to cases in which "the authorizee has committed an act that would violate the copyright owner's § 106 rights." *Id.* at 595. In other words, for "authorize" to have any legal bite, the *Curb* court required that the infringer also infringe on one of the copyright holder's enumerated rights. Furthermore, *Curb* is limited on its facts to cases of contributory infringement, and has no application to cases concerning allegations of direct infringement, such as the one at bar. *Curb* may also be viewed as sui generis: the *Curb* court was addressing a scenario in which the authorizer was subject to jurisdiction in the United States, but the authorizee – the person violating the distribution right – was beyond the jurisdictional reach of the laws of the United States. The *Curb* court's construction of the statute was directed, in part, in an effort to construe the statute so as to give copyright holders some remedy at law against international infringers. As the court points out, "piracy has changed since the Barbary days." *Id.* The same limitations likewise constrain the *Expediters* decision, which followed *Curb* in holding that copyright holders have a legal remedy against domestic authorizers when the authorizee has violated one of the copyright holder's enumerated rights. *See Expediters*, 995 F. Supp. at 477.

Accordingly, the Court holds that Section 106 does not create an infringeable right of

21

authorization independent of the expressly enumerated rights set forth in that Section, and thus cannot form the basis for a "make available" right.

### III. Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss the Complaint based on Rule 8 is DENIED. Defendant's Motion to Dismiss the Complaint because Plaintiffs' "making available" claim fails to state a valid claim is also DENIED, because Plaintiffs have adequately alleged claims of infringement of their exclusive rights of reproduction and distribution based on actual transfers of Plaintiffs' copyrighted works. Should Plaintiffs desire to modify their "make available" allegation, Plaintiffs have thirty days from the date of this Opinion to file an amended complaint consistent with this Opinion.

The Clerk of Court is respectfully directed to terminate the pending motion. (Dkt. No. 17.)

SO ORDERED.

Dated:        March 31 , 2008
              New York, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

22

Service List:

Brian Eugene Moran, Esq.
Robinson & Cole LLP - NYC
885 Third Avenue, Ste. 2800
New York, NY 10022
(212) 451-2900
Fax: (212) 451-2999
Email: bmoran@rc.com
*Counsel for Plaintiffs*

Richard Lance Gabriel, Esq.
Holme Roberts & Owen LLP
1700 Lincoln, Suite 4100
Denver, CO 80203
(303)-866-0331
Fax: (303)-866-0200
Email: richard.gabriel@hro.com
*Counsel for Plaintiffs*

Ray Beckerman, Esq.
Vandenberg & Feliu, LLP
110 East 42nd Street
New York, NY 10017
(212) 763-5809
Fax: (212) 763-6810
Email: rbeckerman@vanfeliu.com
*Counsel for Defendant*

Morlan Ty Rogers, Esq.
Vandenberg & Feliu, LLP
110 East 42nd Street
New York, NY 10017
(212) 763-6838
Fax: (212) 763-6810
Email: mtrogers@vanfeliu.com
*Counsel for Defendant*

Michael J. Garcia
United States Attorney for the Southern District of New York
Rebecca C. Martin, Esq.
Assistant United States Attorney
86 Chamber Street, 3rd Floor
New York, NY 10007
(212) 637-2714
Fax: (212)-627-2686
*Counsel for Amici United States of America*

Andrew P. Bridges, Esq.
Winston & Strawn, LLP
101 California Street, 39th Floor
San Francisco, CA 94111
(415) 591-1482
Fax: (415) 591-1482
*Counsel for Amici Computer & Communications Industry Association*
*and U.S. Internet Industry Association*

Eric J. Schwartz, Esq.
Smith & Metalitz LLP
1747 Pennsylvania Ave., NW, Suite 825
Washington, DC 20006
(202) 833-4198
Email: schwartz@smimetlaw.com
*Counsel for Amici Motion Picture Association of America*

Jonathan Zavin, Esq.
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
(212) 407-4000
*Counsel for Amici Motion Picture Association of America*

Fred von Lohmann, Esq.
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110
(415) 436-9333
Fax: (415) 436-9993
Email: Fred@eff.org

Wendy Seltzer, Esq.
250 Joralemon St.
Brooklyn, NY 11201
(718) 780-7961
Fax: (415) 436-9993
Email: Wendy@seltzer.org
*Counsel for Amici Electronic Frontier Foundation*

25

EXHIBIT "E"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ATLANTIC RECORDING CORP., *et al.* | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| *v.* | § | CIVIL ACTION NO. H-06-3578 |
| | § | |
| ABNER ANDERSON | § | |
| | § | |
| *Defendant.* | § | |

## O R D E R

Pending before the Court is Plaintiffs' motion for summary judgment. **(Instrument No. 16).**

### I.

On November 14, 2006, Plaintiffs Atlantic Recording Corporation, Capitol Records, Incorporated, UMG Recordings, Incorporated, Sony BMG Music Entertainment and Artista Records, LLC (collectively, the "Plaintiffs") initiated this suit against Defendant Abner Anderson ("Defendant" or "Anderson"). (Instrument No. 1). In their complaint, Plaintiffs alleged "that Defendant, without the permission or consent of Plaintiffs, has used, and continues to use, an online media distribution system to download" and/or distribute certain sound recordings (the "Copyrighted Recordings"), thereby infringing Plaintiffs' federally registered copyrights in violation of the Copyright Act of 1976 ("Copyright Act"), 17 U.S.C. § 101 *et seq.*[1] (*Id.*, at 3). For Defendant's alleged harm(s), Plaintiffs seek injunctive relief "prohibiting Defendant from further infringing Plaintiffs' copyrights, and ordering Defendant to destroy all copies of sound recordings made in

---

[1]     The subject Copyrighted Recordings include each of the copyrighted sound recordings listed in Exhibit A, which is attached to Plaintiffs' complaint, in addition to certain of the copyrighted sound recordings listed on Exhibit B, which is also attached to Plaintiffs' complaint. (Instrument No. 1, at 3).

violation of Plaintiffs' exclusive rights." (*Id.*, at 5). Plaintiffs further seek, *inter alia*, statutory damages, pursuant to 17 U.S.C. § 504, for each instance of Defendant's alleged infringement of the copyrights identified in Plaintiffs' complaint. (*Id.*).

Approximately two months later, on January 22, 2007, Defendant filed his original answer to Plaintiffs' complaint, generally denying all allegations of wrongdoing and asserting four affirmative defenses. (Instrument No. 9). Defendant's affirmative defenses set forth that: (1) Defendant "took all of the necessary measures to avoid any copyright infringement alleged" in Plaintiffs' complaint; (2) Plaintiffs' complaint fails to state a claim upon which relief can be granted; (3) Plaintiffs themselves are or were complicit in any copyright infringement that may have occurred; and (4) Defendant's allegedly infringing conduct was neither negligent, willful nor intentional. (*Id.*, at 3-4).

Thereafter, on October 31, 2007, Plaintiffs moved for summary judgment. (Instrument No. 16). Months later, on January 30, 2008, Defendant filed an out-of-time response to Plaintiffs' motion for summary judgment, which the Court subsequently allowed. (Instrument No. 19).

## II.

The factual background of this case is straightforward. "Plaintiffs are recording companies that own or control exclusive rights to copyrights in sound recordings." (Instrument No. 16, at 1). However, over the last ten to fifteen years, the proliferation of the internet and internet-dependent technologies has led to, according to Plaintiffs, "a massive and exponentially expanding problem of digital piracy[,]" directly resulting in the infringement of Plaintiffs' (and other copyright holders) federally registered copyrights. (*Id.*, at 2). Plaintiffs contend that over the recent years, digital piracy has continually evolved and that today, "copyright infringers use various online media distribution

systems to download (copy) and unlawfully disseminate (distribute) to others billions of perfect digital copies of Plaintiffs' copyrights sound recordings each month." (*Id.*). According to Plaintiffs, "As a direct result of piracy over these peer-to-peer networks, Plaintiffs have sustained and continue to sustain devastating financial losses." (*Id.*).

Relevant to the instant case, Plaintiffs contend that Defendant is one such infringer of their copyrights and that he was found "distributing" the digital music files (that is, the subject Copyrighted Recordings and other copyrighted recordings) identified in Plaintiffs' complaint. (Instrument No. 16, at 2). Specifically, Plaintiffs assert that "on August 16, 2005, at approximately 1:34 a.m. EST, Plaintiffs' investigator, MediaSentry, detected an individual using the screen name 'StolenMagic@KaZaA' who was engaged in the distribution of Plaintiffs' copyrighted sound recordings[.]" (*Id.*). Upon identifying the offending individual's Internet Protocol ("IP") address, IP address 67.10.35.159, MediaSentry apparently contacted the individual's Internet Service Provider ("ISP"), Time Warner Cable ("Time Warner"), to discover the identity of the customer. (*Id.*). Pursuant to a federal court subpoena, the offending individual was subsequently identified by Time Warner as Defendant Abner Anderson. (*Id.*). Plaintiffs assert that at the time MediaSentry detected Defendant online, Defendant was "actively distributing" or availing some 558 digital music files for download to the many users of the subject peer-to-peer network, KaZaA. (*Id.*). At issue in this case are a subset of thirty-one of those digital music files, those files comprising the Copyrighted Recordings at issue in this suit.

### III.

After learning Defendant's identity, on November 14, 2006, Plaintiffs initiated this suit against Defendant, alleging copyright infringement and seeking injunctive relief and damages.

3

(Instrument No. 1). Thereafter, on October 31, 2007, Plaintiffs moved for summary judgment. (Instrument No. 16). In their motion, Plaintiffs emphasize that, as an initial matter, during the course of discovery in this case, Defendant admitted to: (1) downloading an online media distribution system to his computer, that system being KaZaA; (2) using the KaZaA online media distribution system; (3) using the screen name "StolenMagic@KaZaA" while connected to the KaZaA online media distribution system; and (4) using the KaZaA online media distribution system to both download and make available, without Plaintiffs' authorization or consent, certain Copyrighted Recordings (and other copyrighted sound recordings) identified in Plaintiffs' complaint. (*Id.*, at 3-4; Instrument No. 17, at 5-14 – *First Set of Request for Admissions*). More succinctly, according to Plaintiffs, "Defendant admits that he used the KaZaA online media distribution system . . . to download (and thereby copy) Plaintiffs' [Copyrighted Recordings] and to distribute those [Copyrighted Recordings] over the Internet to millions of other KaZaA users." (Instrument No. 16, at 4; Instrument No. 17, at 5-14 – *First Set of Request for Admissions*). Plaintiffs allege that Defendant carried out the distribution of Plaintiffs' Copyrighted Recordings to others by "placing them in his KaZaA shared folder on his computer . . . and making them available and actively distributing them to other KaZaA users over the Internet." (Instrument No. 16, at 4). Through such overt acts and admissions, Plaintiffs contend that Defendant clearly infringed upon their valid copyrights, therein entitling Plaintiffs to summary judgment as a matter of law on their copyright infringement claim(s) as "there is no genuine issue as to any material fact." (*Id.*, at 7).

In support of these assertions, Plaintiffs explain that they are the valid owners of the subject Copyrighted Recordings and that the Copyright Act grants them, as owners of those valid copyrights, the exclusive right(s) to reproduce and/or distribute copies of those recordings. (Instrument No. 16,

4

at 6). Plaintiffs argue that Defendant has already admitted to violating Plaintiffs' exclusive rights and that independent of Plaintiffs' intent, Defendant's acts, as described, constitute copyright infringement. (*Id.*). For any or all of these reasons, "Plaintiffs seek an award of statutory damages under 17 U.S.C. § 504(c) for Defendant's infringement of each of thirty-one of the Sound Recordings listed on Exhibit A to [Plaintiffs'] Complaint and in Schedule 1, injunctive relief under 17 U.S.C. § 502, and costs under 17 U.S.C. § 505." (*Id.*, at 4). The thirty-one Copyrighted Recordings at issue include the following:

| Name of Sound Recording | Album | Musical Artist | Sound Recording Registration Number |
|---|---|---|---|
| I'm With You | Let Go | Avril Lavigne | SR # 312-786 |
| It's Not Right But It's Okay | My Love Is Your Love | Whitney Houston | SR # 298-453 |
| The Way You Move | Speakerboxx/The Love Below | Outkast | SR # 340-520 |
| Hold Me Now | Into the Gap | Thompson Twins | SR # 52-747 |
| He Wasn't Man Enough | The Heat | Toni Braxton | SR # 287-194 |
| You Make Me Wanna | My Way | Usher | SR # 257-730 |
| Wrapped Around Your Finger | Synchronicity | The Police | SR # 44-862 |
| Mr. Jones | August and Everything After | Counting Crows | SR # 172-267 |
| Loser | Mellow Gold | Beck | SR # 185-369 |
| In My Bed | Dru Hill | Dru Hill | SR # 227-760 |
| Why | My Thoughts | Avant | SR # 281-220 |
| Separated | Separated (single) | Avant | SR # 281-184 |

| The Rock Show | Take Off Your Pants And Jacket | Blink-182 | SR # 301-317 |
| The Light | Like Water For Chocolate | Common | SR # 297-993 |
| Get At Me Dog | It's Dark And Hell Is Hot | DMX | SR # 252-613 |
| U Not Like Me | Get Rich Or Die Tryin' | 50 Cent | SR # 337-801 |
| Dilemma | Nellyville | Nelly featuring Kelly Rowland | SR # 315-537 |
| Over and Over | Suit | Nelly | SR # 358-551 |
| Kryptonite | The Better Life | 3 Doors Down | SR # 277-407 |
| Every Morning | 14:59 | Sugar Ray | SR # 262-149 |
| She's Out Of My Life | Off the Wall | Michael Jackson | SR # 11-120 |
| Human Nature | Thriller | Michael Jackson | SR # 41-965 |
| Lose My Breath | Destiny Fulfilled | Destiny's Child | SR # 363-786 |
| Because You Loved Me | Falling Into You | Celine Dion | SR # 224-159 |
| Always Be My Baby | Daydream | Mariah Carey | SR # 215-243 |
| Drops of Jupiter | Drops of Jupiter | Train | SR # 293-024 |
| Made You Look | God's Son | Nas | SR # 332-713 |
| Love Don't Cost a Thing | J. Lo | Jennifer Lopez | SR # 293-297 |
| Independent Women, Pt. 2 | Survivor | Destiny's Child | SR # 289-199 |
| Too Legit to Quit | Too Legit to Quit | MC Hammer | SR # 136-387 |
| Here Comes the Hammer | Please Hammer Don't Hurt 'Em | MC Hammer | SR # 133-683 |

(Instrument No. 17, at 47-108).  Plaintiffs seek a minimum statutory damage amount of $750 per

each of these thirty-one Copyrighted Recordings allegedly infringed upon by Defendant, for a sum total of $23,250 in statutory damages, and costs of this suit in the amount of $420. (Instrument No. 16, at 5).[2]

In response, Defendant first argues that this case "is just one of thousands that have been filed by Plaintiffs against unsuspecting, vulnerable Defendants all over the country." (Instrument No. 19, at 1). Defendant further states that "Plaintiffs have joined together to create an army-of-one who claim to be fighting the war against piracy by launching attacks, in the form of lawsuits, on Defendants they know to be innocent actors." (*Id.*). According to Defendant, to date, "this arsenal of corporations and their lawyers have filed tens of thousands of Federal Copyright violation lawsuits against innocent users while doing very little to mitigate their damages by educating the public on the illegality of using peer-to-peer networks." (*Id.*, at 1-2). Consequently, Defendant asserts that Plaintiffs are partially or wholly at fault for any potential infringement that takes place over peer-to-peer networks, such as KaZaA, because Plaintiffs have not distributed "literature" or some other "official statement" to teach the public about the impropriety of using such peer-to-peer networks to share digital music files. (*Id.*, at 2).

Moreover, Defendant argues that genuine issues of material fact preclude summary judgment in Plaintiffs' favor. Specifically, Defendant first argues that "Plaintiffs have failed to prove Defendant acted willfully and . . . [w]hether Defendant's actions were willful is an important element, a genuine issue of material fact, which must decided by a jury." (Instrument No. 19, at 3). Defendant further argues that, even if Defendant did unintentionally infringe Plaintiffs' copyrights,

---

[2]    As an aside, the Court notes that the subject Copyrighted Recordings that Defendant allegedly purloined from Plaintiffs include several musical selections that the Court has, from time to time, enjoyed in the ever-commodious comfort of chambers.

17 U.S.C. § 504(c)(2) provides a court with the discretion to reduce the minimum statutory damage amount to $200 per infringed sound recording, rather than $750, if the court "finds the actor was unaware he was committing an act of infringement." (*Id.*, at 3-4). Similarly, Defendant contends that awarding Plaintiffs $750 in statutory damages for each Copyrighted Recording at issue would result in a total damage award that is "750 times the amount of their actual damages[,]" given that such recordings are each readily available for ninety-nine cents through other online services. (*Id.*, at 4). Morever, Defendant asserts that the imposition of damages in the amount sought by Plaintiffs ($750 per each of the thirty-one Copyrighted Recordings at issue for a total of $23,250) would be "analogous" to imposing punitive damages. (*Id.*). Defendant also argues that he "has a Seventh Amendment right to have a jury determine the amount of statutory damages, if any, that should be awarded to [Plaintiffs]." (*Id.*).

Additionally, included in Defendant's response to Plaintiffs' motion for summary judgment is a notification to this Court of Defendant's "intent to challenge the Constitutionality of the Federal Copyright Statute as asserted by the Plaintiffs in this action." (Instrument No. 19, at 5). Defendant further asks that this Court "certify this challenge of the Constitutionality of [t]he Copyright Act . . . with the United States Attorney General pursuant to 28 U.S.C. § 2403 and Federal Rule of Civil Procedure 5.1(b)." (*Id.*). Given that this case has been on this Court's docket since late 2006 and given that Plaintiffs' complaint indicated their intent to seek statutory damages under the Copyright Act, Defendant's effort to suddenly raise a novel constitutional challenge to that statute – when this case is set for trial only weeks from now – is both delinquent and obviously suspect. Accordingly, because, *inter alia*, Defendant has waited until the eve of this case's disposition to raise this constitutional challenge to the Court in a responsive briefing which was filed out-of-time,

8

Defendant's request for certification is **DENIED**.

## IV.

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also United States v. Arron*, 954 F.2d 249, 251 (5th Cir. 1992). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *See Anderson*, 477 U.S. at 248. If the evidence rebutting the motion for summary judgment is only colorable or is not significantly probative, summary judgment should be granted. *See Id.* at 2511; *see also Thomas v. Barton Lodge, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999). The summary judgment procedure, therefore, enables a party "who believes there is no genuine issue as to a specific fact essential to the other side's case to demand at least one sworn averment of that [specific] fact before the lengthy process continues." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886-88 (1990).

Under Rule 56(c), the moving party bears the initial burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial and of identifying those portions of the record that demonstrate such absence. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 576, 586-87 (1986); *see also Burge v. Parish of St. Tammany*, 187 F.3d 452, 464 (5th Cir. 1999).

Where the moving party has met its Rule 56(c) burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward 'with specific facts showing that there is a *genuine issue for trial*.'"

9

*Matsushita*, 475 U.S. at 586-87 (quoting FED. R. CIV. P. 56(e)) (emphasis in original). *See also*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Engstrom v. First Nat'l Bank*, 47 F.3d 1459,

1462 (5th Cir. 1995). To sustain the burden, the nonmoving party must produce evidence admissible

at trial. *See Anderson*, 477 U.S. at 242; *see also Thomas v. Price*, 975 F.2d 231, 235 (5th Cir. 1992)

("To avoid a summary judgment, the nonmoving party must adduce admissible evidence which

creates a fact issue.").

The Court reviews the facts in the light most favorable to the nonmovant and draws all

reasonable inferences in favor of the nonmovant. *See Brown v. Bunge Corp.*, 207 F.3d 776, 781

(5th Cir. 2000). "The mere existence of a scintilla of evidence in support of the plaintiff's position

will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."

*Anderson*, 477 U.S. at 252.

## V.

### 1.

Plaintiffs assert that Defendant has infringed their valid copyrights by downloading and/or

distributing certain Copyrighted Recordings to other users through the media distribution system or

peer-to-peer network KaZaA. Plaintiffs argue that Defendant has admitted to engaging in the

offending conduct and that consequently, Plaintiffs are entitled to, at a minimum, a statutory award

of damages under 17 U.S.C. § 504(c) for each of the thirty-one Copyrighted Recordings identified

as being infringed upon by Defendant.[3]

The United States Copyright Act grants certain rights upon a copyright owner of a sound

---

[3]    According to Plaintiffs, Defendant infringed upon substantially more than thirty-one of Plaintiffs'
valid copyrights, but Plaintiffs have sued Defendant only on the basis of those thirty-one Copyrighted Recordings
identified herein.

recording, including the exclusive right to "reproduce the copyrighted work" and "distribute copies. . . of the copyrighted work." 17 U.S.C. § 106(1), (3). Thus, Title 17 "prohibits infringement by anyone who violates '[a]ny of the exclusive rights of the copyright owner.'" *Prostar v. Massachi*, 239 F.3d 669, 677 (5th Cir. 2001) (quoting 17 U.S.C. § 501(a)). To succeed on a claim that these rights have been infringed, a plaintiff must generally demonstrate two elements: (1) ownership of a valid copyright, and (2) that a defendant violated one or more of the plaintiff's exclusive rights under the Copyright Act. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 199 U.S. 340, 361 (1991) (stating that a plaintiff must demonstrate ownership of a valid copyright as well as copying of constituent elements of the work that are original) (citations omitted); *see also Positive Black Talk, Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 367 (5th Cir. 2004) (citations omitted); *Peel & Co., Inc. v. Rug Market*, 238 F.3d 391, 394 (5th Cir. 2001) (citing *Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772, 790 (5th Cir. 1999)).

**a.**

As to the first of these two elements, copyright ownership is demonstrated by showing proof of originality, copyrightability and compliance with applicable statutory formalities. *Norma Ribbon & Trimming, Inc. v. Little*, 51 F.3d 45, 47 (5th Cir. 1995) (citations omitted). A valid copyright certificate of registration constitutes *prima facie* evidence of the validity of a copyright. *Id.* (citing 17 U.S.C. § 410(c)). However, this presumption may be rebutted by a defendant so as to disprove the validity of a plaintiff's copyright. *Lakedreams v. Taylor*, 932 F.2d 1103, 1108 n.10 (5th Cir. 1991) (citation omitted).

In the instant case, Plaintiffs have submitted to the Court copies of their certificates of registration for the Copyrighted Recordings that Defendant has allegedly infringed upon, thereby

11

setting forth *prima facie* evidence of the validity of their copyrights. (Instrument No. 17, at 47-108). Further, Plaintiffs have submitted sworn declarations establishing that they held those valid copyrights prior to the date on which Defendant was discovered to be distributing those Copyrighted Recordings via his shared folder on KaZaA (that date being August 16, 2005). (Instrument No. 17, at 109-24). Moreover, Defendant does not challenge nor deny the validity of Plaintiffs' copyrights. Accordingly, as Plaintiffs' ownership of the Copyrighted Recordings in this case is not in dispute, the first element of Plaintiffs' copyright infringement claim against Defendant is satisfied.

**b.**

Once the validity of the subject copyright(s) has been established, then the secondary inquiry is whether the copyright owner's exclusive rights under 17 U.S.C. § 106 have been violated, thereby resulting in copyright infringement. *See* 17 U.S.C. § 501(a) (stating that "Anyone who violates any of the exclusive rights of the copyright owner as provided by section[ ] 106 . . . is an infringer of the copyright . . ."). The exclusive rights afforded to an owner of a valid copyright by section 106 of the Copyright Act include the rights to *distribute* and reproduce the copyrighted material. *See* 17 U.S.C. § 106 (emphasis added).

"Distribute" is not defined in the Copyright Act, but the Supreme Court has equated the term with "publication," which is defined under the Act. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 552 (1985). "Publication" includes "[t]he offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display." 17 U.S.C. § 101. Courts have concluded that availing unauthorized copies of sound recordings for download using an online file-sharing system (such as a peer-to-peer network, as is the case here) constitutes an offer to distribute those works, thereby violating a copyright owner's

12

exclusive right to distribution. *See A&M Records, Inv. v. Napster, Inc.*, 239 F.2d 1004, 1014 (9th Cir. 2001) (explaining that individuals who download unauthorized music files and/or who avail such files for download by others commit copyright infringement). Stated differently, making copyrighted works available for download via a peer-to-peer network contemplates "further distribution," and thus constitutes a violation of the copyright owner's exclusive "distribution" right under 17 U.S.C. § 106(3).

In this case, Plaintiffs assert that Defendant has already conceded that he distributed the Copyrighted Recordings, thereby satisfying element two of their copyright infringement claim because in doing so, he violated their exclusive right to distribute the Copyrighted Recordings. Specifically, Plaintiffs assert that in Defendant's responses to Plaintiffs' first set of request for admissions, Defendant admitted to placing the Copyrighted Recordings, along with other sound recordings, into a shared folder on his computer while being connected to the media distribution system or peer-to-peer network KaZaA. (Instrument No. 17, at 8-9 – *First Set of Request for Admission*s). Plaintiffs urge that in doing so, Defendant availed the 558 digital music files (or sound recordings) in his shared folder at that time, which included the Copyrighted Recordings, for distribution to the vast community of persons also connected to KaZaA at the time MediaSentry detected him online – that time being on August 16, 2005, at approximately 1:34 a.m. EST. Defendant concedes that he did place the subject Copyrighted Recordings in his shared folder for distribution to other users while being connected to KaZaA, but asserts that he did not know that doing so was unlawful. (*Id.*, at 9 – *First Set of Request for Admission*s).

On these facts, it is self-evident that Defendant's actions in placing Plaintiffs' Copyrighted Recordings in a shared folder accessible to numerous other persons on KaZaA constituted a

13

"distribution" for the purposes of Plaintiffs' copyright infringement claim against Defendant. "Distributing copyrighted sound recordings without authorization through a peer-to-peer network such as KaZaA is a 'distribution' prohibited by the [C]opyright [A]ct." *Artista Records, LLC v. Butler*, No. 8:07-cv-3-T-23EAJ, 2007 WL 4557198, at * 2 n.6 (M.D. Fla. Dec. 21, 2007). Numerous courts have assessed whether availing music and/or media for download by other users on a peer-to-peer network constitutes copyright infringement as a matter of law. *See In Re Aimster Copyright Lit.*, 334 F.3d 643, 645 (7th Cir. 2003) (explaining that "If the music is copyrighted, [ ] swapping, which involves making and transmitting a digital copy of the music, infringes copyright. The swappers . . . are [ ] direct infringers."), *cert. denied*, 540 U.S. 1107 (2004); *Elektra Entm't Group Inc. v. Brimley*, No. CV205-314, 2006 WL 2367135, at *2 (S.D. Ga. Aug. 15, 2006) (similarly stating that "It is clear that use of a peer-to-peer media distribution system to share music files infringes copyright."); *Sony Music Entertainment Inc. v. Does 1-40*, 326 F.Supp.2d 556, 565 (S.D.N.Y. 2004) (observing that the use of peer-to-peer networks to "download and distribute copyrighted music has been held to constitute copyright infringement") (citations omitted).

Accordingly, because it has been established that Plaintiffs are the valid owners of the thirty-one Copyrighted Recordings at issue and because it has been both proven and admitted to that the Defendant intentionally downloaded and/or distributed those Copyrighted Recordings, no genuine issue of material fact remains as to Plaintiffs' claim for copyright infringement against Defendant. Therefore, Plaintiffs' motion for summary judgment as to their copyright infringement claim is **GRANTED**.[4]

---

[4]    As to Defendant's argument that he did not know that his conduct was unlawful and that at worst he is an innocent infringer is wholly unavailing. *See BMG Music v. Gonzalez*, 2005 WL 105592, at *1 (N.D. Ill. Jan. 7, 2005) (stating that to permit a defendant "to assert [an innocent infringer] defense based on [his] ignorance of the

**2.**

Once copyright infringement has been found, "the copyright owners may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work . . . in a sum of not less than $750 or more than $30,000 as the court considers just." 17 U.S.C. § 504(c)(1). Furthermore, if the Court finds that "the infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200," but if the Court finds "that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000." 17 U.S.C. § 504(c)(2). "A plaintiff may elect statutory damages 'regardless of the adequacy of the evidence offered as to his actual damages and the amount of the defendant's profits.'" *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1194 (9th Cir. 2001) (quoting 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 14.02[A] (2000)).

Here, Plaintiffs ask for the minimum statutory damages in the amount of $750 for each of the thirty-one Copyrighted Recordings for a sum total of $23,250. In response, Defendant analogizes the imposition of such damages to imposing punitive damages on the order of 750 times Plaintiffs' actual damages per infringed work. Defendant also asserts that any infringement committed by Defendant was not done so willfully and therefore, the Court should reduce the amount of damages

---

law would eviscerate copyright protection and the old adage that 'ignorance is no defense to the law.'"). A defendant's intent to infringe is irrelevant under the law. *Chavez v. Arte Publico Press*, 204 F.3d 601, 607 (5th Cir. 2000).

available to Plaintiffs.[5] (Instrument No. 19, at 4).

However, Defendant's argument must fail, both because Plaintiffs are entitled to, at the very least, the minimum statutory damages for Defendant's infringement of their Copyrighted Recordings, but also because Defendant's arguments are intellectually inaccurate. For instance, Defendant asserts that Plaintiffs' actual damages per infringed Copyrighted Recording are approximately ninety-nine cents, because the songs can be readily purchased online for that price. Yet, the true cost of Defendant's harms in distributing Plaintiffs' Copyrighted Recordings for download by other users on KaZaA is incalculable. That is, there is no way to ascertain the precise amount of damages caused by Defendant's actions in not only improperly downloading Plaintiffs' Copyrighted Recordings himself but also subsequently distributing some or all of Plaintiffs' Copyrighted Recordings to a vast community of other persons on KaZaA. Clearly, under such circumstances, Plaintiffs' actual damages exceed ninety-nine cents per Copyrighted Recording.

Furthermore, Defendant concedes that he placed the subject Copyrighted Recordings, along with other sound recordings, into a shared folder on his computer while being connected to the media distribution system or peer-to-peer network, KaZaA. Defendant also concedes that he knowingly did so without the consent or authorization of Plaintiffs. Thus, even though the Court acknowledges the possibility that Defendant did not appreciate the gravity of his actions in the context of copyright law, that nevertheless does not amount to a wholesale lack of willfulness. *See Broadcast Music Inc., v. Xanthas, Inc.,* 855 F.2d 233, 236 (5th Cir. 1988) (explaining that "A defendant acts 'wilfully'

---

[5]        Defendant further argues that he "has a Seventh Amendment right to have a jury determine the amount of statutory damages, if any, that should be awarded to [Plaintiffs]." (Instrument No. 19, at 4). This argument does not apply where, as here, a plaintiff seeks only the minimum statutory damages. *See Feltner v. Columbia Pictures Television, Inc.,* 523 U.S. 340, 342 (1998).

16

within the meaning of § 504(c)(2) . . . if he knows his actions constitute an infringement; the actions need not have been malicious."); *Kepner-Tregoe, Inc. v. Vroom*, 186 F.3d 283, 288 (2d. Cir. 1999) (explaining that infringement is willful if the defendant had knowledge that his conduct constituted infringement or where defendant recklessly disregarded the possibility that his conduct might constitute infringement). Given Defendant's admittedly intentional conduct and the incalculable harm to Plaintiffs, a reduction in individual damages for each of Plaintiffs' infringed Copyrighted Recordings from, for instance, $750 to $200, as suggested by Defendant, would be inappropriate.

Therefore, because Plaintiffs have sought the statutory minimum of $750 under 17 U.S.C. § 504(c)(1) for each of the thirty-one Copyrighted Recordings at issue, the Court concludes that Plaintiffs are entitled to a total award of $23,250 in statutory damages.

### 3.

Section 505 of the Copyright Act also permits a plaintiff to recover the costs of the suit, in the court's discretion.  17 U.S.C. § 505 (providing that "the court in its discretion may allow the recovery of full costs by or against any party").  In this case, Plaintiffs also ask for $420 in costs, comprised of a $350 filing fee and a $70 service fee.  The Court finds that the costs incurred are reasonable under the circumstances of this case and that Plaintiffs are awarded $420 in costs against Defendant.

### 4.

In addition to statutory damages and costs, Plaintiffs ask the Court to enter a permanent injunction against Defendant. Under § 502(a), a court may grant a permanent injunction on terms it finds reasonable to prevent or restrain copyright infringement. 17 U.S.C. § 502(a). To obtain a permanent injunction, a party must demonstrate: (1) actual success on the merits; (2) no adequate

remedy at law; (3) that the threatened injury outweighs any damage to the defendant; and (4) that the injunction will not disserve the public interest. *See DSC Comms. Corp. v. DGI Tech., Inc.*, 81 F .3d 597, 600 (5th Cir.1996).

In this case, Plaintiffs have succeeded on the merits against Defendant. Moreover, Plaintiffs have no adequate remedy at law because Plaintiffs' injury cannot be fully compensated or measured in money. *See, e.g., Arista Records, Inc. v. Beker Enters.*, 298 F.Supp.2d 1310, 1414 (S.D. Fla. 2003). Without an injunction, Plaintiffs' Copyrighted Recordings, past and future, would remain vulnerable to continued infringement by Defendant. *Id.* No burden is imposed on Defendant by an injunction to refrain from further infringements because he is merely required to comply with the law. Further, the public interest is served by upholding copyright protections.

Accordingly, the Court finds that Plaintiffs are entitled to a permanent injunction enjoining Defendant from infringing on Plaintiffs' Copyrighted Recordings, whether now in existence or later created, and requiring Defendant to destroy all unauthorized copies. *See Beker Enters.*, 298 F.Supp.2d at 1315 (explaining that "Because Plaintiffs continually create new works-works that would be vulnerable to infringement if the injunction were limited to existing works, and that would require new litigation to redress each future infringement-the requested injunction follows standard practice in copyright cases by covering works to be created in the future."); *see also* 17 U.S.C. § 503(b) (stating that "As part of a final judgment or decree, the court may order the destruction or other reasonable disposition of all copies . . . found to have been made or used in violation of the copyright owner's exclusive rights . . . ").

Defendant is hereby permanently **ENJOINED** from directly or indirectly infringing on Plaintiffs' rights under federal or state law in the Copyrighted Recordings (as delineated in this

18

order) and any sound recording, whether now in existence or later created, that is owned or controlled by Plaintiffs (or any parents, subsidiary, or affiliate record label of Plaintiffs) ("Plaintiffs' Recordings"), including without limitation by using the Internet or any online media distribution system to reproduce (*i.e.*, download) any of Plaintiffs' Recordings, to distribute (*i.e.*, upload) any of Plaintiffs' Recordings, or to make any of Plaintiffs' Recordings available for distribution to the public, except pursuant to a lawful license or with express authority of Plaintiffs. Defendant also shall destroy all copies of Plaintiffs' Recordings that Defendant downloaded onto any computer hard drive or server without Plaintiffs' authorization and shall destroy all copies of those downloaded recordings transferred onto any physical medium or device in Defendant's possession, custody, or control. (Instrument No. 1, at 5).

## VI.

For the foregoing reasons, Plaintiffs' motion for summary judgment is **GRANTED**.

**(Instrument No. 16)**. Plaintiffs are awarded statutory damages in the amount of $23,250 and costs

in the amount of $420, for a total damages and costs award of $23,670 against Defendant. Defendant

is also permanently enjoined from infringing on the Copyrighted Recordings of Plaintiffs as

described herein. Lastly, while Plaintiffs' motion for summary judgment was *sub judice*, the United

States filed a motion to intervene in defense of the constitutionality of the Copyright Act.

**(Instrument No. 30)**. The Court, having read and considered the motion, hereby orders that it is

**DENIED AS MOOT**.

The Clerk shall enter this Order and provide a copy to all parties.

**SIGNED** on this the ____ day of March, 2008, at Houston, Texas.

**VANESSA D. GILMORE**
**UNITED STATES DISTRICT JUDGE**

20

EXHIBIT "F"

114



The Register of Copyrights
of the
United States of America

Library of Congress
Department 17
Washington, D.C. 20540

September 25, 2002

(202) 707-8350

RE:  Hearing on Piracy of Intellectual Property on Peer-to-Peer Networks

Dear Representative Berman:

In response to your request, I am responding to an assertion made in written testimony for tomorrow's Subcommittee hearing on "Piracy of Intellectual Property on Peer-to-Peer Networks" that U.S. copyright law does not give copyright owners a separate exclusive right of "making available."

This statement reflects an incorrect understanding of U.S. copyright law.  While Section 106 of the U.S. Copyright Act does not specifically include anything called a "making available" right, the activities involved in making a work available are covered under the exclusive rights of reproduction, distribution, public display and/or public performance set out in Section 106.  *(See, e.g., New York Times Co., Inc. v. Tasini,* 533 U.S. 483 (2001), *Playboy Enters., Inc. v. Frena,* 839 F. Supp. 1552 (M.D. Fla. 1993), *Playboy Enters., Inc. v. Webbworld, Inc.,* 991 F. Supp. 543 (N.D. Tex. 1997), *Marobie-FL, Inc. v. National Ass'n of Fire Equip. Distribs.,* 983 F. Supp. 1167 (N.D. Ill. 1997), *Religious Tech. Ctr. v. Netcom On-Line Communication Servs.,* 907 F. Supp. 1361 (N.D. Cal. 1995).)  Which of these rights are invoked in any given context will depend on the nature of the "making available" activity.

In the case of a peer to peer network user uploading a copyrighted work onto his or her computer, making it available for other users of the peer to peer network to download, it is simply incorrect to suggest that the person performing the download is the only person legally responsible for infringement.  Making the work available in this context constitutes an infringement of the exclusive distribution right, as well of the reproduction right (where the work is uploaded without the authorization of the copyright holder).  In the Ninth Circuit's decision in *A&M Records v. Napster,* the court held that "Napster users who upload file names to the search index for others to copy violate plaintiffs' distribution rights."  (239 F.3d 1004, 1014 (9th Cir. 2001)).

As you are aware, in implementing the new WIPO Copyright Treaty (WCT) and WIPO Performances and Phonograms Treaty (WPPT) in the Digital Millennium Copyright Act, Congress determined that it was not necessary to add any additional rights to Section 106 of the Copyright Act in order to implement the "making available" right

115

The Honorable Howard L. Berman          2                    September 25, 2002

under Article 8 of the WCT.[1] Title I of the DMCA was intended to, and did, fully implement the WCT. As I stated in my testimony before the subcommittee, "In our view, [the bill] fully and adequately implements the obligations of the new WIPO treaties, without amending the law in areas where a change is not required for implementation." Since existing U.S. law already covered the activities encompassed in a making available right, "The treaties [did] not require any change in the substance of the copyright rights or exceptions in U.S. law." (H. Rep.105-551 at 15.)

Please let us know if you have any further questions or would like us to provide you with a more detailed analysis.

Sincerely,

Marybeth Peters / JF

Marybeth Peters
Register of Copyrights

The Honorable Howard L. Berman
Subcommittee on Courts, the Internet and Intellectual Property
B-351A Rayburn House Office Building
Washington, D.C. 20515

---

[1] Article 8 provides in pertinent part that:

"[A]uthors of literary and artistic works shall enjoy the exclusive right of authorizing any communication to the public of their works, by wire or wireless means, including *the making available* to the public of their works in such a way that members of the public may access these works from a place and at a time individually chosen by them." WCT, Article 8 (*emphasis added*.)